**ORAL ARGUMENT REQUESTED**

**No. 24-06226**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

---

XOUCHI JONATHAN THAO,
Special Administrator for the Estate of
KONGCHI JUSTIN THAO

*Plaintiffs-Appellants*,

v.

GRADY COUNTY CRIMINAL JUSTICE AUTHORITY,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Western District of Oklahoma
No. 5:19-cv-01175-JD
Hon. Jodi W. Dishman

---

**APPELLANTS' APPENDIX VOLUME 4 OF 4**

---

Glenn Katon
KATON LAW
385 Grand Ave., Ste. 200
Oakland, CA 94610
(510) 463-3350
gkaton@katon.law

Jennifer J. Clark*
Ogemdi Maduike
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
jennifer.clark@sidley.com

## Index Volume 4 of 4

| Document | USDC Dkt. No. | Date | Vol. | Page |
|---|---|---|---|---|
| Gerlach depo. Tr. | 154-3 | 08/17/2023 | 4 | 1 |
| Okla. Jail Standards | 154-4 | 08/17/2023 | 4 | 34 |
| Duncan depo. Tr | 154-5 | 08/17/2023 | 4 | 53 |
| Selected policies | 154-6 | 08/17/2023 | 4 | 59 |
| Henneman depo. Tr | 154-7 | 08/17/2023 | 4 | 60 |
| Farley depo. Tr. | 154-8 | 08/17/2023 | 4 | 66 |
| Video of Thao in Cell 126 (Part 1) | 154-9 | 08/17/2023 | 4 | 71 |
| Video of Thao in Cell 126 (Part 2) | 154-10 | 08/17/2023 | 4 | 72 |
| Notice of Violation (DOH) | 154-11 | 08/17/2023 | 4 | 73 |
| Jail policies (selected) | 154-12 | 08/17/2023 | 4 | 74 |
| Death Report (Elliott))(Bryan, John) | 154-13 | 08/17/2023 | 4 | 126 |
| Order Granting 148 Plaintiff's Unopposed Motion To File Exhibits By Conventional Means | 158 | 08/17/2023 | 4 | 136 |
| Conventionally Filed Exhibits Re 158 Order Granting 148 Plaintiff's Unopposed Motion To File Exhibits By Conventional Means | 160 | 08/22/2023 | 4 | 138 |
| Reply To Response To Motion Re 124 Motion For Summary Judgment And Brief In Support Filed By | 164 | 08/24/2023 | 4 | 139 |

| Grady County Criminal Justice Authority | | | | |
|---|---|---|---|---|
| Deposition of Jones | 164-1 | 08/24/2023 | 4 | 150 |
| Unopposed Motion To Amend/Correct 154 Response In Opposition To Motion | 165 | 08/24/2023 | 4 | 154 |
| Attachment Duncan Tr p 102 | 165-1 | 08/24/2023 | 4 | 156 |
| Order Granting 165 Motion To Amend/Correct | 167 | 08/25/2023 | 4 | 157 |
| Motion To Supplement Regarding Summary Judgment by Xouchi Jonathan Thao | 172 | 09/01/2023 | 4 | 158 |
| Supp. Brief in Response to Motion for Summary Judgment | 172-1 | 09/01/2023 | 4 | 162 |
| Defendant's Response To Plaintiff's Motion to Supplement | 175 | 09/19/2023 | 4 | 165 |
| Notice By Xouchi Jonathan Thao Re 66 Motion For Partial Summary Judgment | 181 | 07/16/2024 | 4 | 168 |
| Lakey v. City of Wilson et al | 181-1 | 07/16/2024 | 4 | 170 |
| Response Re 181 Notice To Plaintiff's Notice Of Supplemental Authority Filed By Grady County Criminal Justice Authority | 182 | 08/02/2024 | 4 | 177 |
| Reply by Plaintiff Xouchi Jonathan Thao re 181 | 183 | 08/05/2024 | 4 | 180 |

| Notice filed by Xouchi Jonathan Thao | | | | |
|---|---|---|---|---|
| Order Denying Plaintiff's Motion For Partial Summary Judgment | 184 | 09/30/2024 | 4 | 183 |
| Judgment | 185 | 09/30/2024 | 4 | 206 |
| Notice Of Appeal | 189 | 10/28/2024 | 4 | 207 |

1

1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE WESTERN DISTRICT OF OKLAHOMA

3

4   XOUCHI JONATHAN THAO, Special      )
    Administrator For The Estate       )
5   of KONGCHI JUSTIN THAO,            )
                                       )
6           Plaintiff,                 )
                                       )No.
7   vs.                                )CIV-19-1175-JD
                                       )
8   GRADY COUNTY CRIMINAL JUSTICE      )
    AUTHORITY, et al.,                 )
9                                      )
            Defendants.                )



10

11

12

13

14        VIDEOTAPED DEPOSITION OF JAMES GERLACH

15           TAKEN ON BEHALF OF THE PLAINTIFF

16            IN OKLAHOMA CITY, OKLAHOMA

17               ON JUNE 29, 2023

18

19        REPORTED BY:  KAREN B. JOHNSON, CSR

20

21

22

23

24

25

Ex. 3

**Volume 4 (of 4)**                                    **4 App 1**

James Gerlach                                    June 29, 2023

```
                                                    Page 14
   1      A    Yes.
   2      Q    And what did you do before that?
   3      A    I was a jail administrator and
   4   undersheriff for Washington County, Colorado
   5   Sheriff's Office.
   6      Q    How long did you have that position?
   7      A    Approximately three years, from 2005 to
   8   2008.
   9      Q    And how about before that?
  10      A    Before that -- well, there's a little
  11   break in between, I basically retired from
  12   California in 2002, so I pretty much lived in Utah
  13   and did odd jobs here and there in Utah, so -- and
  14   then waited to get into corrections again.
  15      Q    What type of work did you retire from in
  16   California in 2002?
  17      A    I worked for the Santa Clara County
  18   Department of Corrections in Santa Clara,
  19   California.
  20      Q    How long did you work at the Santa Clara
  21   County Department of Corrections?
  22      A    2000, wait, sorry, 1988 to 2002.
  23      Q    So I want to ask you about some of the
  24   discovery that we served in this case, and one of
  25   the things I want to ask you about is when Justin
```

**Volume 4 (of 4)**                              **4 App 2**

James Gerlach                                          June 29, 2023

                                                           Page 15

1    Thao was detained in Cell 126, are you aware of
2    any jail staff that did not follow the jail's
3    policies or practices?
4              MR. MOON:  Object to the form.
5              THE WITNESS:  Obviously, the only -- the
6    only policy that I can see that was even in
7    question was the -- was the hourly checks as -- as
8    defined, they -- they -- they did not get there
9    quite in the hour, but the other procedures, I
10   cannot see anything that was violated.
11     Q    (By Mr. Katon) When you refer to the
12   hourly checks as defined, were you referring to a
13   particular jail policy?
14     A    More -- more of a policy with the -- with
15   the state standard saying that -- that the cell
16   should be checked once every hour.
17     Q    And apart from that, there are no other
18   jail policies or practices that were violated in
19   connection with Mr. Thao's detention in Cell 126
20   that you're aware of?
21             MR. MOON:  Object to the form.
22             THE WITNESS:  I believe that policies are
23   different than behaviors, I think there were some
24   behaviors that could be corrected, but not
25   policies.

James Gerlach                                    June 29, 2023

Page 16

1      Q    (By Mr. Katon) What behaviors are you

2    referring to that could be corrected?

3      A    I -- I think verbiage, comments, those

4    types of things can be -- can be corrected, I

5    mean, way -- way that we respond to other people,

6    that could be corrected, but that's a behavior

7    issue, that's something that has to be trained,

8    so.

9      Q    And was anyone disciplined as a result of

10   Justin Thao's time at the jail authority?

11     A    I don't believe individually, I believe

12   there was a -- there was several discussions about

13   what we could have done different, but no -- no

14   written documentation of people getting in trouble

15   for it.

16     Q    Were there any policy changes that

17   resulted from the incident with Mr. Thao?

18     A    No.

19          MR. MOON:  Object to the form.

20          THE WITNESS:  Sorry.

21          MR. MOON:  Just wait a little bit before

22   you respond, you're good.

23          THE WITNESS:  No, there was no policy

24   changes that were made.

25     Q    (By Mr. Katon) Was there any training that

James Gerlach                                    June 29, 2023

Page 19

```
1     anything.
2         Q     And you mentioned discussing the reason
3     for putting him in Cell 126, what was the reason
4     for that?
5         A     I like -- I like to know the story behind
6     the situation.  So he attacked a nurse, he was
7     escorted down there, he was placed in there
8     because they were waiting for him to leave the
9     next morning, and that was -- that was the reason
10    why he was put in the cell.  I mean, that's --
11    that's -- I don't -- I don't really get into big
12    stories, I just want to get the idea of why -- why
13    things happen.
14        Q     It's your understanding that he actually
15    attacked a nurse?
16        A     That was -- that was the -- the report
17    that was given is that he -- he lunged towards a
18    nurse and was intercepted by another officer.
19        Q     Did you make any inquiry as to why he was
20    put into Cell 126 in particular?
21        A     No.
22        Q     During your time at the jail authority
23    starting in 2014 onward, what was Cell 126 used
24    for, as far as you know?
25        A     It started off as a shower, along with
```

James Gerlach                                        June 29, 2023

Page 20

1    127, and -- and I moved one of them to be a
2    holding cell and the other one just to be a shower
3    to make sure they had their privacy.  And then --
4    the basically 126 was also a backup room just in
5    case there was somebody that was out of control
6    or -- or needed to be by themselves and wait for a
7    flight, 126 was good, because it was right by the
8    sallyport and ready to go onto the bus.
9         Q    So during your time at the jail authority,
10   126 was used as a shower cell and also a -- you
11   referred to it as a backup room, is that a backup
12   for detaining people?
13        A    Just a backup to put somebody in to let
14   them chill out for a while, because they just --
15   they just got -- did something they shouldn't have
16   done, so.
17        Q    So is that a determination like
18   administrative segregation or disciplinary
19   detention or somebody -- somebody is making that
20   decision based on the person's behavior, what --
21   could it be like any reason that they needed to be
22   in a cell alone or is it -- you mentioned that
23   they did something they shouldn't have done, that
24   could cover a lot of things?
25             MR. MOON:  Object to the form.

James Gerlach                                    June 29, 2023

Page 24

1    through to get fingerprinted, there's lots of

2    reasons why you have to move people around and

3    shift people.

4         So 126 is not used just for disciplinary,

5    just for anything else, it's used in case we need

6    it, and -- and it's used as a shower, so everybody

7    down in holding, you know, that needs to take a

8    shower would be able to use it as a shower, too.

9    So it has multiple purposes, just like every other

10   area in the jail has multiple purposes.

11        Q    (By Mr. Katon) Did you stop the practice

12   of detaining people or holding people, I should

13   say, in Cell 126 after the incident with Mr. Thao?

14        A    No, it's still being used the same

15   purpose.

16        Q    And is any training provided to detention

17   officers about supervising people who are being

18   held in Cell 126 in particular?

19             MR. MOON:  Object to the form.

20             THE WITNESS:  No, I mean, so 126 is just

21   another jail cell or another locked room, so

22   there's no specific training on 126, there's

23   training on how to be a detention officer and how

24   to do your job, but there's no -- that would be

25   like saying do we train somebody to -- to

James Gerlach                                    June 29, 2023

Page 25

1     specifically watch 4-A.  It -- it -- the job is

2     the job in a -- in a whole, not just in a one

3     room, so.

4          Q    (By Mr. Katon) Well, there are things

5     about Cell 126 that are unique in the jail; isn't

6     that right?

7               MR. MOON:  Object to the form.

8               THE WITNESS:  Besides being a shower, no.

9          Q    (By Mr. Katon) Are there other cells that

10    don't have -- well, as of November of 2017, were

11    there other cells that could not be looked into

12    without lifting a cover on the window?

13              MR. MOON:  Form.

14              THE WITNESS:  I would have to double

15    check, but some of the -- I would have to look at

16    some records, but -- but holding cells in the

17    booking area pretty much all had covers on them.

18         Q    (By Mr. Katon) Okay.  Did they all also

19    not have cameras in them?

20         A    All of those had cameras, the only reason

21    why 126 didn't is because of the shower.

22         Q    So Cell 126 was, as of November 2017, the

23    only cell in the jail that didn't have a camera in

24    it; is that --

25         A    No.

James Gerlach                                    June 29, 2023

Page 27

1        A      Through a window.

2        Q      Is it a square window about the size of

3    the window on Cell 126?

4        A      No, those are rectangle windows, thinner

5    than the ones on -- on 126 and the holding cells

6    in booking.

7        Q      Thinner, but --

8        A      Longer.

9        Q      -- wider?  Yeah.

10       A      Longer.  I -- I can't tell you the

11   dimensions, but, yeah, they're probably about six

12   inches wide by about 18 inches or two feet tall.

13       Q      And would you refer to Cell 126 as -- oh,

14   that's right, let me withdraw that.

15              So was -- as of November 2017, was Cell

16   126 the only cell in the jail that did not have a

17   camera in it and also had a cover over the window?

18       A      No, I believe the other holding cells did,

19   also.

20       Q      Other holding cells also had no camera and

21   no way to look into the cell without lifting up a

22   flap on the window?

23              MR. MOON:  Form.

24              THE WITNESS:  126 was the only cell -- all

25   right, so maybe I misstated that.  126 is the only

James Gerlach                                    June 29, 2023

Page 28

1   cell that had a cover on it that did not have a

2   camera on it.

3       Q    (By Mr. Katon) So for the cells, you

4   mentioned that several cells don't have cameras in

5   them, then the only way to visually check on the

6   inmate in those cells is during a watch tour?

7       A    Yes, a sight check watch tour.

8       Q    And sight check could mean physically

9   looking into the cell or looking at it through the

10  camera?

11          MR. MOON:  Form.

12          THE WITNESS:  The practice would be that

13  it would be done through a visual check, not only

14  through a camera, the cameras are there also for

15  control to be watching over it, but the -- the

16  object or the -- the practice would be that they

17  would actually do a physical sight check.

18      Q    (By Mr. Katon) And that's once per hour?

19      A    Once per hour is -- is -- should be --

20  should be the minimum, yeah.

21      Q    So is -- is what you're saying then that

22  there are no regularly scheduled sight checks

23  using the cameras in the cells that have them?

24          MR. MOON:  Form.

25          THE WITNESS:  I'm not saying they're

James Gerlach                                June 29, 2023

```
                                                   Page 37
 1    time is 9:04.
 2         Q    (By Mr. Katon) Mr. Gerlach, I believe you
 3    mentioned a little while ago that the Department
 4    of Health inspects the physical facility of the
 5    jail?
 6         A    Yes.
 7         Q    How often does it do that?
 8         A    Supposed to be done annually.
 9         Q    It's supposed to be, but it doesn't always
10    happen that often?
11         A    Well, I don't want to tell on them, but,
12    no, it doesn't always happen, especially during
13    COVID, they really never showed up.
14         Q    Did you ever make the Department of Health
15    aware that Cell 126 was being used as a holding
16    cell?
17         A    There's no requirement for me to let them
18    know that.
19         Q    Does that mean that you didn't?
20         A    I did not advise them it was being used as
21    a holding cell.
22         Q    As far as you know, was there any purpose
23    to those handles inside the door -- well, I -- I
24    keep wanting to put 126 and 127 together, since
25    there's similarities, but let me withdraw that.
```

James Gerlach                                      June 29, 2023

                                                           Page 38

1            Was there any purpose to having the

2    internal door handle on Cell 126 given that the

3    door actually opens outward?

4            MR. MOON:  Object to form.

5            THE WITNESS:  I can't comment on why the

6    designers put those there and what the purpose was

7    for it there.  I can't see a reason for them, but

8    they were in the design, so I cannot speak for

9    the -- the architects at that time.

10      Q    (By Mr. Katon) Yeah, no, my question was

11   not directed at the architects, it was directed if

12   you were aware of a purpose, and I believe you

13   said that you are not; correct?

14           MR. MOON:  Object to the form.

15           THE WITNESS:  I believe the purpose of it

16   would probably be to open and shut it from the

17   inside by the inmate who was in there showering, I

18   cannot -- I cannot give you any other reason that

19   it would need to be there, but like I said, it was

20   there and it was part of the building.

21      Q    (By Mr. Katon) Well, you wouldn't need a

22   handle to open it if it opens outward; right?

23           MR. MOON:  Object to the form.

24           THE WITNESS:  I guess I don't even know

25   how to answer that because I'm speculating on why

James Gerlach                                    June 29, 2023

Page 39

1    they put it there.  I don't know.  I would imagine

2    so they can -- they can grab it, I -- I don't

3    know.

4        Q    (By Mr. Katon) Okay.  I just want to be

5    clear, I'm asking about your knowledge, and -- and

6    if you don't know, that's fine, but, you know, I'm

7    not asking you to go into the minds of whoever it

8    was who built the jail.

9             Is the same true for the U shape of the

10   handle at the -- on the door that was attached to

11   the door at both ends, are you aware of any

12   purpose for that design?

13            MR. MOON:  Object to the form.

14            THE WITNESS:  I -- I'm trying to

15   understand what the U shape is.

16       Q    (By Mr. Katon) Do you -- well, first of

17   all, I believe the -- the door handle is no longer

18   there on the inside of Cell 126; is that correct?

19       A    They're not on 126 or 127 at this point.

20       Q    Do you remember what -- what they used to

21   look like?

22       A    I believe they were closed handles, closed

23   ended handles, they were attached on both sides,

24   so that would -- that would be my recollection.

25       Q    Okay.  As far as you know, since those

James Gerlach                                    June 29, 2023

Page 118

```
 1                    C E R T I F I C A T E

 2

 3   STATE OF OKLAHOMA  )
                        )  SS:
 4   COUNTY OF OKLAHOMA )

 5              I, Karen B. Johnson, Certified Shorthand

 6   Reporter, within and for the State of Oklahoma, do

 7   hereby certify that JAMES GERLACH was by me first

 8   duly sworn to testify the truth, the whole truth,

 9   and nothing but the truth in the case aforesaid;

10   that the above and foregoing testimony was by me

11   taken in shorthand and thereafter transcribed; that

12   the same was taken on JUNE 29, 2023, that the

13   testimony was taken in OKLAHOMA CITY, State of

14   Oklahoma; that I am not an attorney for nor a

15   relative of any said parties or otherwise interested

16   in the event of said action.

17              IN WITNESS WHEREOF, I have hereunto set my

18   hand and seal of office on this 8th day of JULY,

19   2023.

20

21

22

23

24                         -------------------------
                           Karen B. Johnson
25                         State of Oklahoma CSR #1376
```

James Gerlach                                        August 1, 2023

Page 119

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA


XOUCHI JONATHAN THAO, Special      )
Administrator For The Estate       )
of KONGCHI JUSTIN THAO,            )
                                   )
          Plaintiff,               )
                                   )No.
vs.                                )CIV-19-1175-JD
                                   )
GRADY COUNTY CRIMINAL JUSTICE      )
AUTHORITY, et al.,                 )
                                   )
          Defendants.              )



VOLUME II

VIDEOTAPED DEPOSITION OF JAMES GERLACH

TAKEN ON BEHALF OF THE PLAINTIFF

IN OKLAHOMA CITY, OKLAHOMA

ON AUGUST 1, 2023


REPORTED BY:  KAREN B. JOHNSON, CSR

James Gerlach                                     August 1, 2023

Page 179

1    would have their information, firearms would have

2    theirs, defensive tactics would have -- have their

3    paperwork, so I would imagine they had some forms

4    or some -- some handouts that they had to -- to be

5    taught from.

6        Q    And if those exist, they would be kept by

7    your training department; correct?

8        A    Yes, both -- both in -- in form and in

9    digital.  I would imagine that they did some

10   training with just a digital form on top of the --

11   the screen that they train from.

12       Q    Okay.  So I want to get the court reporter

13   to pull a document that I had sent prior to the

14   first session of the deposition, and it says at

15   the top Mental Health and the United States Prison

16   System.  And it has a graphic of someone -- of

17   a -- basically a person's head and at the bottom

18   it says DDR Number 60, 001.  If you would just

19   take a moment and look that over.

20           MR. MOON:  Glenn, do you want him to look

21   at all 100 pages, 97 pages, or is there some

22   portion you would like him to focus on?

23           MR. KATON:  No, I don't need him to focus

24   on a portion at the moment.

25       Q    (By Mr. Katon) But if you could tell me,

James Gerlach                                    August 1, 2023

Page 180

1    Mr. Gerlach, when you've reviewed it sufficiently
2    to tell me if you are familiar with that document.
3              MR. MOON:  If you are going to testify
4    that you're familiar with it, take the time to
5    look at each and every page.
6              THE WITNESS:  Okay.  Yeah, because I -- I
7    know of it, but I've never even read it, so.
8              MR. MOON:  Yeah.  Look at every page if he
9    wants you to be familiar with the entire document.
10             MR. KATON:  Well, if -- if he's saying
11   that he never read it, then he probably doesn't
12   need to read every page now, does he?
13             MR. MOON:  Well, you're asking him, have
14   you looked at it sufficiently that you're familiar
15   with it.
16             MR. KATON:  Yeah, all I want to know is if
17   the witness is familiar with the document.
18             MR. MOON:  Well, he hasn't looked at it
19   yet, so he can't be familiar.
20             MR. KATON:  If you want to have him look
21   at all 97 pages, you can do that, it doesn't seem
22   necessary to me.
23             THE WITNESS:  I am familiar with the
24   document, I never reviewed it.
25        Q    (By Mr. Katon) Okay.  Do you know when it

James Gerlach                                    August 1, 2023

Page 181

1      was created?

2          A     I do not know, but I do know that

3      Lieutenant Drewery did create it.

4          Q     And do you know if that document had been

5      provided to any jail staff that were on duty while

6      Justin Thao was at your jail?

7          A     I do not remember the date that this was

8      made, so I'd have to ask to get -- get -- revisit

9      the date it was made.  I believe that it was -- I

10     think this was made after.  I don't know.  I --

11     I -- I do not know anything except I knew that he

12     was doing this to create a class for -- for the

13     sheriff's association to get CLEET credit.  That's

14     all I know about this document.

15         Q     Okay.  So is it fair to say then that you

16     don't know if any jail staff that was on duty

17     while Mr. Thao was at your jail had received that

18     document?

19         A     I -- I could not tell you that, no.

20         Q     Okay.

21               MR. KATON:  If I could get the court

22     reporter to pull another document that was sent

23     for the first session, and it doesn't have

24     anything at the top, but towards the bottom or I

25     should say like under -- around the middle, it

James Gerlach                                    August 1, 2023

Page 182

1    says, "Suicide and Meth Use."  And the number on

2    the bottom is DDR 60, 098 and it's an 11-page

3    document.

4            COURT REPORTER:  Okay.

5            THE WITNESS:  Did you want me to read it?

6       Q    (By Mr. Katon) No.  Could you just tell me

7    if you're familiar with that document?

8       A    No, I'm not.

9       Q    Do you believe that you haven't seen this

10   document before?

11      A    I do not recall ever seeing this document.

12      Q    So then is it -- is it fair to say then

13   that you don't know if this document was provided

14   to any jail staff that was on duty when Mr. Thao

15   was at your jail?

16      A    I cannot testify to that, no.

17      Q    You don't know one way or the other?

18      A    No, I don't know.

19      Q    Okay.  Do you know who created this

20   document?

21      A    I do not know who created the document.

22      Q    Okay.  So for the -- for the detention

23   officers that were on duty while Justin Thao was

24   at your jail, did they receive any training to

25   identify mental health problems in inmates that

James Gerlach                                    August 1, 2023

Page 183

1    could be dangerous?

2            MR. MOON:  Object to the form.

3            THE WITNESS:  I wouldn't know without

4    reviewing every single person that was there, so,

5    no, I do not know if they got that training, but I

6    do know there was training involved in their -- in

7    their job.

8       Q    (By Mr. Katon) There's training involved

9    in their job on the subject of identifying mental

10   health problems in inmates that could be

11   dangerous?

12      A    There is training that is done through

13   their FTO program to -- to identify people that

14   are having difficult times, I -- I -- I do not

15   know exactly what each person was trained on

16   specifically.

17      Q    So as of November 2017, what field

18   training would detention officers have received on

19   the subject of identifying mental health problems

20   and inmates that could be dangerous?

21      A    Other than policies and procedures and

22   their training manual, they would receive only

23   those things in those -- in those -- in those

24   documents.

25      Q    Okay.  I want to ask you a similar

James Gerlach                                    August 1, 2023

Page 184

1    question about substance abuse problems.  For the
2    jailers who were on duty while Mr. Thao was at
3    your jail, what training did the jailers receive
4    to identify substance abuse problems in inmates
5    that could be dangerous?
6        A    Besides behavior, really, none if it --
7    at -- at our level, I mean, that's why we have
8    medical, but the -- the problem is, is that it's
9    not required for them to know how to identify an
10   individual characteristic, they're officers,
11   they're not medical or mental professionals.
12       Q    You started out your answer by saying
13   "besides behavior," and I didn't understand that,
14   can you tell me what you meant by that?
15       A    Behavior tells us how they're going to
16   act, how they're -- how they're -- how they're
17   being, we don't -- we don't get into their
18   psychosis or their -- their -- their inner
19   feelings, we -- a lot of it's on surface.  We look
20   at 553s, if they have a problem, then we have
21   medical look at it, we have medical interview
22   them.  If they're -- if they're behaving fine, we
23   treat them as if they're just anybody else, and we
24   get them through the system so they can get on
25   their way.  We don't -- we don't -- we don't

James Gerlach                                    August 1, 2023

Page 185

1    classify people just to classify them, so behavior

2    is everything when it comes to somebody that goes

3    to jail, behavior rules on how they're classified

4    and everything.  We have to go by that.

5        Q    Okay.  So for the detention officers who

6    were on duty while Mr. Thao was at the jail, what

7    training on behavior would they have received

8    that's relevant to substance abuse problems that

9    could be dangerous?

10       A    Anything that would require safety and

11   security to watch them closer or to treat them

12   differently would be based on their behavior.

13   This is something that's trained through

14   experience, not through a book or anything else,

15   they have to work there, they have to understand

16   people.  We hire people that are -- are trying to

17   get a job and they get the job and they learn as

18   they go and they learn through training.  I -- I

19   just don't know how else you want that answered,

20   unless you work the field, you don't know, you

21   don't understand it, so.

22       Q    Yeah, so I understand that when people are

23   at a job, they gain experience, but I'm asking

24   something a little different, which is, is there

25   any training that the jail provided to jailers as

James Gerlach                                    August 1, 2023

Page 186

1    of November 2017 that would help them identify if

2    an inmate is having a substance abuse problem that

3    could be dangerous?

4        A    Well, I'm not going to speculate, other

5    than the -- what's in the procedure manual, what's

6    in their training manual.

7        Q    So then you're not aware of any training

8    on that subject other than what's in the policies

9    and procedures and the training manual?

10       A    Not without reviewing them.

11       Q    Well, when you say "not without reviewing

12   them," do you mean the -- the policies -- policies

13   and procedures in the training manual?

14       A    Based on the fact that I would like to --

15   I would like to review what was in the policy and

16   procedure manual, and -- and the training manual

17   as of 2017, you're asking me as of 2017, it's now

18   2023, so I think we're a little bit beyond there,

19   I would have to look at what was in 2017 and --

20   and also what they were trained.

21       Q    Okay.  So at the moment I'm not asking

22   anything about the content of the policies and

23   procedures or the training manual as of November

24   2017, I'm asking if there was any training

25   provided to jailers as of November 2017 on how to

James Gerlach                                    August 1, 2023

Page 197

 1   you try to run out of the room?
 2            MR. MOON:  Form.
 3            THE WITNESS:  Absolutely not, they
 4   shouldn't ask him any questions because if it
 5   turned into charges being filed, then that would
 6   have been inappropriate.
 7        Q    (By Mr. Katon) So they shouldn't have
 8   asked him if he was having a medical problem like
 9   intense diarrhea and that's why he was running out
10   of the room, shouldn't have done that?
11            MR. MOON:  Object to the form.
12            THE WITNESS:  No.  If he was having that
13   problem, he would have told us.
14        Q    (By Mr. Katon) Oh, okay.  How about if
15   someone was chasing him, is that something that
16   you think jail staff should have asked him about?
17            MR. MOON:  Same objection.
18            THE WITNESS:  The officers were at the
19   pod, they would have been able to see that.
20        Q    (By Mr. Katon) So the answer then is, no,
21   that's not something they should have asked him?
22        A    No.
23            MR. MOON:  Asked and answered.
24            THE WITNESS:  No.
25        Q    (By Mr. Katon) And then after the jailers

James Gerlach                                August 1, 2023

Page 246

1    tracked?

2        A    I -- I -- I'm not a technology person, so

3    I would say I have absolutely no absolute

4    knowledge that it can't be tracked somewhere, I

5    just don't know of that tracking.

6        Q    Okay.  I want to switch now to another

7    aspect of Mr. Thao's detention in Cell 126.  You

8    are aware that he was discovered with a towel

9    around his neck that was tied to the inside door

10   handle of the cell; correct?

11       A    Yes, I am aware of that.

12       Q    And no one could see how long Mr. Thao had

13   the towel around his neck before he tried to tie

14   it to the door handle, could they?

15           MR. MOON:  Object to the form.

16           THE WITNESS:  No, I don't -- I don't see

17   how they could have seen that.

18       Q    (By Mr. Katon) Or if he put the towel

19   around the door handle first, no one could see how

20   long a towel was around a door handle before he

21   put it around his neck; correct?

22       A    Same --

23           MR. MOON:  Form.

24           THE WITNESS:  -- answer, no.

25       Q    (By Mr. Katon) And no one could see how

James Gerlach                                    August 1, 2023

Page 247

```
 1    long it took him to tie the towel to the door

 2    handle; right?

 3              MR. MOON:  Form.

 4              THE WITNESS:  Right.

 5       Q    (By Mr. Katon) And no one could see how

 6    long it took him to lose consciousness once the

 7    towel was around the door handle and his neck?

 8              MR. MOON:  Same objection.

 9              THE WITNESS:  Same answer, that is

10    correct.

11       Q    (By Mr. Katon) And lastly, no one could

12    see how long he was hanging from the door handle

13    before Detention Officer Henneman opened the door;

14    correct?

15              MR. MOON:  Same objection.

16              THE WITNESS:  Correct.

17       Q    (By Mr. Katon) As of the time Mr. Thao was

18    at the jail, did detention officers receive any

19    training on when they should contact the nurse on

20    duty regarding the condition of someone in

21    custody?

22       A    Yes.

23       Q    Okay.  What training did they receive?

24       A    Again, based on policies and procedures

25    and the training manual, that's what they would
```

James Gerlach                                    August 1, 2023

Page 248

1    have been instructed on.

2        Q      So is there anything besides what's in the

3    policies and procedures and the training manual

4    that would have been used to train detention

5    officers on when to contact the nurse on duty

6    regarding the condition of someone in custody?

7        A      No.

8        Q      And the same question for contacting a

9    medical professional outside the jail, did the

10   jail provide any training to detention officers on

11   when they should contact a medical professional

12   outside the jail about the condition of someone in

13   custody?

14       A      Only in exigent -- exigent circumstances

15   would they contact somebody outside, they would

16   contact our nursing staff first.

17       Q      Did they receive training on what exigent

18   circumstances would be appropriate for them to

19   directly contact some medical professional outside

20   the jail rather than the nurse first?

21       A      Through emergency procedures, they would

22   have had some training on -- on that, I would have

23   to read it to -- to -- to be specific, but they

24   would have received some training on when to call

25   911.  A lot of that is based on the fact that if

James Gerlach                                    August 1, 2023

                                                 Page 249
1     they can't get our medical, they immediately
2     contact 911 to get a -- a EMT group there.
3         Q     And you referred to emergency procedures,
4     where -- where would I be able to find training
5     that the detention officers received on emergency
6     procedures?
7         A     Should be within the policies and
8     procedures manual and the -- and the training
9     manual.
10        Q     Anywhere else?
11        A     No.
12        Q     And do you -- do you claim -- and when I
13    say "you," I mean the jail authority, does the
14    jail authority claim that Mr. Thao asked for a
15    towel when he was in Cell 126?
16            MR. MOON:  Object to the form.
17            THE WITNESS:  I'm not sure.
18            MR. KATON:  What's the form objection?
19            THE WITNESS:  I don't think the board has
20    any -- any --
21            MR. KATON:  I'm sorry, one -- one -- one
22    second.  What was the form objection, W.R.?
23            MR. MOON:  So you're asking him to
24    speculate as to something he has no personal
25    knowledge of?  He wasn't present that evening or

James Gerlach                                    August 1, 2023

                                                      Page 250
 1    that morning.  Is that your question, Glenn,

 2    you're asking him to speculate?

 3            MR. KATON:  This is an item that's

 4    directly out of the 30(b)(6) notice, W.R., so --

 5            MR. MOON:  I don't know that authorities

 6    have opinions.

 7            MR. KATON:  I don't know that I asked

 8    anything about opinion, but authorities do make

 9    claims, so --

10            MR. MOON:  What did you say, belief then,

11    can you read back his question?

12            MR. KATON:  The 30(b)(6) notice -- let me

13    just proceed with that.  You've made your

14    objection, so for what that's worth, it's in the

15    record, let me just proceed with my question.

16            MR. MOON:  Madam Court Reporter, can you

17    mark that place in the record, please?

18            COURT REPORTER:  Sure.

19            (Whereupon, section of transcript marked

20            as requested by counsel)

21    Q    (By Mr. Katon) Mr. Gerlach, are you aware

22    that for certain topics, you're here as a

23    representative for the jail authority?

24    A    Yes, I am.

25    Q    And -- and for the jail authority, can you

James Gerlach                                    August 1, 2023

                                                      Page 251

1      tell me if you are claiming that Mr. Thao asked

2      for a towel while -- a towel while he was in Cell

3      126?

4          A    The board or myself does not know if he

5      actually asked for a towel or if he was just given

6      back the towel that he was originally issued.

7          Q    When was he issued a towel?

8          A    I believe the towel and the shoe were in

9      his possessions up on the fourth floor, that's

10     what we -- that's what we -- and the towel that

11     was given to him was the same towel that he was

12     issued.

13         Q    And what is your belief that he had a

14     towel issued -- issued to him while he was in A

15     pod, what is that based on?

16         A    Based on standard issue, every inmate's

17     given a towel.

18         Q    Every inmate, whether they're a

19     turn-around or another federal detainee or a local

20     inmate or a local detainee, every single inmate

21     gets a towel when they're booked in?

22         A    When they arrive, it's not after booking,

23     it's when they arrive, all right, because a lot of

24     them have been traveling around for a while, so

25     there's a shower in there that they're able to

James Gerlach                                          August 1, 2023

Page 325

1    those standards were satisfied in connection with

2    Mr. Thao's detention at the jail?

3        A    What does it -- what does the first

4    sentence start with?

5        Q    "Jailer posts shall be located and

6    staffed."

7        A    Okay.  Okay.  Yes, I believe that those --

8    I read all the way down to closed circuit TV, is

9    that where you wanted me to end?

10       Q    Yes, sir.

11       A    I believe that applies to everybody.

12       Q    And you believe that that subsection, the

13   language of that subsection that we're talking

14   about was meant for Mr. Thao's detention?

15       A    Yes.

16       Q    And I believe we've established that the

17   booking officer could not see into Cell 126 while

18   Mr. Thao was there; correct?

19       A    That's -- no, they cannot see from

20   their -- their duty station.

21       Q    And they cannot hear reliably what's

22   happening in Cell 126?

23       A    That's correct.

24       Q    Then how is it that you believe the post

25   was located and staffed to, quote, monitor all

James Gerlach                                      August 1, 2023

Page 326

1    prisoner activity, either physically or

2    electronically?

3        A    Because it's a duty station that that

4    cell's responsible for, so.  Are you -- are you

5    asking -- I guess I'm wondering if you're asking

6    does every cell have somebody watching them at all

7    times?  No, I mean, you don't have that in any

8    jail.

9        Q    No, that's not what I'm asking, what I'm

10   asking is the question that I'll ask the court

11   reporter to repeat back, please.

12            COURT REPORTER:  "Then how is it that you

13   believe the post was located and staffed to,

14   quote, monitor all prisoner activity, either

15   physically or electronically?"

16            THE WITNESS:  I -- I'm going to stick with

17   my same answer, yes, I do believe it was -- met

18   that policy or met that requirement from the state

19   because it's an accepted practice of all jails,

20   right.  So I mean, that post has responsibilities

21   for several rooms and that they -- they check on

22   those rooms, so every cell does not have a TV in

23   it or a camera in it, so it relies on -- on them

24   checking or going to check it based on the

25   standards.

**Volume 4 (of 4)**                                **4 App 32**

James Gerlach                                    August 1, 2023

                                                        Page 396

 1               C E R T I F I C A T E

 2
     STATE OF OKLAHOMA  )
 3                      )  SS:
     COUNTY OF OKLAHOMA )

 4

 5           I, Karen B. Johnson, Certified Shorthand

 6   Reporter, within and for the State of Oklahoma, do

 7   hereby certify that JAMES GERLACH was by me first

 8   duly sworn to testify the truth, the whole truth,

 9   and nothing but the truth in the case aforesaid;

10   that the above and foregoing testimony was by me

11   taken in shorthand and thereafter transcribed; that

12   the same was taken on AUGUST 1, 2023, that the

13   testimony was taken in OKLAHOMA CITY, State of

14   Oklahoma; that I am not an attorney for nor a

15   relative of any said parties or otherwise interested

16   in the event of said action.

17           IN WITNESS WHEREOF, I have hereunto set my

18   hand and seal of office on this 7TH day of AUGUST,

19   2023.

20

21

22

23                    -------------------------
                      Karen B. Johnson
24                    State of Oklahoma CSR #1376

25

**Volume 4 (of 4)**                              **4 App 33**

OAC 310:670                    OKLAHOMA STATE DEPARTMENT OF HEALTH

**SUBCHAPTER 5.    STANDARDS FOR JAIL FACILITIES/DETENTION CENTER**

Section
310:670-5-1.    Admission, release and records
310:670-5-2.    Security and control
310:670-5-3.    Supervision of prisoners
310:670-5-4.    Prisoner rules and discipline
310:670-5-5.    Classification and segregation
310:670-5-6.    Safety, sanitary and hygiene standards
310:670-5-7.    Food services and dietary requirements
310:670-5-8.    Medical care and health services
310:670-5-9.    Mail and visitation
310:670-5-10.   Training and staff development
310:670-5-11.   Physical plant

**310:670-5-1.    Admission, release and records**
   The following admission and release procedures shall be followed.  A facility shall have written policies and procedures for the reception, orientation and release of prisoners.
   (1)  The admission process of new prisoners shall include at least the following:
      (A)  Verification of arrest or commitment papers;
      (B)  Complete search of the individual upon entering the facility;
      (C)  Medical/mental health screening by trained facility personnel utilizing a questionnaire approved by the Department of Health, or a screening conducted by a physician or other licensed medical personnel;
      (D)  Procedures to ensure orientation and understanding of facility rules;
      (E)  Issue bedding, clothing, and footwear; and
      (F)  Classification and assignment to a housing unit.
   (2)  Positive identification shall be made of the arresting or committing officer, including verification of the officer's authority to make the commitment.
   (3)  Each newly admitted prisoner shall be permitted to complete at least two (2) local or collect telephone calls during the admission process or after a reasonable length of time as determined by the administrator. These telephone calls shall be documented and a prisoner's refusal to make telephone calls shall be documented. In facilities, where prisoners have unlimited access to operational telephones, a prisoner's refusal to make telephone calls is not required to be documented.
   (4)  The types of personal property prisoners may retain in their possession during confinement shall be specified in a facility's policies and procedures. Secure storage for property not authorized to be in the prisoner's possession, to include civilian street clothing shall be provided.
   (5)  A written itemized inventory shall be made of all personal property of a newly admitted prisoner.
   (6)  Before a prisoner is released, positive identification shall be made of the individual and authority for release shall be verified.

Ex. 4

OAC 310:670                    OKLAHOMA STATE DEPARTMENT OF HEALTH

(7) After the individual is positively identified, the prisoner's personal property shall be returned. The items shall be compared with the inventory list and the prisoner shall sign for the returned property upon release.

(8) A logbook or computer record shall be maintained on all prisoners admitted to the facility. The logbook or computer record shall include at least the following:
    (A) Name of the prisoner;
    (B) Date and time of admission;
    (C) Date and time of release;
    (D) Offense charges;
    (E) Arrest number;
    (F) Date of birth;
    (G) Race; and
    (H) Gender;
    (I) Social security number;
    (J) Booking and intake number.

(9) An intake form shall be completed for every person admitted to a facility. The intake form shall be placed in the prisoner's file and shall contain at least the following information:
    (A) Date and time of admission;
    (B) Name and aliases of prisoner;
    (C) Address;
    (D) Name and title of arresting or delivering officer and employing agency;
    (E) Charges;
    (F) Date of birth;
    (G) Race;
    (H) Gender;
    (I) Height;
    (J) Weight (verified by scale);
    (K) Eye color;
    (L) Hair color;
    (M) Scars, tattoos and other identifying markings;
    (N) Special medical and mental health comment-data and recommendations;
    (O) Name, relationship, address and phone number of emergency contact; and
    (P) Court judgment and sentence if sentenced prisoner.

(10) Records shall be safeguarded from unauthorized disclosure. Written policies and procedures shall specify the process that prisoners and former prisoners are allowed access to their records.

(11) Individual records shall be maintained and kept current for each prisoner which shall contain at least the following information:
    (A) Intake information;
    (B) Commitment papers and court order;
    (C) Reports of disciplinary actions or unusual occurrences;
    (D) Medical, mental health and dental orders issued by the health care authority;
    (E) A medical screening shall be performed and documented on

OAC 310:670                        OKLAHOMA STATE DEPARTMENT OF HEALTH

all prisoners, and shall contain at a minimum the following
information:
    (i) Communicable diseases (i.e., HIV/STD, Hepatitis,
    TB);
    (ii) Alcohol and drug abuse and treatment;
    (iii) Allergies;
    (iv) Injuries;
    (v)  Illnesses;
    (vi) Medications;
    (vii) Suicide risk or attempts;
(F) Photographs or video imaging; and
(G) Personal property inventory.

[**Source:** Amended at 8 Ok Reg 3129, eff 7-18-91 (emergency);
Amended at 9 Ok Reg 1433, eff 5-1-92; Amended at 13 Ok Reg 2139,
eff 6-13-96; Amended at 20 Ok Reg 2387, eff 7-11-20031; Amended at
22 Ok Reg 2445, eff 7-11-2005]

**310:670-5-2.  Security and control**
    The facility administrator shall develop and implement written
policies and procedures for the safety, security and control of
staff, prisoners and visitors.   Policies and procedures shall
address at least the following:
    (1)  A central control center shall be maintained to coordinate
    the facility's internal and external security network.  The
    control center shall be staffed twenty-four (24) hours-a-day.
    The control center or other location may be designated by the
    facility administrator and shall be responsible for prisoner
    counts and key control.
    (2)  There shall be a prisoner count at the beginning of each
    shift change. The prisoner count shall be documented.
    (3)  There shall be at least one (1) visual sight check every
    hour which, shall include all areas of each cell and such sight
    checks shall be documented.
    (4)  All security perimeter entrances, control center doors,
    cell block doors and doors opening into a corridor shall be
    locked except when used for authorized entry and exit. Staff
    members shall know which doors should be locked and under what
    circumstances they should be opened.
    (5)  No one person shall be permitted to enter a prisoner's
    cell or other area in which a prisoner is confined, past the
    last locked door, without backup assistance.   Prior to
    breaching the last locked/secure door, central control or
    another staff member who can provide assistance will be
    notified. Documentation shall reflect the reason for the
    decision to enter a cell without backup assistance and a
    permanent record of the event shall be maintained.
    (6)  A weekly security device inspection shall be performed and
    priority corrective action taken on any discrepancy.  A weekly
    inspection report shall be submitted to the facility
    administrator.
    (7)  Searches of facilities and prisoners to control contraband
    shall be unannounced and at irregular intervals.  These searches
    shall be documented.

OAC 310:670                     OKLAHOMA STATE DEPARTMENT OF HEALTH

(8)  The availability, control and use of firearms, ammunition, chemical agents and related security equipment shall be sufficient to meet needs.  The level of authority required for access to, and use of, security equipment shall be specified in policy and procedure.  Chemical agents shall be used only with the authorization of the facility administrator or designee. Jailers shall be trained in the use of chemical agents as prescribed by the manufacturer's specification.

(9)  Firearms, ammunition, chemical agents and related security equipment shall be stored in a secure but readily accessible depository located outside the prisoner living area. The facility may adopt policy and procedures that authorize trained and certified jailers to be equipped with chemical agent and non-lethal weapons while on duty.

(10) Firearms, chemical agents and related security equipment shall be inventoried at least one (1) time each month to determine their condition and expiration dates.  Firearms shall be cleaned and fired annually and repairs shall be made as needed.

(11) In an emergency situation, supervision of armed personnel is essential and only weapons/firearms authorized by the administrator shall be used.

(12) Personnel discharging firearms or using chemical agents shall submit a written report to the facility administrator documenting the nature of the incident and the identity of the personnel and prisoners involved. All persons, employees and prisoners involved in an incident where a weapon or chemical agent or force was used shall receive an immediate medical examination and/or treatment.

(13) Except in emergency situations, a weapon shall not be permitted in the secure area. There shall be a system of checking firearms and ammunition for temporary secure storage outside the secure perimeter.

(14) All keys shall be issued from a secure location designated by the jail administrator, and a log shall be used to record the number of each key, location of the lock and the number of keys to each lock. The key control system shall include a current accounting of the location and authorized person to have each key.  Keys shall be returned to the control center or a secure issue location at each shift change. There shall be at least one (1) duplicate key to each lock that is maintained in a secure location inaccessible to prisoners.

(15) Tools and utensils such as hacksaw blades, welding equipment, culinary, barber shears and all sharps of similar-type equipment shall be secured, issued and used in accordance with prescribed policy and procedure. The control system shall also provide for this type of tool and equipment brought into the facility by outside authorized persons.

(16) Prisoners shall not possess flammable, toxic or caustic materials unless they are under supervision of qualified personnel.  Such materials shall be stored in secure areas that are inaccessible to prisoners.

(17) A post order shall be prepared for each post or duty

OAC 310:670                    OKLAHOMA STATE DEPARTMENT OF HEALTH

assignment to be performed, and it shall specify the procedure to be followed for completing the assignment.

(18) There shall be written procedures for dealing with an escape. These procedures shall be available to all personnel and shall provide for sounding an alarm, alerting officials, mobilizing resources and ending the alert. Following an escape, the staff shall prepare an analysis of the escape and defects in the security system shall be corrected immediately.

(19) There shall be written procedures that specify what actions to take in emergency situations, i.e., fire, disturbances, and taking hostages. The procedures shall specify areas of responsibility, the staff to be involved, when and what authorities shall be notified, how the problem may be contained and what shall be done after the incident ends. Emergency housing and supervision of prisoners shall be provided.

(20) Staff shall be knowledgeable of and trained in the implementation of the emergency plans.

(21) An emergency auxiliary power generator or battery-operated system that meets fire and life safety codes shall be provided to maintain lighting and essential equipment in an emergency.

(22) All emergency equipment shall be inspected at least one (1) time each month and corrective action taken as needed.  These inspections shall be documented.

(23) The use of physical force by staff shall be restricted to instances of justifiable self-protection, protection of others, protection of property and prevention of an escape, and shall be only to the degree necessary. A written report shall be prepared and submitted to the administrator following the use of physical force. All persons, employees, and prisoners involved in an incident where a weapon, chemical agent, or physical force was used shall receive an immediate physical inspection, and if affected by the action, shall receive a medical examination and treatment.

(24) Instruments of restraint such as handcuffs, leg irons, restraint chairs, restraint beds and straitjackets, shall not be applied longer than authorized by policy and procedure and equipment manufacturers specifications. Prisoners placed in restraints shall not be left without required supervision. Instruments of restraint shall be used only as follows:

    (A)  As a precaution against escape during transfer;

    (B)  For medical/mental health reasons, by direction of the designated medical authority and jail facility administrator or designee; and

    (C)  To prevent prisoner self-injury, injury to others or property damage, and then only with the approval of the jail administrator or designee.

(25) Guidelines for transporting prisoners shall emphasize safety and security and shall be available to all staff involved in transporting prisoners.

(26) All entrances and exits to the facility shall be secure.

(27) In case of a death or an escape with injury, the Department shall be notified immediately.

(28) The Department shall be notified no later than the next

OAC 310:670                    OKLAHOMA STATE DEPARTMENT OF HEALTH

working day if any of the following incidents occur:
 (A)  Extensive damage to jail property;
 (B)  Serious injury to staff or prisoner defined as life threatening or requiring transfer to outside medical facility;
 (C)  Escape;
 (D)  Serious suicide attempt, defined as life threatening or requiring transfer to outside medical facility.
(29)  Trusties shall be either locked down or confined to the facility when not engaged in a job assignment. Trusties permitted outside the facility shall be supervised according to the written policy of the sheriff, chief of police, jail administrator and/or as required by state statute.
[**Source:**   Amended at 8 Ok Reg 3129, eff 7-18-91 (emergency); Amended at 9 Ok Reg 1433, eff 5-1-92; Amended at 13 Ok Reg 2139, eff 6-13-96; Amended at 20 Ok Reg 2387, eff 7-11-20031; Amended at 22 Ok Reg 2445, eff 7-11-2005]

**310:670-5-3.  Supervision of prisoners [1], [2]**
(a)  The movement of prisoners from one location to another shall be controlled and supervised by staff.
(b)  Staff shall provide twenty-four (24) hour supervision of prisoners.

_____

[1] Effective July 1, 2005, Title 0.S. 74 Section 192 was amended by Section 1 of Enrolled Senate Bill No 725 to include this new subsection:
 *D.  Any county or municipality that operates a jail facility which houses more than twenty and less than seventy-five prisoners at all times which:*
 *1.  Provides twenty-four-hour supervision of prisoner activity that is conducted either by direct observation or electronically by closed circuit television; and*
 *2.  Provides an intercommunication system that terminates in a location that is staffed twenty-four (24) hours a day and is capable of providing an emergency response,*
*shall be required to have more than one jailer or one jailer and at least one other basic CLEET-certified person on the same premises as the jail facility to provide for the security, custody, and supervision of prisoners.* [74:192]

[2] Effective July 1, 2005, a new section of law was established at Title 0.S. 19 Section 513.1, by Section 2 of Enrolled Senate Bill No 725. The new section is as follows:
 *Every sheriff shall require appropriate training for deputies and jailers in accordance with the jail standards promulgated by the State Department of Health.  The sheriff shall not permit supervision of any prisoner in the custody of the jail by any person that does not meet the jail standards for training and supervision of inmates.  The sheriff or contractor having charge and custody of the jail shall comply with all minimal supervision standards pursuant to the jail standards promulgated by the State Department of Health, except when otherwise provided by law.  Nothing in this section shall be construed to prohibit or restrict the sheriff or contractor having charge and custody of the jail from training or cross-training a person as a backup jailer, if otherwise qualified for such position.* [19:513.1]

OAC 310:670                  OKLAHOMA STATE DEPARTMENT OF HEALTH

(c)  Jailer posts shall be located and staffed to monitor all prisoner activity either physically or electronically and close enough to the living areas to respond immediately to calls for assistance, and respond to emergency situations. A jailer shall be on duty at all times at each location where prisoners are confined or the observation shall be conducted by closed circuit TV. The location shall be equipped with an intercommunication system that terminates in a location that is staffed twenty-four (24) hours-a-day and is capable of providing an emergency response.

(d)  There shall be sufficient staff to perform all assigned functions relating to security, custody and supervision of prisoners. Staff assignments shall provide for backup assistance for all employees entering locations where prisoners are confined.

(1)  Any city jail or county jail which houses twenty (20) prisoners or less *shall not be required to have more than one jailer or dispatcher on-site to provide for the security, custody and supervision of prisoners* [74:192(C)] provided the following requirements are met:

(A)  The facility *provides twenty-four-hour supervision that is conducted either by direct observation or electronically by closed circuit television* [74:192(C)(1)];

(B)  The facility *provides an intercommunication system that terminates in a location that is staffed twenty-four (24) hours a day and is capable of providing an emergency response* [74:192(C)(2)]; and

(C)  The on-site jailer or dispatcher providing security, custody and supervision, shall have completed the training required in OAC 310:670-5-10.

(2)  Facilities which house more than twenty (20) prisoners shall have on site one (1) dispatcher or control center operator and a minimum of two (2) jailers on the premises.

(e)  All prisoners shall be searched thoroughly when entering or leaving the security area.

(f)  Policies and procedures shall specify a system for the supervision of female prisoners by male staff and supervision of male prisoners by female staff.

(g)  When both male and female prisoners are housed in a facility, at least one male and one female trained jailer shall be available to perform sensitive functions and procedures as necessary to accommodate prisoner gender.

(h)  A prisoner shall be prohibited from supervising, controlling, exerting or assuming any authority over another prisoner.

(i)  The name and telephone number of the practicing attorneys and bonds persons in the area shall be posted conspicuously near the telephone used by prisoners.  This can be a telephone book.

(j)  Direct supervision of prisoners shall be permitted if the facility has policies and procedures in place to ensure the safety of employees, prisoners and visitors and if the physical plant design lends itself to direct supervision operation.

[**Source:**  Amended at 8 Ok Reg 3129, eff 7-18-91 (emergency); Amended at 9 Ok Reg 1433, eff 5-1-92; Amended at 13 Ok Reg 2139, eff 6-13-96; Amended at 20 Ok Reg 2387, eff 7-11-20031; Amended at 22 Ok Reg 2445, eff 7-11-2005]

OAC 310:670                      OKLAHOMA STATE DEPARTMENT OF HEALTH

**310:670-5-4.  Prisoner rules and discipline**
(a)  Written facility rules shall list all chargeable offenses, and the range of sanctions and disciplinary procedures to be followed and shall be made available to prisoners. A rule book that contains all chargeable offenses, range of sanctions, and disciplinary procedures is provided to each prisoner upon booking and is translated into those languages spoken by the significant number of prisoners.  When a literacy or language problem prevents a prisoner from understanding the rule book, a staff member shall assist the prisoner.
(b)  All persons who deal with prisoners shall be familiar with the rules of prisoner conduct, and the approved sanctions. To prevent discrepancies among staff in interpretations, in-service training shall be conducted as often as necessary by direction of the administrator.
(c)  Employees shall prepare a disciplinary report when they have reason to believe that a prisoner has committed a violation of rules.
(d)  Disciplinary reports prepared by staff shall include at least the following:
    (1)  Specific rules violated;
    (2)  A formal statement of the charge;
    (3)  Any unusual prisoner behavior;
    (4)  Any staff or prisoner witness;
    (5)  Disposition of any physical evidence;
    (6)  Any immediate action taken, including the use of force; and
    (7)  Date and time of the report.
(e)  Administrative due process procedures shall be followed for all rule violations. A chairperson or a committee may be appointed by the administrator to hear the charges and make a decision on appropriate action to be taken. Due process procedures shall include at least the following elements:
    (1)  Written rules that specify offenses and sanctions;
    (2)  Prisoner has been made aware of the rules and sanctions;
    (3)  Prisoner receives written notice of the charges and time of hearing prior to the hearing;
    (4)  Prisoner is present at the hearing and hears evidence, except for confidential information or presents unruly behavior or waives that right in writing;
    (5)  Prisoner has the right to make his own statement;
    (6)  Prisoner has the right to call relevant witnesses;
    (7)  Prisoner may be assisted by a willing prisoner or staff member of his choosing;
    (8)  The decision shall be based solely on the evidence and shall be rendered in writing;
    (9)  Record shall be made of the hearing;
    (10) Decision shall be reviewed by the facility administrator or designee;
    (11) A prisoner shall have the right to appeal the decision of the facility administrator or designee to the next level of authority;

**Volume 4 (of 4)**                                    **4 App 41**

OAC 310:670                    OKLAHOMA STATE DEPARTMENT OF HEALTH

(12)   If a prisoner is found not guilty, the disciplinary report and all associated documents shall be removed from the prisoner's file;
(13)   If a prisoner is found guilty, the findings shall be maintained in the prisoner's file.
(f)   If a prisoner allegedly commits an act covered by statutory law, the case may be referred to the appropriate court or law enforcement officials for prosecution.
(g)   There shall be a written policy and procedure to respond to prisoner requests to staff and grievances.
[**Source:**   Amended at 8 Ok Reg 3129, eff 7-18-91 (emergency); Amended at 9 Ok Reg 1433, eff 5-1-92; Amended at 13 Ok Reg 2139, eff 6-13-96; Amended at 20 Ok Reg 2387, eff 7-11-2003]

## 310:670-5-5.   Classification and segregation

The facility administrator shall develop and implement written policies and procedures for the classification and segregation of prisoners.   The classification plan shall ensure the safety of prisoners and staff.   The following criteria shall ensure an adequate classification and reclassification system.
(1)   Prisoners of opposite sex shall be housed separately. Separation shall be by substantial architectural arrangements which permit no sustained visual contact.
(2)   If detention of a juvenile is authorized, such juveniles shall be housed completely separate from adults.   Separation shall be by substantial architectural arrangements which permit no visual contact with adult prisoners.
(3)   Prisoners considered to be a threat to other prisoners or staff shall be housed separately from other prisoners for the following reasons:
        (i)      Prisoner's past criminal history;
        (ii)     The nature and severity of the charges pending against the prisoner;
        (iii)    Prisoner's behavior while in the facility; and
        (iv)     Other relevant reasons as directed by the administrator.
(4)   Prisoners may be double-celled or confined to dormitory-style housing if the floor space meets the square footage requirements.   These prisoners shall be afforded the same living conditions and privileges as those occupying the general population.   Any exception regarding conditions and privileges shall be defined by the administrator.
(5)   Prisoners who are intoxicated or under the influence of a controlled substance shall be housed separately from other prisoners until such time as the medical authority or the jail administrator determines their suitability for placement into general population or other appropriate housing.
(6)   Prisoners who are mentally ill shall be separated from other prisoners.   Every effort shall be made to contact a local hospital, clinic or mental health facility for the detention of the mentally ill.
(7)   Unsentenced prisoners shall be separated from sentenced prisoners, to the extent possible, and shall be permitted

OAC 310:670                    OKLAHOMA STATE DEPARTMENT OF HEALTH

whatever confinement is least restrictive unless prisoner behavior or other security considerations dictate otherwise.
  (8)  Classification and segregation shall not be done solely on the basis of race, color, creed or national origin.
[**Source:**  Amended at 8 Ok Reg 3129, eff 7-18-91 (emergency); Amended at 9 Ok Reg 1433, eff 5-1-92; Amended at 13 Ok Reg 2139, eff 6-13-96; Amended at 20 Ok Reg 2387, eff 7-11-2003]

**310:670-5-6.  Safety, sanitary and hygiene standards**
  The administrator shall develop and implement policies and procedures for the safety and maintenance of sanitation throughout the facility.  These shall include at least the following:
  (1)  The facility shall comply with state and local sanitation and health codes, as well as the Life Safety code.
  (2)  There shall be a housekeeping plan for the facility that includes a cleaning schedule with specific duties.  Cleaning activities performed by prisoners shall be supervised at all times.
  (3)  Floors shall be kept clean, dry and free of hazardous substances.
  (4)  Prisoners shall be provided with cleaning materials daily to clean showers, washbasins and toilets.
  (5)  Smoking in a county jail facility shall not be permitted in accordance with 21 O.S. Section 1247.
  (6)  Upon admission or after commitment by the court, each prisoner shall be issued personal hygiene items to include—soap, towel, toilet paper, toothbrush and toothpaste. Feminine hygiene articles shall be provided upon request.  Razors are issued to each prisoner upon request, and collected immediately after use and disposed of or stored as specified by facility policy and procedures.  Prisoners shall not share razors.  With the exception of toilet paper and feminine hygiene items, prisoners who are not indigent and have funds in their prisoner account may be required to purchase hygiene items from the jail facility.
  (7)  Clean bedding shall be issued to each prisoner who is confined overnight in the facility. A standard issue of bedding shall include:
    (A)  An approved mattress with a cleanable surface; and
    (B)  Enough clean blankets to provide comfort under the existing weather conditions.
  (8)  Prisoners held over twenty-four (24) hours shall be issued a clean set of appropriately sized jail clothing to include, at least, shirts and trousers, coveralls and footwear.
  (9)  A prisoner shall be given an opportunity to receive a complete change of clothing at least one (1) time each week.
  (10) Clean bedding and towels shall be offered at least one (1) time each week.
  (11) Laundry services shall be sufficient to permit regular exchange of all prisoner clothing, bedding and towels.
  (12) Blankets and mattresses shall be cleaned or sanitized before reissue.
  (13) Issuance of all clothing and bedding shall be documented

OAC 310:670                              OKLAHOMA STATE DEPARTMENT OF HEALTH

and prisoners shall be held accountable for these items.

(14) The supply of bedding, linens and clothing shall exceed that required for the facility's maximum prisoner rated population capacity.

(15) Under extreme circumstances it may be necessary for the administrator to authorize the removal of linens, clothing and bedding from a prisoner. Such action may be taken only as a measure to protect the prisoner from self-injury, to protect others or to prevent facility damages. Such actions shall be documented and reviewed at least daily by jail administration. A paper gown or another appropriate garment may be provided as appropriate.

(16) Sufficient showers shall be provided in housing units to provide prisoners the opportunity to bathe at least three (3) times each week. Prisoners working in food service shall be required to bathe daily.

(17) Haircuts shall be available to prisoners based on arrangements specified in facility policy and procedures.

(18) The potable water supply shall meet all state and local water quality standards. Hot and cold water shall be provided in showers and washbasins.

(19) Any condition conducive to harboring or breeding insects, rodents or other vermin shall be eliminated immediately. Licensed pest control professionals shall be contracted to perform pest control on a scheduled basis specified in the facility policy and procedure.

(20) Liquid and solid wastes shall be collected, stored and disposed of in a manner that avoids nuisance and hazards and protects the health and safety of prisoners and staff. Garbage shall be stored in rust resistant, water-tight, rodent-proof and easily cleanable containers with tight fitting lids. Biomedical waste shall be stored and destroyed in compliance with state and federal requirements.

(21) The facility's fire prevention policies and procedures shall ensure the safety of staff, prisoners and visitors. These shall include, but not be limited to an adequate fire protection service; a system of fire inspection and testing of equipment and documentation on a weekly basis; and the availability of fire hoses or extinguishers at appropriate locations throughout the facility. The facility shall have an automatic fire alarm and heat and smoke detection system approved by the Oklahoma State Fire Marshal.

(22) There shall be containers for refuse in prisoner living quarters and in other locations throughout the facility. Containers shall be fire retardant and approved for use in a jail facility.

(23) The facility shall have a written evacuation plan in the event of fire or major emergency. Prisoners shall be instructed on emergency procedures.

(24) There shall be a reliable means to permit prompt release of prisoners from locked areas in case of emergency. The route of evacuation shall be posted in conspicuous locations throughout the facility.

OAC 310:670                      OKLAHOMA STATE DEPARTMENT OF HEALTH

(25) Facility furnishings, walls, ceilings and floors shall be constructed of material that meets the Oklahoma Fire Safety Code.

(26) Heating systems shall be capable of maintaining a temperature of at least sixty-five (65) degrees Fahrenheit. Open-faced or un-vented heaters are not permitted.

(27) Air circulation and ventilation shall be capable of maintaining a temperature of at least eighty-five (85) degrees Fahrenheit or lower. If temperature exceeds eighty-five (85) degrees Fahrenheit, positive air movement shall be provided by use of fans, coolers, or air conditioning units. New facilities or substantially remodeled facilities shall be equipped with central air conditioning or individual air conditioning units which are capable of maintaining a temperature of eighty-five (85) degrees Fahrenheit.

[**Source:** Amended at 8 Ok Reg 3129, eff 7-18-91 (emergency); Amended at 9 Ok Reg 1433, eff 5-1-92; Amended at 13 Ok Reg 2139, eff 6-13-96; Amended at 20 Ok Reg 2387, eff 7-11-20031; Amended at 22 Ok Reg 2445, eff 7-11-2005]

**310:670-5-7.  Food services and dietary requirements**
The jail administrator shall comply with OAC 310:256.

(1)  Each prisoner shall be provided at least three (3) meals each twenty-four (24) hours that meet the national recommended allowance for basic nutrition. At least two (2) hot meals shall be provided daily. There shall not be more than fourteen (14) hours between the breakfast and evening meals.

(2)  Special diets shall be available for prisoners upon a physician's or dentist's authorization.  Special diets shall be planned and prepared by one who is skilled in preparing special diets according to a physician's or dentist's authorization. Special diets shall conform as closely as possible to the food served other prisoners.

(3)  If it is a requirement of a prisoner's religious beliefs that the prisoner adhere to dietary practices, reasonable provision shall be made for such diets from meals that are currently being served.

(4)  A uniform record keeping system shall be developed to record the items served for each meal.

(5)  Food shall not be used as a reward or disciplinary action, nor shall the menu be varied for the same reason.

(6)  All meals shall be served under the direct supervision of staff.  A prisoner's refusal to eat shall be documented at each meal and reported to jail administration.

(7)  Any prisoner assigned to food service shall be closely supervised and shall maintain a high degree of personal hygiene. Each prisoner, providing food service or acting as a food employee, shall be screened for communicable diseases.  Each prisoner, providing food service or acting as a food employee, shall wear a hairnet or hat, beard guard, and gloves while preparing and serving food.

(8)  Ice machines that are available to the prisoners shall be dispenser-type.

OAC 310:670                    OKLAHOMA STATE DEPARTMENT OF HEALTH

(9) Menus shall be reviewed and approved in advance by a registered dietician or a request may be made to the Department of Health for a standardized menu.
[**Source:** Amended at 8 Ok Reg 3129, eff 7-18-91 (emergency); Amended at 9 Ok Reg 1433, eff 5-1-92; Amended at 13 Ok Reg 2139, eff 6-13-96; Amended at 20 Ok Reg 2387, eff 7-11-20031; Amended at 22 Ok Reg 2445, eff 7-11-2005]

**310:670-5-8.  Medical care and health services**
Adequate medical care shall be provided in a facility.  The administrator shall develop and implement written policies and procedures for complete emergency medical and health care services.  Policies and procedures shall include at least the following:
(1)  The administrator shall be responsible for the facility's medical services and shall develop, with the assistance of a designated medical authority, the facility's health care plan. Security restrictions shall be considered in the development of the plan, and any medical personnel included in the plan shall have their responsibilities regulated by written job descriptions.  The health care plan shall cover at least the standards outlined in this section.
(2)  Medical triage screening shall be performed on all prisoners immediately upon admission to the facility and before being placed in the general population or housing area.  Those individuals who appear to have a significant medical or psychiatric problem, or who may be a suicide risk, shall be transported to the supporting medical facility as soon as possible.  They shall be housed separately in a location where they can be observed frequently by the staff at least until the appropriate medical evaluation has been completed. If after stringent evaluation by the highest-ranking mental health professional, in conjunction with a senior detention supervisor, these prisoners may be authorized to share the same cell.
(A)  Medications in the possession of the prisoner at the time of the booking, whether prescription or over-the-counter shall be logged, counted and secured.  Prescription medications shall be provided to the prisoner as directed by a physician or designated medical authority. The prisoner shall be observed to ensure the prisoner takes the medication.  Neither prescription or over-the-counter medications shall be kept by a prisoner in a cell with the exception of prescribed nitroglycerin tablets and prescription inhalers.  Over-the-counter medications shall not be administered without a physician's approval unless using prepackaged medications.
(B)  Medical reception information shall be recorded on a printed screening form approved by the designated medical authority which shall include inquiry into:
(i)  Current illnesses and health problems including medications taken and any special health requirements;
(ii) Behavioral observation, including state of consciousness and mental status;

OAC 310:670                    OKLAHOMA STATE DEPARTMENT OF HEALTH

    (iii) Notation of body deformities, trauma markings, i.e., bruises, lesions, ease of movement, and jaundice;
    (iv) Condition of skin and visible body orifices, including infestations; and
    (v) Disposition/referral of prisoners to qualified medical personnel on an emergency basis.
(3) Delousing procedures shall be developed in coordination with the designated medical authority and used whenever vermin are detected.
(4) Prisoners are informed upon admission to the facility about the procedures for gaining access to medical and health care services. These procedures shall be posted in a conspicuous place.
(5) Each facility shall have a plan and provide twenty-four (24) hour emergency medical and dental care. Emergency plans shall at least include arrangements for:
    (A) The use of one (1) or more hospital emergency rooms or other appropriate health care facility;
    (B) The use of an emergency medical vehicle; and
    (C) An emergency on-call physician and dentist when the emergency health care facility is not located in a nearby community.
(6) If the need is indicated by the medical screening at booking, prisoners held for forty-eight (48) hours or more, shall undergo a medical examination which shall be conducted by licensed medical personnel.
(7) An appointment shall be made with a physician or other licensed medical personnel within forty-eight (48) hours of a valid written request unless more immediate action is dictated by the severity of the current situation.
(8) If medical services are delivered in the facility, adequate space, equipment, supplies and materials as determined by the designated medical authority, shall be provided for primary health care delivery.
(9) First aid kits approved by the designated medical authority, shall be available in each facility. They shall be located in an area(s) also approved by the designated medical authority.
(10) Referral sources shall be identified in advance by the designated medical authority or administrator.
(11) The administration of medications, and the date, time and place of medical encounters shall be documented.
(12) Copies of the medical record, or a discharge summary if any, shall accompany a prisoner upon transfer to another facility.
(13) Any remaining medications shall accompany the prisoner upon transfer to another facility or upon release. The amount of medications provided shall be documented. The count at that time shall be logged.
(14) Staff shall wear disposable gloves when dealing with possible exposure to a prisoner's body fluids.
(15) Biomedical waste shall be stored and destroyed in compliance with state and federal requirements.

**Volume 4 (of 4)**                    **4 App 47**

OAC 310:670                OKLAHOMA STATE DEPARTMENT OF HEALTH

(16) Sharps, i.e., needles, lancets and scalpels shall be disposed of in a puncture-proof container.

(17) Staff shall receive a TB skin test as a part of the pre-employment evaluation and each twelve (12) months as long as the test is negative. Individuals with positive skin tests shall be referred to the local health department or personal physician for evaluation. Employees will also be offered hepatitis B vaccination within one month of employment, at no cost to the employee.

(18) Universal precautions shall be used at all times by all employees.

[**Source:** Amended at 8 Ok Reg 3129, eff 7-18-91 (emergency); Amended at 9 Ok Reg 1433, eff 5-1-92; Amended at 13 Ok Reg 2139, eff 6-13-96; Amended at 20 Ok Reg 2387, eff 7-11-20031; Amended at 22 Ok Reg 2445, eff 7-11-2005]

**310:670-5-9.  Mail and visitation**

Written policies and procedures shall govern prisoner correspondence. Policies and procedures shall include at least the following:

(1) There shall be no limitations on the volume of mail a prisoner may send or receive as long as the prisoner provides postage. The facility shall provide postage, one (1) time per week, for prisoners who do not have funds for correspondence with their attorney, court officials, elected officials, and next of kin.

(2) The number of approved correspondents for a prisoner shall be unlimited. A facility shall allow prisoners access to publications to the extent that such access is consistent with security.

(3) Incoming and outgoing prisoner mail shall not be read except when such correspondence, in the opinion of the administrator, poses a threat to safety and security.

(4) Incoming prisoner mail from court officials, the prisoner's attorney and elected public officials shall be opened and inspected for contraband only in the presence of the prisoner.

(5) Outgoing prisoner mail to court officials, the prisoner's attorney and elected public officials shall not be opened.

(6) Cash, checks or money orders received from incoming mail shall be removed and credited to the prisoner's account. Contraband shall be removed if it is discovered in either incoming or outgoing mail. Contraband shall be considered anything not authorized to be in a prisoner's possession.

(7) Outgoing mail shall be collected and sent daily except Sundays and holidays and incoming mail shall be delivered to prisoners within twenty-four (24) hours of its arrival at the facility.

(8) The number of visitors a prisoner may receive and the length of visits shall be limited only by facility security, visitation, space and schedules.

(9) Licensed attorneys and ministers shall be allowed additional visitation privileges and accommodations, which

Appellate Case: 24-6226   Document: 23-4   Date Filed: 01/29/2025   Page: 53
Case 5:19-cv-01175-JD   Document 154-4   Filed 08/17/23   Page 16 of 19

OAC 310:670                    OKLAHOMA STATE DEPARTMENT OF HEALTH

ensure privacy and are consistent with security.
(10) Policies and procedures shall allow special visits for persons who have come long distances.
(11) Visitors shall register upon entry to the facility and may be searched.
(12) Visitation by a person under age 18 may be permitted if the visitor is a member of the prisoner's immediate family and if a parent or legal guardian accompanies the visitor.
[**Source:**   Amended at 8 Ok Reg 3129, eff 7-18-91 (emergency); Amended at 9 Ok Reg 1433, eff 5-1-92; Amended at 13 Ok Reg 2139, eff 6-13-96; Amended at 20 Ok Reg 2387, eff 7-11-2003]

## 310:670-5-10.   Training and staff development

The administrator shall develop policies and procedures for staff orientation and training. The training program shall be supervised by a designated employee. A facility with more than one-hundred (100) employees shall employ a full-time person for staff orientation and training.   Policies and procedures shall include at least the following:
(1) A new employee shall receive orientation and training prior to job assignment by the employing agency.
(2) All employees, including the jail administrator and all supervisors, who work in direct contact with prisoners during the first year of their employment shall receive at least twenty-four (24) hours of training that covers at least the following:
    (A) Security procedures;
    (B) Supervision of prisoners;
    (C) Report writing and documentation;
    (D) Prisoner rules and regulations;
    (E) Grievance and disciplinary procedures;
    (F) Rights and responsibilities of prisoners;
    (G) Emergency procedures;
    (H) First aid and cardiopulmonary resuscitation; and
    (I) Requirements of this Chapter.
(3) After the first year of employment, an employee who works in direct contact with prisoners shall receive at least the following training. This training shall be in addition to any requirements for completion of first aid and cardiopulmonary resuscitation. Before training begins a training schedule shall be provided to the Department for approval, listing subjects, number of hours, date, time, location and instructor.
    (A) Four (4) hours review of the required training items.
    (B) Eight (8) hours training provided by the administrator; content and instructors shall be selected by the administrator.
    (C) A test shall be given by the Department that covers this Chapter.
(4) A documentation log shall be sent to the Department for each person who completes the required training.
(5) Training may be given through other programs that have first been reviewed and approved by the Department.
(6) A passing score on the test given by the Department shall

OAC 310:670                OKLAHOMA STATE DEPARTMENT OF HEALTH

be seventy (70) percent or higher. Any person scoring less than seventy (70) percent shall not be considered to have satisfactorily completed training and may retest as necessary for a period of up to one year.

[**Source:** Amended at 8 Ok Reg 3129, eff 7-18-91 (emergency); Amended at 9 Ok Reg 1433, eff 5-1-92; Amended at 13 Ok Reg 2139, eff 6-13-96; Amended at 20 Ok Reg 2387, eff 7-11-20031; Amended at 22 Ok Reg 2445, eff 7-11-2005]

**310:670-5-11.  Physical plant**
(a)  **Existing facilities.**
 (1)  The reception and release area shall be located inside the security perimeter, but outside the prisoner living quarters. There shall be a secure weapons storage area outside of the custody perimeter.
 (2)  All cells and living areas shall have at least forty (40) square feet of floor space for the initial prisoner and at least twenty (20) square feet of floor space for each additional prisoner occupying the same cell.  Double-celling of prisoners is permitted if there is at least sixty (60) square feet of floor space for two (2) persons.
 (3)  The facility shall have at least one (1) special purpose cell to provide for the temporary detention of prisoners under the influence of alcohol or dangerous substances or for persons who are uncontrollably violent or self-destructive.  These cells shall be designed to prevent injury.
 (4)  The housing and activity areas shall provide, at least the following:
  (A) Lighting of at least twenty (20) foot candles;
  (B) One (1) toilet and one (1) washbasin, with hot and cold running water, in every cell or dormitory at a ratio of at least one (1) toilet and one (1) washbasin to twenty (20) prisoners; and
  (C) A shower with non-skid floors and with hot and cold running water, at a ratio of at least one (1) shower to twenty (20) prisoners in the housing areas.
 (5)  There shall be sufficient floor drains to ensure a sanitary facility.
 (6)  There shall be designated and marked emergency evacuation exits that comply with the Fire Safety Code which permits prompt evacuation of prisoners and staff in an emergency.
 (7)  A county may provide a dormitory-style jail to accommodate up to medium-security prisoners. It shall be equipped with washbasins, toilets and showers with hot and cold running water at a ratio of at least one (1) washbasin, one (1) toilet and one (1) shower to twenty (20) prisoners.  A dormitory-style jail shall meet all requirements for a jail facility.
(b)  **New facilities and substantial remodeling of facilities (after January 1, 1992).**  Plans for the construction of a new facility or the substantial remodeling of an existing facility shall be submitted to the Department for approval.
 (1)  A new jail facility shall be geographically accessible to criminal justice and community agencies.

Appellate Case: 24-6226    Document: 23-4    Date Filed: 01/29/2025    Page: 55
Case 5:19-cv-01175-JD    Document 154-4    Filed 08/17/23    Page 18 of 19

OAC 310:670                    OKLAHOMA STATE DEPARTMENT OF HEALTH

(2)  The reception and release area shall be located inside the security perimeter but outside prisoner living quarters.  The reception and release area shall have the following components:
    (A)  Sally port;
    (B)  Secure weapons storage, outside the jail custody perimeter;
    (C)  Temporary holding rooms with adequate seating for its rated capacity, toilets and washbasins;
    (D)  Booking area;
    (E)  Medical examination room;
    (F)  Shower facilities;
    (G)  Secure area for prisoner personal property storage;
    (H)  Telephone access;
    (I)  Interview room; and
    (J)  General administration space.
(3)  Cells shall be constructed and arranged to allow direct natural light into each area.
(4)  Windows shall conform to ACA standards.
(5)  All areas shall provide for at least twenty (20) foot candles of light.
(6)  Each cell and detention room shall have at least forty (40) square feet of floor space for the initial prisoner, and at least twenty (20) square feet of floor space for each additional prisoner occupying the same cell.  Double-celling is permitted if there is at least sixty (60) square feet of floor space for two (2) persons.  Each room or cell shall have:
    (A)  One (1) toilet and one (1) washbasin with hot and cold running water, for every single or double occupancy cell or dormitory at a ratio of at least one (1) toilet and one (1) washbasin to twenty (20) prisoners.
    (B)  Bunks and storage as indicated by square feet.
(7)  A county may provide a dormitory-style jail to accommodate minimum security prisoners. A dormitory-style jail shall be equipped with washbasins, toilets and showers with hot and cold running water at a ratio of at least one (1) washbasin, one (1) toilet and one (1) shower to twenty (20) prisoners. A dormitory-style jail shall meet all requirements for jail facilities.
(8)  There shall be a dayroom area for each living unit containing at least thirty-five (35) square feet of floor space per prisoner for the maximum number of prisoners who use the dayroom at one time.  It shall be separate and distinct from the sleeping area but immediately adjacent and accessible.
(9)  Living areas shall be planned and organized to permit segregation of prisoners according to existing laws, and the facility's classification plan.
(10) Each facility shall have at least one (1) special purpose cell or room to provide for the temporary detention of persons under the influence of alcohol or dangerous substances, or for persons who are uncontrollably violent or self-destructive. Such cells shall be designed and located to prevent injury to confined persons.
(11) There shall be showers with hot and cold running water at a ratio of at least one (1) shower to twenty (20) prisoners in

OAC 310:670                    OKLAHOMA STATE DEPARTMENT OF HEALTH

the housing areas.
(12) There shall be sufficient floor drains to ensure a sanitary facility.
(13) If the facility maintains an arsenal it shall be located outside the prisoner area accessible only to authorized persons for secure storage, care and issuance of weapons, firearms, ammunition, chemical agents and other related security equipment.
(14) Space shall be provided for the secure storage of items a prisoner has in his possession at the time of booking.
(15) Space shall be provided for administrative, professional and clerical staff, including conference rooms, storage room for records, public lobby and toilet facilities.
(16) There shall be designated and marked emergency exits that comply with the Fire Safety Code which permits prompt evacuation.
(17) In areas not specifically covered by these standards, new buildings and buildings undergoing extensive remodeling shall generally meet requirements of the state-adopted building code and *National Fire Protection Association,* Life Safety Code (current edition) and the plans shall be approved by the State Fire Marshal.

(c) **Temporary tent jails.** The Department must approve the establishment and design of this type of facility. The State Fire Marshal must approve it. A county may erect a tent jail which is temporary in nature, to meet the needs of the county for confining minimum-security prisoners. A tent jail shall not detain juveniles and shall maintain continuous, physical and architectural separation of male and female prisoners. A tent jail shall not be required to meet minimum requirements for a jail facility but shall provide at least the following:
(1) **Accommodations.**
   (A) Basic daily living needs;
   (B) Medical needs;
   (C) Shelter from inclement weather;
   (D) Freedom from obvious safety hazards;
   (E) Fire extinguishers as recommended by the Oklahoma State Fire Marshal; and
   (F) General comfort consistent with security and control of prisoners.
(2) **Security.**
   (A) Tents erected inside a fenced area suitable for guarding and controlling prisoners; and
   (B) Permit prisoners to have visitors consistent with security requirements.

[**Source:** Amended at 8 Ok Reg 3129, eff 7-18-91 (emergency); Amended at 9 Ok Reg 1433, eff 5-1-92; Amended at 13 Ok Reg 2139, eff 6-13-96; Amended at 20 Ok Reg 2387, eff 7-11-2003]

**Exhibit 5 Amended to Add Page
Pursuant to Order ECF 167**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

```
XOUCHI JONATHAN THAO,      )
Special Administrator for )
The Estate of KONGCHI      )
JUSTIN THAO,               )
                           )
      Plaintiff,           )
                           )No. CIV-19-1175-JD
                           )
-vs-                       )
                           )
                           )
GRADY COUNTY CRIMINAL      )
JUSTICE AUTHORITY, et al.,)
                           )
      Defendants.          )
```



DEPOSITION OF JIMMY DUNCAN

TAKEN ON BEHALF OF THE PLAINTIFF

IN CHICKASHA, OKLAHOMA

ON JANUARY 27, 2023

_____

REPORTED BY:  KATE SCIPIONE, CSR, RPR

Jimmy Duncan                                    January 27, 2023

```
                                                       Page 44
 1   health issues?
 2           MR. MOON:  Form.
 3       A.  I -- I can't remember because it's been a
 4   while since we had that training.  Or I had that
 5   training.
 6       Q.  (By Mr. Katon) What's your best estimate of
 7   when you had that training?
 8       A.  I -- I couldn't even -- I couldn't even
 9   guess.  My best estimate, within the last ten years.
10       Q.  You can't be any more precise than that?
11       A.  I -- I cannot.
12       Q.  So it could have been within the last year?
13       A.  Oh, I can tell you it hasn't been in the
14   last year.  Okay.  It's been longer than -- it's been
15   longer than the last four or five years.
16       Q.  Thank you.
17       A.  Sorry.
18       Q.  And were you ever tested on your knowledge
19   of how to deal with mental health issues of inmates
20   at the jail?
21       A.  No.
22       Q.  And you mentioned that one training of signs
23   of what to look for.  Do you recall other trainings
24   in addition to that on the subject of mental health
25   issues of inmates?
```

Jimmy Duncan                                    January 27, 2023

Page 75

```
 1       Q.  (By Mr. Katon) Are you okay to continue,
 2   Mr. Duncan?
 3       A.  Yes.
 4       Q.  Are you familiar with the Oklahoma Health
 5   Department's jail standards?
 6       A.  Yes.  But it's been a while since I've been
 7   over them.
 8       Q.  It's been a while since what?  I'm sorry.
 9       A.  Since -- since we've gone over them.  But we
10   have -- I have been over them a few times in my years
11   there.
12       Q.  Do you receive -- I'm sure you receive a
13   variety of different types of trainings, but do you
14   receive training specifically on the Oklahoma Health
15   Department's jail standards?
16       A.  No.
17       Q.  No?
18       A.  No.
19       Q.  So I take it, then, that you're not tested
20   on the Oklahoma Health Department's jail standards?
21           MR. MOON:  Form.
22       A.  I have been, but I haven't -- it's been a
23   few years.
24       Q.  (By Mr. Katon) So you said that you -- you
25   haven't received training on those standards, and
```

**Volume 4 (of 4)**                              **4 App 55**

Jimmy Duncan                                        January 27, 2023

Page 102

1       A.   No.  I'm --

2       Q.   You don't recall?

3       A.   No, I'm not.

4       Q.   Oh, okay.  I suspect I know the answer to

5  this, but do you weigh more or less?

6       A.   More.

7       Q.   What do you weigh now?

8       A.   Like 285.

9       Q.   And what do you figure you weighed in

10 November 2017?

11      A.   Probably -- I don't know.  If I had to

12 estimate, probably around 265, 270.

13      Q.   Okay.  Do you know if there was any

14 investigation into what happened on the elevator with

15 Mr. Thao while he was being transported to 126?

16      A.   I don't know if there was -- what

17 investigation was done or what wasn't done.  I don't

18 know.  That's our investigations department.

19      Q.   Okay.  Do you know if there was anyone who

20 was disciplined as a result of what happened on the

21 elevator with Mr. Thao?

22      A.   I do not know.

23      Q.   And were you part of any debriefing on the

24 incident of what happened in the cell in 126 where

25 Mr. Thao was found hanging from the door?

Jimmy Duncan                                        January 27, 2023

Page 124

 1    scroll up or down.  The top center says special

 2    custody, and then the bottom middle says booking.  So

 3    you can refer to anything that's on there --

 4         A.  Okay.  Sorry.  Didn't mean to interrupt.

 5         Q.  No, it's okay.  So you can refer to anything

 6    that's on there to describe where the last locked

 7    doors are.

 8         A.  Okay.  Just -- just further down -- your map

 9    runs out.  Just -- just on the other side of the

10    book-in is one of the last locked doors.  Right --

11         Q.  Okay.

12         A.  -- about right where your cursor is.

13         Q.  Got it.

14         A.  And then if you scroll back up.  Or scroll

15    down.

16         Q.  So I'm just -- because that's not on the

17    exhibit, let me just say it's kind of actually where

18    that DDR No. 9, 001, writing is --

19         A.  Yes.

20         Q.  -- on the doors right around there?

21         A.  Yes.

22         Q.  Okay.

23         A.  And If you go back to the top --

24         Q.  Yeah.

25         A.  -- let's see.  Right just -- just to the

**Volume 4 (of 4)**                                  **4 App 57**

Jimmy Duncan                                    January 27, 2023

Page 140

```
 1                        CERTIFICATE

 2

 3

 4   STATE OF OKLAHOMA          )
                               )SS:
 5   COUNTY OF GRADY            )

 6

 7         I, Kate Scipione, a certified shorthand

 8   reporter within and for the State of Oklahoma,

 9   certify that JIMMY DUNCAN was sworn to testify the

10   truth; that the deposition was taken by me in

11   stenotype and thereafter transcribed by computer and

12   is a true and correct transcript of the testimony of

13   the witness; that the deposition was taken on

14   January 27, 2023, at 10:00 A.M., at 721 West Country

15   Club Drive, Chickasha, Oklahoma; that I am not an

16   attorney for or a relative of either party, or

17   likewise interested in this action.

18         Witness my hand and seal of office on

19   February 7, 2023.

20

21                      _____

                        KATE SCIPIONE, CSR
22                      For the State of Oklahoma
                        CSR #1877
23

24

25
```

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

(1)    XOUCHI JONATHAN THAO,
       SPECIAL ADMINISTRATOR FOR
       THE ESTATE OF KONGCHI JUSTIN THAO,

            PLAINTIFF,

v.                                                    CASE NO.: CIV-19-1175-JD

(2)    GRADY COUNTY CRIMINAL JUSTICE
       AUTHORITY, ET AL.

            DEFENDANTS.

## EXHIBIT 6

### (SELECTED POLICIES)

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**FILED UNDER SEAL**

1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE WESTERN DISTRICT OF OKLAHOMA

 3

 4  XOUCHI JONATHAN THAO, Special      )
    Administrator For The Estate       )
 5  of KONGCHI JUSTIN THAO,            )
                                       )
 6           Plaintiff,               )
                                       )No.
 7  vs.                                )CIV-19-1175-JD
                                       )
 8  GRADY COUNTY CRIMINAL JUSTICE      )
    AUTHORITY, et al.,                 )
 9                                     )
             Defendants.               )
10

11

12       VIDEOTAPED DEPOSITION OF TREVOR HENNEMAN

13          TAKEN ON BEHALF OF THE PLAINTIFF

14             IN OKLAHOMA CITY, OKLAHOMA

15                ON APRIL 20, 2023

16

17

18

19         REPORTED BY:  KAREN B. JOHNSON, CSR

20

21

22

23

24

25
```

Trevor Henneman                                    April 20, 2023

Page 24

```
 1            THE WITNESS:  I don't remember.
 2       Q    (By Mr. Katon) But you do remember that
 3   the female officer was standing against a wall of
 4   the elevator?
 5       A    Yes.
 6       Q    And did you -- did you and Mr. Duncan and
 7   Mr. Farley enter the elevator at roughly the same
 8   time?
 9       A    Yes.
10       Q    And what happened after the three of you
11   entered the elevator?
12       A    We tried to assist and gain control.
13       Q    How did you assist in trying to gain
14   control?
15       A    I grabbed the legs, started grabbing his
16   legs.
17       Q    At the point where you grabbed his legs,
18   was he on the ground?
19       A    Yes.
20       Q    Was he faceup or facedown or something
21   else?
22       A    He was on his belly.
23       Q    And was he in any kind of restraints?
24       A    I don't remember.
25       Q    So if he was on the ground and you grabbed
```

Trevor Henneman                                    April 20, 2023

                                                        Page 27

1    in the elevator before you drive stunned his leg?

2        A    I don't remember.

3        Q    Did you ask any of the other officers in

4    the elevator for assistance?

5            MR. MOON:  Object to the form.

6            THE WITNESS:  I don't remember.

7        Q    (By Mr. Katon) You can answer.

8        A    I don't remember.

9        Q    At the time right before you drive stunned

10   Mr. Thao's leg, did Mr. Harrison still have his

11   hands on Mr. Thao?

12       A    I don't know.

13       Q    Would it have been important to your

14   decision to tase him to know if there were other

15   officers available to help restrain him?

16       A    What do you mean?

17       Q    So if you tased him because you didn't

18   have control of him, would having the other

19   officers assist you in gaining control have been

20   an option that you considered?

21           MS. DARK:  Object to the form.

22           MR. MOON:  Same.

23           MR. KATON:  What's the form objection?

24           MR. MOON:  What time period are you

25   talking about, immediately, within a minute,

Trevor Henneman                                    April 20, 2023

Page 124

1        Q     Up until what time at night are they
2    allowed to make phone calls?
3        A     I -- I don't remember that.
4        Q     And what are they told about medical?
5        A     To put in a medical staff report or
6    medical staff request on the kiosk.
7        Q     I've seen photos from inside the jail, but
8    I don't remember seeing a photo of the kiosk, is
9    there a kiosk on every floor?
10       A     There's a kiosk in every cell, in every
11   section, yeah, like community room.
12       Q     So if you're locked in a cell and you want
13   to use the kiosk, are you supposed to use the
14   intercom or ask the guard if you can use the
15   kiosk?
16       A     Yes, usually the CSA will let you out to
17   use the kiosk.
18       Q     Is there anything else that people being
19   booked in are notified about besides the intercom,
20   the phone, medical requests and kiosk?
21       A     Request to staffs is probably the only
22   other thing.
23       Q     What's it called, a request of staff?
24       A     Request to staff.
25       Q     Quest to staff?

Trevor Henneman                                    April 20, 2023

                                                        Page 151

1    confusing, you don't understand my questions, let
2    me know and I'll rephrase, okay?
3         A    Okay.
4         Q    To start with, you had nothing to do with
5    the booking in of Mr. Thao prior to your arrival
6    on the early morning hours of November 16th;
7    correct?
8         A    Right.
9         Q    When you got there, all the federal
10   transfers were already in their fourth floor pod;
11   right?
12        A    Yeah.
13        Q    So you don't know what process was done to
14   get him in or anything like that; right?
15        A    Huh-uh.  I don't know any -- I don't know
16   of any of it.
17        Q    When you were in the transport office and
18   heard the call for all -- was it all available
19   officers?
20        A    Yeah, all available officers, yeah.
21        Q    Okay.  What does that kind of notification
22   indicate to you?
23        A    There's emergency or something is
24   happening where we need all officers.
25        Q    Tells you that there's a serious event

Trevor Henneman                                    April 20, 2023

Page 168

1                    C E R T I F I C A T E

2
   STATE OF OKLAHOMA  )
3                     )  SS:
   COUNTY OF OKLAHOMA )

4

5           I, Karen B. Johnson, Certified Shorthand

6    Reporter, within and for the State of Oklahoma, do

7    hereby certify that TREVOR HENNEMAN was by me first

8    duly sworn to testify the truth, the whole truth,

9    and nothing but the truth in the case aforesaid;

10   that the above and foregoing testimony was by me

11   taken in shorthand and thereafter transcribed; that

12   the same was taken on APRIL 20, 2023, that the

13   testimony was taken in OKLAHOMA CITY, State of

14   Oklahoma; that I am not an attorney for nor a

15   relative of any said parties or otherwise interested

16   in the event of said action.

17           IN WITNESS WHEREOF, I have hereunto set my

18   hand and seal of office on this 4TH day of MAY,

19   2023.

20

21

22

23                    -------------------------
                      Karen B. Johnson
24                    State of Oklahoma CSR #1376

25

D&R REPORTING & VIDEO, INC.
(800)771-1500 / depo@drreporting.com

**Volume 4 (of 4)**                              **4 App 65**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA


XOUCHI JONATHAN THAO,   )
Special Administrator for )
The Estate of KONGCHI    )
JUSTIN THAO,          )
                    )
    Plaintiff,     )
                    )No. CIV-19-1175-JD
                    )
-vs-               )
                    )
                    )
GRADY COUNTY CRIMINAL   )
JUSTICE AUTHORITY, et al.,)
    Defendants.    )




VIDEOTAPED DEPOSITION OF JOHNNIE FARLEY

TAKEN ON BEHALF OF THE PLAINTIFF

IN CHICKASHA, OKLAHOMA

ON FEBRUARY 10, 2023

_____

REPORTED BY:  KATE SCIPIONE, CSR, RPR

Johnnie Farley                                    February 10, 2023

                                                         Page 18
 1   during that shift.  Is that right?

 2        A.  Yes.

 3        Q.  So I want to ask you something a little bit

 4   different, which is what you remember from the night

 5   of the incident in particular.  And I understand that

 6   you probably don't remember specifics before the

 7   things that are relating to Mr. Thao because that

 8   was, I would imagine, a significant incident.

 9            So, for example, if you don't remember

10   specifically what you did between 5:00 and 6:00, then

11   it's fine to tell me you don't remember.  That was

12   over five years ago, or almost five years ago.  So I

13   understand that.

14            But I do want to -- I do want to find out

15   what you remember or what are the first -- what are

16   the first things you remember about that night in

17   particular?

18        A.  The first thing I remember from that night

19   is an all-call to fourth floor to deal with the

20   incident.  I don't really remember anything that

21   happened before that.

22        Q.  Okay.  So did you say an "on call" to the

23   fourth floor?

24        A.  An "all-call."

25        Q.  All-call.  Right.  And can you tell us what

Johnnie Farley                                    February 10, 2023

Page 72

```
 1        Q.  What were those?

 2        A.  I was a three-time state placer.  I was an

 3   Oklahoma all-state my senior year.

 4        Q.  Does all-state mean that you won a state

 5   title for your weight class?

 6        A.  Yes.

 7        Q.  What was your weight class?

 8        A.  Heavy weight.

 9        Q.  How much did you weigh when you were

10   competing?

11        A.  285.

12        Q.  How tall are you?

13        A.  About five-ten.

14        Q.  How much do you weigh today?

15        A.  About 275.

16        Q.  And do you remember approximately how much

17   you weighed in November 2017?

18        A.  Anywhere between 350 and 400.

19        Q.  Did you have a beard in the videos -- or let

20   me withdraw that.

21            Did you have a beard in November 2017?

22        A.  I don't remember.

23        Q.  Do you remember from the videos of the night

24   of the incident if you had a beard at that time?

25        A.  I wasn't paying attention to my face.
```

**Volume 4 (of 4)**                                    **4 App 68**

Johnnie Farley                                    February 10, 2023

Page 124

1    Mr. Farley?

2         A.   Yeah.

3         Q.   When I was asking you earlier about the term

4    "special management inmate" and you said you weren't

5    familiar with that term, are there other sorts of

6    classification terms that you are familiar with?

7         A.   "Protective custody" is about the only term

8    we use like that.

9         Q.   So when the -- there is a classifications

10   sergeant I believe you mentioned.  Is that a position

11   at the jail?

12        A.   Yes.

13        Q.   And when new prisoners are arriving and you

14   mentioned the packets that people would flag if there

15   were -- if there was an issue, and when the prisoners

16   arrived at the jail, it would be the classifications

17   officer who made the final decision on placement.  Is

18   all of that correct?

19        A.   Yes.

20        Q.   And are you aware of any other

21   classifications that are used for placement besides

22   protective custody?

23             MR. MOON:  Object to the form.

24        A.   That and just gang affiliations.

25        Q.   (By Mr. Katon) Okay.  So you don't have

**Volume 4 (of 4)**                                    **4 App 69**

Johnnie Farley                                    February 10, 2023

Page 187

1                     C E R T I F I C A T E

2

3

4    STATE OF OKLAHOMA            )
                                  )SS:
5    COUNTY OF GRADY              )

6

7          I, Kate Scipione, a certified shorthand

8    reporter within and for the State of Oklahoma,

9    certify that JOHNNIE FARLEY was sworn to testify the

10   truth; that the deposition was taken by me in

11   stenotype and thereafter transcribed by computer and

12   is a true and correct transcript of the testimony of

13   the witness; that the deposition was taken on

14   February 10, 2023, at 10:03 A.M., at 721 West Country

15   Club Road, Chickasha, Oklahoma; that I am not an

16   attorney for or a relative of either party, or

17   likewise interested in this action.

18         Witness my hand and seal of office on

19   February 21, 2023.

20

21                         _____

                           KATE SCIPIONE, CSR
22                         For the State of Oklahoma
                           CSR #1877
23

24

25

**Volume 4 (of 4)**                                    **4 App 70**

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

(1)   XOUCHI JONATHAN THAO,
      SPECIAL ADMINISTRATOR FOR
      THE ESTATE OF KONGCHI JUSTIN THAO,

          PLAINTIFF,

v.                                                    CASE NO.: CIV-19-1175-JD

(2)   GRADY COUNTY CRIMINAL JUSTICE
      AUTHORITY, ET AL.

          DEFENDANTS.

## EXHIBIT 9

### (VIDEO OF JUSTIN THAO IN CELL 126 – PART 1)

### PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### FILED BY CONVENTIONAL MEANS

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

(1)    XOUCHI JONATHAN THAO,
       SPECIAL ADMINISTRATOR FOR
       THE ESTATE OF KONGCHI JUSTIN THAO,

              PLAINTIFF,

v.                                              CASE NO.: CIV-19-1175-JD

(2)    GRADY COUNTY CRIMINAL JUSTICE
       AUTHORITY, ET AL.

              DEFENDANTS.

## EXHIBIT 10

**(VIDEO OF JUSTIN THAO IN CELL 126 – PART 2)**

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**FILED BY CONVENTIONAL MEANS**

NOTICE OF VIOLATION
D-2015-007

JAIL:  Grady County Jail              LOCATION:   215 N 3ʳᵈ                    INSPECTION   January 25, 2016
                                                  Chickasha, OK 73018          DATE:

| LETTER DATED | 60-DAY CORRECTION DATE | CERTIFIED # |
|---|---|---|
| May 2, 2016 | July 3, 2016 | 7014 1200 0001 9146 6910 |

| | OAC: 310:670 | FACILITY DOES NOT MEET OKLAHOMA JAIL STANDARDS AS EVIDENCED BY: | RECOMMENDED PLAN OF CORRECTION | COMPLETE |
|---|---|---|---|---|
| 1 | 5-2(3) | (3) There shall be at least one (1) visual sight check every hour which shall include all areas of each cell and such sight checks shall be documented.<br><br>This standard was not met because I found evidence that jailers were watching the cameras and using the speaker monitors to do their hourly sight checks. | It is recommended that jail administrator ensures that jail staff conducts at least one sight check every hour that includes all areas of each cell and document each check in accordance with jail standards. | |
| 2 | 5-2(5) | (5) No one person shall be permitted to enter a prisoner's cell or other area in which a prisoner is confined, past the last locked door, without backup assistance. Prior to breaching the last locked/secure door, central control or another staff member who can provide assistance will be notified. Documentation shall reflect the reason for the decision to enter a cell without backup assistance and a permanent record of the event shall be maintained.<br><br>This standard was not met because no documented found as to why DO#2 entered without backup assistance. | It is recommended that the Jail Administrator ensures jail staff is aware that they are not allowed to enter a prisoner's cell or the last locked door without backup assistance. | |

Ex. 11

**DDR #3, 012**

# GCCJA

## Policy and Procedure Manual



## Detentions
## 2016

Ex. 12

**DDR #6, 001**

TABLE OF CONTENTS

**1**   From the Office of the Jail Administrator

**2**   Manual Instructions

**3**   Organizational Chart

**4**   1.0   Intake and Booking

**5**   2.0   Orientation

**6**   3.0   Inmate Rules and Discipline

**7**   4.0   Classification

**8**   5.0   Inmate Clothing

**9**   6.0   Release of Inmates

**10**   7.0   Physical Searches

**11**   8.0   Use of Force

**12**   9.0   Use of Restraints

**13**   10.0   Physical Plant

**14**   11.0   Mail and Visitation

**15**   12.0   Security and Control

**16**   13.0   Supervision of Inmates

**17**   14.0   Training and Development

**18**   15.0   Food Service

**19**   16.0   Safety, Sanitation and Hygiene

**20**   17.0   Prison Rape Elimination Act **(PREA)**

**21**   18.0   Report Writing

**22**   19.0   Post Orders

**23**   20.0   Court Movement

**24**   21.0   Facility and Inmate Programs

**DDR #6, 002**

AVERY® READY INDEX® DOUBLE-COLUMN DIVIDERS

## From the Office of the Jail Administrator:

Over the years we have experienced changes, operating facilities that are aging and those of new design. These abrupt changes from linear intermittent surveillance systems to the twenty-first century detentions systems (podular design) represents a tremendous challenge to the staff as well as the inmate.

One of the tools in facilitating this change and assuring the continuation of a smoothly operating facility is the implementation, maintenance and adherence to competent and effective policies and procedures.



Not only is maintenance and adherence to policy and procedure a prerequisite for assurance of a safe and professionally administered facility, but it minimizes the attributing liabilities as well.

The procedures contained in this manual have been found to conform to the beliefs, ideals and mandates of the undersigned, the applicable standards of the American Correctional Association and the National Institute of Corrections as well as the laws and mandates of the State of Oklahoma and the United States of America.

_____
Jim Gerlach (Executive Director/Jail Administrator)

7-1-16
_____
Date Submitted:

I

DDR #6, 003

These procedures, as presented by the Executive Director/Jail Administrator of the GCCJA, located in the Grady County Law Enforcement Center, have been presented and adopted by the authorized undersigned persons.



### GCCJA BOARD

Jaime Meyer (Chairman) _____ Date: _7-21-16_ (Y) N

John Baker (Vice Chair) _____ Date: _7-21-16_ (Y) / N

Jim Weir (Grady County Sheriff) _____ Date: _7-21-16_ (Y) / N

Jack Weaver (Board Member) _____ Date: _7-21-16_ (Y) N

Mike Lenier (BOCC Chairman) _____ Date: _7-21-16_ (Y) / N

Vote administered by:

Sabra Martin (GCCJA Secretary) _____ Date: _7/21/16_

II

DDR #6, 004

## **Mission Statement:**

The primary goal of the GCCJA Detention Facilities of the Grady County Law Enforcement Center is to provide safety, facility security and welfare of the staff, inmates and the community in the City of Chickasha and throughout Grady County. The GCCJA Detention operations comply with applicable standards set forth by the American Correctional Association, the National Sheriff's Association, and the National Commission on Correctional Health Care and with state standards currently in effect and proposed for Oklahoma Detention Facilities.

The primary function of the GCCJA is to safely and securely detain both pre-trial detainees and sentenced inmates.    The detention staff fully understand that inmates are subject to confinement resulting merely from their current situation.



We will always be professional in our daily duties.    Inmates will be treated fair, firm and consistent.    While meeting the standards of jail management, we will provide to the needs of the inmates 100% of what they need and consider what they want.    The safety and security of the staff, visitors, community, inmates and facility integrity are of the utmost importance.

The effective operation of the Grady County Law Enforcement Center depends on highly motivated, well-trained staff who continually strive to improve both their individual job performances and their areas of responsibility.

The GCCJA encourages professional growth and Detention Staff are provided with training within the department and are given opportunities to attend outside training.  To facilitate the effective operation of the Grady County Law Enforcement Center of the GCCJA, the Detention Staff are encouraged to actively contribute to management decisions through appropriate staff meetings.

_____
Jim Gerlach (Executive Director/Jail Administrator)

7-1-16
Date Submitted:

III

**DDR #6, 005**

# MANUAL INSTRUCTIONS

**Preface:**

The written directives included in this manual are intended for the Grady County Criminal Justice Authority (GCCJA) use only. They are for internal administrative purposes and do not create any higher legal standard of care or liability. Violations of laws will be appropriately addressed in a proper judicial proceeding. The directives may, however, form the basis for disciplinary action.

Areas in blue are Oklahoma State Jail Standards. These are provided for officers to know the standards for the yearly test.



The GCCJA Executive Director/Jail Administrator reserves the right to alter, amend, issue and rescind any written directive or other rule or regulation as deemed appropriate.

Personnel are to be in compliance with the letter and spirit of all written directives of the GCCJA.

Deviation from policy by any personnel is permitted only when circumstances in a particular incident dictates that such a deviation from the directive would accomplish a positive result. Whenever such deviation occurs all personnel must be prepared to offer reasons that adherence to procedure in a particular instance would have been detrimental to effectiveness, while maintaining standardized goals and objectives.

I

DDR #6, 006

**Use of Policy and Procedure Manuals:**

1. **Clarity.** Personnel who do not understand a policy or procedure should consult their immediate supervisor for clarification. If that supervisor cannot resolve the issue, they must go to their direct supervisor. This process should continue upward in the chain of command until the employee is clear on the meaning of the directive in question.

2. **Updates.** If personnel believe that there is an outdated policy or discrepancy in a policy they should contact their supervisor immediately. 

3. All personnel are responsible for knowledge of all policies.

4. Personnel should note that all areas in blue are the Oklahoma Jail Standards. They should study these for the yearly test.

5. Personnel should note that all areas in **black** are the specific details of policy and procedure.

6. All policies will contain: a title, a policy statement, a purpose statement, definitions (if any), a procedure section, a signature of the Executive Director/Jail Administrator, and a date.

II

DDR #6, 007



GRADY COUNTY CRIMINAL JUSTICE AUTHORITY
PROTECT DETENTION SERVE
OKLAHOMA

# GRADY COUNTY LAW ENFORCEMENT CENTER (GCLEC)

## POLICIES AND PROCEDURES

### Detentions – 2.0

### ORIENTATION



---

## 2.1 Policy:

The GCCJA will conduct orientations for inmates who are a new intake and assigned to housing units in order to familiarize inmates with facility rules and available services.

## 2.2 Purpose:

To outline the process for informing all inmates of facility rules and available services.

## 2.3 Definitions:

**Inmate Handbook (Inmate Rules):** An informational booklet provided to all inmates at classification with topics such as rules, discipline, mail and visitation.

## 2.4 Procedure:

A.  Prior to being placed in the housing population, each inmate is provided with an orientation to the facility, which includes at a minimum:

1.  Written materials describing facility rules;

2.  Answering of reasonable questions;

3.  Information on how to access medical care; and

4.  PREA information and accessibility.

**B.**   This information will be provided through a written inmate handbook or verbally as needed. The information is to be communicated in a language clearly understood by the inmate, prior to assignment to a housing unit.

   1.  If an inmate cannot read orientation materials, the materials explained to the inmate by a staff member. For inmates who do not speak or read English, interpretive services will be provided.

   2.  If the inmate can read English or Spanish, the officer will give the inmate a copy of the inmate handbook in the appropriate language, and will have the inmate sign for the handbook.

**C.**   Inmates will verify, by signature, the receipt of initial orientation and of the inmate handbook. Signed acknowledgement for receipt of the handbook is maintained in the inmate's file.

Jail Administrator: _____ Date: _7- 1- '6_

                        **Jim Gerlach**

**Adopted:**   July 1st, 2016

**Revised:**   TBA

# GRADY COUNTY LAW ENFORCEMENT CENTER (GCLEC)

## POLICIES AND PROCEDURES

### Detentions – 3.0

## INMATE RULES AND DISCIPLINE



## 3.1 Policy:

The GCCJA has a system of inmate discipline that will serve to protect the public, inmates, facility and personnel. These policies will maintain order through the impartial application of a fully developed set of rules and regulations and a procedure that incorporates all applicable due process requirements. An impartial person or panel of persons conducts disciplinary hearings on rule violations. The Jail Administrator or designee will review all disciplinary hearings and dispositions to assure conformity with policy and procedures.

## 3.2 Purpose:

To identify acts that are prohibited and the sanctions for such acts and to establish guidelines for providing due process to inmates accused of violations.

## 3.3 Definitions:

**Inmate Handbook (Inmate Rules):** An informational booklet provided to all inmates at classification with topics such as rules, discipline, mail and visitation.

**Possession of Contraband:** Having in one's control any item which has not been approved by the Jail Administrator including weapons or any item which has been altered for use as a weapon, intoxicants or drug paraphernalia or any other use for which the item has not been approved.

**Gambling:** Operating or acting in any game of chance or waging of goods or other valuables or possessing gambling paraphernalia.

**Insurrection:** Participation or encouraging others to participate in unauthorized activity such as a riot, unauthorized meeting or gathering or work stoppage.

Page 1 of 7

**DDR #6, 011**

**Disorderly Conduct:** Behavior such as loud talking or yelling, pushing another, or any other behavior which creates a disturbance and/or disrupts the orderly operation of the facility and/or housing unit.

**Hindering an Employee:** Acting in such a way so as to interrupt the duties of an employee such as causing delays or giving false information.

**Sexual Misconduct:** Taking part in any sex act (kissing, fondling or other inappropriate touching of another) where all parties are able to and offer consent; exposing one's genitals or buttocks to any other person; masturbation in the view or presence of another.

## 3.4 Procedure:

A.    **Jail Standards – General:**

1.    Written facility rules shall list all chargeable offenses, and the range of sanctions and disciplinary procedures to be followed and shall be made available to inmates.

2.    A rule book that contains all chargeable offenses, range of sanctions, and disciplinary procedures is provided to each inmate upon booking and is translated into those languages spoken by the significant number of inmates.

3.    When a literacy or language problem prevents an inmate from understanding the rule book, a staff member shall assist the inmate.

4.    All persons who deal with inmates shall be familiar with the rules of inmate conduct, and the approved sanctions.

5.    To prevent discrepancies among staff in interpretations, in-service training shall be conducted as often as necessary by direction of the administrator.

6.    Employees shall prepare a disciplinary report when they have reason to believe that an inmate has committed a violation of rules.

7.    Disciplinary reports prepared by staff shall include at least the following:

    a.    Specific rules violated;
    b.    A formal statement of the charge;
    c.    Any unusual inmate behavior;
    d.    Any staff or inmate witness;
    e.    Disposition of any physical evidence;
    f.    Any immediate action taken, including the use of force;
    g.    Date and time of the report.

8.    Administrative due process procedures shall be followed for all rule violations.

9. A chairperson or a committee may be appointed by the administrator to hear the charges and make a decision on appropriate action to be taken.

10. Due process procedures shall include at least the following elements:

    a. Written rules that specify offenses and sanctions;

    b. Inmate has been made aware of the rules and sanctions;

    c. Inmate receives written notice of the charges and time of hearing prior to the hearing;

    d. Inmate is present at the hearing and hears evidence, except for confidential information or presents unruly behavior or waives that right in writing;

    e. Inmate has the right to make his own statement;

    f. Inmate has the right to call relevant witnesses;

    g. Inmate may be assisted by a willing inmate or staff member of his choosing;

    h. The decision shall be based solely on the evidence and shall be rendered in writing;

    i. Record shall be made of the hearing;

    j. Decision shall be reviewed by the facility administrator or designee;

    k. An inmate shall have the right to appeal the decision of the facility administrator or designee to the next level of authority;

11. If an inmate is found not guilty, the disciplinary report and all associated documents shall be removed from the inmate's file;

12. If an inmate is found guilty, the findings shall be maintained in the inmate's file. If an inmate allegedly commits an act covered by statutory law, the case may be referred to the appropriate court or law enforcement officials for prosecution.

13. There shall be a written policy and procedure to respond to inmate requests to staff and grievances.

B.    Any inmate who may have violated a local, state or federal law while in custody is subject to criminal prosecution. Alleged violations of any laws are reported, investigated and handled as any regular criminal case.

C.  Detention officers, deputies and medical staff who work directly with inmates will be knowledgeable of the inmate rules and regulations, attend ***annual*** in-service training and be instructed in the rules of discipline and procedures.

D.  Inmates will be subject to rules, regulations, and laws. Inmates will be subject to two levels of discipline. The GCCJA will have a non-criminal discipline, and a criminal discipline. Inmates may be subject to both disciplines at the same time.

E.  An explanation of the inmate disciplinary system, including a list of rules and which offences are categorized as major or minor is included in the Inmate Rules Handbook. Each inmate receives a copy of the Inmate Handbook during the booking process.

F.  **Inmate Disciplinary Reports:**

   1.  Officers will notify their supervisor of any disciplinary procedures implemented, verbally and by completing a report. The officer will ensure that their supervisor receives the completed report prior to the end of shift. The discipline report will contain the following information.

      a.  The specific rule(s) violated;
      b.  A formal statement of the charge;
      c.  Any unusual inmate behavior;
      d.  Any staff witnesses;
      e.  An explanation of the event that includes who was involved what transpired, and the time and location of the occurrence;
      f.  Any physical evidence and its disposition;
      g.  Any immediate action taken, including the use of force;
      h.  Reporting officer's signature and date and time of report.

G.  **Disciplinary Hearings for Violations:**

   1.  The disciplinary hearing will be conducted by the Jail Administrator or designee. All decisions made by the Jail Administrator or designee will be based solely on information obtained in the hearing process, including staff reports, the statements of the inmates charged and the evidence derived from witnesses and documents.

   2.  The Jail Administrator will review all decisions. The inmate shall have the right to appeal the decision to the next level of authority.

   3.  If an inmate is found not guilty of an alleged rule violation the disciplinary report is removed from all of the inmate's files.

H.  **Offense List and Types of Discipline:**  While it is impossible to define every possible prohibited act or rule violation, the following acts are prohibited. Committing, attempting to commit, aiding in the commission of or making plans to commit one or more of these acts will result in discipline or lawful prosecution. The specific type of discipline imposed

will be at the discretion of the officer and/or the hearing officer conducting the disciplinary review.

1. **Minor Infractions:**

    a. **Disorderly Conduct:**  Behavior such as loud talking or yelling, pushing, which creates a disturbance and/or disrupts the orderly running of the facility;
    b. **Use of Abusive, Vulgar, or Obscene language:**  Use of words and/or phrases that are vulgar, abusive or obscene;
    c. **Failure to Maintain Personal Hygiene:**  Not having a clean body and clothes;
    d. **Possession of Gambling Paraphernalia:**  Having in one's control, items for use in operating or acting in any game of chance involving betting or wagering of goods or other valuables;
    e. **Refusal to Work:**  When a person refuses to perform an assigned job;
    f. **Present in an Unauthorized Area:**  Being in an area that is designated through verbal, written or posted orders as off limits to a specific inmate or inmates in general;
    g. **Self-Mutilation:**  Inflicting injury on one's self. Cutting on one's own body or tattooing;
    h. **Unsanitary and Disorderly Housing Conditions:**  Failing to maintain a clean, neat living area. All possessions are stored in a property storage box or designated areas. Excessive property must be removed. The area should be free from dirt and clutter;
    i. **Smoking Tobacco:**  Smoking of any form of tobacco;
    j. **Failure to Follow Verbal or Posted rules and/or Orders:**  not following specific rules and/or orders which have been designated for the clean, safe, orderly operation of the facility after being advised of rules and/or rules. This includes the failure to follow the facility procedures for taking count.

2. **Minor Infraction Range of Discipline:**

    a. lockdown ranging from 1 to 3 days
    b. loss of commissary
    c. loss of phone usage
    d. loss of visitation for one week, or
    e. any combination of a through d.

3. **Major Infractions:**

    a. **Murder:**  Any act of which the end result is the death of any person including inmates, staff or civilians;
    b. **Assault:**  An attack upon the body of another person. This includes rape;
    c. **Fighting:**  engaging in a physical conflict with another person;

d. **Sexual Misconduct/Rape:** This includes, but is not limited to:

      i. Taking part in sex acts where all parties agree to take part;
      ii. Exposing the genitals or buttocks to any person;
      iii. Masturbation in the view or presence of another;

e. **Arson:** Starting or causing the start of a fire which could or does cause injury to persons or damage to property;

f. **Escape:** Leaving the grounds of the jail or from the custody of an employee outside the facility without permission;

g. **Possession of Contraband:** Having in one's control any item which has not been approved by the facility – including weapons or any item which has been altered for use as a weapon, intoxicant, or drug paraphernalia;

h. **Unauthorized Use of Drugs or Intoxicants:** Use of any drug or intoxicant which has not been prescribed or approved for the inmate's use;

i. **Insurrection:** Participation or encouraging others to participate in unauthorized activity such as rioting or a work stoppage;

j. **Counterfeiting, Forgery or Unauthorized Reproduction:** Unauthorized reproduction of any document, article, identification, money, security or official paper;

k. **Hindering an Employee in the Performance of their Duties:** Acting in such a way so as to interrupt the duties of an employee, such as causing delays or giving false information;

l. **Gambling:** Operating or acting in any game of chance involving betting or wagering of goods or other valuables or possessing gambling paraphernalia;

m. **Destruction, Alteration or Damage to Property:** Destroying, changing or damaging properties belonging to the GCCJA or any other person;

n. **Theft:** Unauthorized taking of something that belongs to someone else;

o. **Threatening Another with Harm:** Telling someone, through actions or words, that harm will come to them;

p. **Unauthorized Use of Mail or Telephone:** Using the mail or telephone to commit fraud or theft. This includes using the mail or telephone in a manner in which it was not designed or at unauthorized times;

q. **Possession of Stolen Property:** Having in one's control, any item which has been stolen from any other person;

r. **Attempt/Conspiracy:** This is an offense for inmates who do not actually commit the offense but participate in the following ways:

      i. Attempts to commit the offense;
      ii. Solicit another or others to commit the offenses;
      iii. Conspires with another or others to commit the offense;
      iv. Facilitates the action of another or others in committing the offense.

s. **Violations of Any Federal or State Law:** any act, though not specifically listed in this policy, which would be either a felony or misdemeanor under federal laws or state laws will constitute a major or minor violation.

Page **6** of **7**

**DDR #6, 016**

4. **Major Violations Range of Discipline:**

    a. Isolation
    b. Loss of privileges for 3 days or more
    c. Loss of earned credits
    d. Criminal Charges
    e. Any combination of a through d.

I.    In the event of a widespread facility disruption requiring emergency action, any portions of this policy may be temporarily suspended. Any inmate involved in the disruption may be detained without a hearing throughout the course of an officially declared emergency. No impermissible sanctions may be employed during such an emergency.

Jail Administrator: _____ Date: 7-1-16
                    **Jim Gerlach**

**Adopted:**    July 1st, 2016

**Revised:**    TBA

**Volume 4 (of 4)**           **4 App 90**

# GRADY COUNTY LAW ENFORCEMENT CENTER (GCLEC)

## POLICIES AND PROCEDURES

### Detentions – 5.0

### INMATE CLOTHING



---

## 5.1 Policy:

The GCCJA will provide each new inmate with clean clothing to include pants and shirts, or jumpsuits, undergarments, socks and shoes. Inmates will be provided bedding to include, sheets and blanket, and a mattresses containing integrated pillows. Inmates will also be issued a hygiene kit. Inmates will be given the opportunity to shower, unless specific documented circumstances relating to the safety and security of the inmate exist.

## 5.2 Purpose:

To provide guidelines for issuing clothing, hygiene products and bedding to inmates.

## 5.3 Definitions:

**Contraband:** Items illegal to possess; for detention purposes, items illegal or against the GCCJA policy to possess in a detention facility.

**Hygiene Kit:** Personal care items issued to inmates at the time they are issued clothing. The kit includes soap, toothbrush, toothpaste and a comb. Items may be replaced as necessary. Feminine hygiene products will be supplied upon request.

## 5.4 Procedure:

A.     **Inmate Clothing:**

　　1. Each article of the inmate's personal clothing will be collected from the inmate, documented on the property form and placed in an inmate clothing storage bag.

2. Inmate clothing storage bags will be easily identified, personnel will log property in the computer.

3. Personal clothing taken during the clothing process will be treated as if these items could be requested and inspected by the courts.

4. Each bag should be tagged with a numbered tag.

5. All issued items will be documented on the property form and a receipt will be issued to the inmate.

6. If, for any reason, an inmate is not issued proper clothing items, the officer will notify the Supervisor and make a detailed entry in the Booking Log Book.

**B.    Medical Problems During Clothing Process:**

1. If the officer notices or is told of any medical problems regarding the inmate during the clothing process, the officer will immediately notify the supervisor of the medical problem.

2. If the supervisor determines that the inmate requires specialized housing, the supervisor will notify the classification officer and medical.

**C.    Contraband Found During Clothing Process:**

1. If the officer observes any contraband during the clothing process of an inmate, the officer will notify a supervisor. Officers will seize the contraband. The officer will secure the seized item/s and reports in an evidence locker unless otherwise directed by the supervisor.

2. The officer who first observed the contraband will complete a report.

3. The supervisor will determine if possession of the contraband item(s) is a violation of the law. If it is not a violation of the law, the contraband may be disposed of in a secure manor. If possession of the contraband is a violation of law, the supervisor will request an officer to complete a criminal report.

4. The supervisor will release custody of illegal contraband to the reporting officer, who will prepare a report and secure the illegal contraband for court purposes.

Jail Administrator: _____ Date: 7 - 1 - 16
                                **Jim Gerlach**
**Adopted:**    July 1st, 2016
**Revised:**    TBA

Page **2** of **2**

**DDR #6, 019**

**Volume 4 (of 4)**                                          **4 App 92**

# GRADY COUNTY LAW ENFORCEMENT CENTER (GCLEC)

## POLICIES AND PROCEDURES

## Detentions – 14.0

## TRAINING AND DEVELOPMENT



## 14.1 Policy:

The GCCJA will provide planned, organized, and evaluated training for all employees to enhance job knowledge, performance skills and employee competence.

## 14.2 Purpose:

To provide guidelines for all GCCJA employees and to define the responsibilities of personnel in regard to the training function.

## 14.3 Definitions:

NONE.

## 14.4 Procedure:

A.  **Training and Development - General:**

1.  The administrator shall develop policies and procedures for staff orientation and training. The training program shall be supervised by a designated employee.

2.  A facility with more than one-hundred (100) employees shall employ a full-time person for staff orientation and training.

3.  Policies and procedures shall include at least the following:

    a.  A new employee shall receive orientation and training prior to job assignment by the employing agency.

b.  All personnel, including the jail administrator and all supervisors, who work in direct contact with inmates during the first year of their employment shall receive at least twenty-four (24) hours of training that covers at least the following:

    i.  Security procedures;
    ii.  Supervision of prisoners;
    iii.  Report writing and documentation;
    iv.  Prisoner rules and regulations;
    v.  Grievance and disciplinary procedures;
    vi.  Rights and responsibilities of prisoners;
    vii.  Emergency procedures;
    viii.  First aid and cardiopulmonary resuscitation;
    ix.  Requirements of this Chapter.

c.  After the first year of employment, an employee who works in direct contact with prisoners shall receive at least the following training. This training shall be in addition to any requirements for completion of first aid and cardiopulmonary resuscitation. Before training begins a training schedule shall be provided to the Oklahoma State Department of Health Jail Inspection Division for approval, listing subjects, number of hours, date, time, location and instructor.

    i.  Four (4) hours review of the required training items.
    ii.  Eight (8) hours training provided by the administrator; content and instructors shall be selected by the administrator.
    iii.  A test shall be given by the Oklahoma State Department of Health Jai Inspection Division that covers this Chapter.

d.  A documentation log shall be sent to the Oklahoma State Department of Health Jai Inspection Division for each person who completes the required training.
e.  Training may be given through other programs that have first been reviewed and approved by the Oklahoma State Department of Health Jai Inspection Division.
f.  A passing score on the test given by the Oklahoma State Department of Health Jai Inspection Division shall be seventy (70) percent or higher.
g.  Any person scoring less than seventy (70) percent shall not be considered to have satisfactorily completed training and may retest as necessary for a period of up to one year.

**B.  Training Detention Employees:**

1.  All new detention officers receive a minimum of 24 hours of training during their first year of employment. At a minimum, the training includes:

a.  Security procedures;
b.  Supervision of prisoners;
c.  Report writing and documentation;
d.  Prisoner rules and regulations;

    e.  Grievance and disciplinary procedures;
    f.  Rights and responsibilities of prisoners;
    g.  Emergency procedures;
    h.  First Aid and CPR;
    i.  Title 310 Oklahoma State Department of Health Chapter 670 Jail Standards and test.

2. Any personnel failing to complete all annual training or failing to keep current with continuing education credits will be subject to disciplinary procedures up to and including termination.

3. **Records Maintained.** The GCCJA will maintain records of training, including records of all classes and outside training. Records will include:

    a.  Type of training;
    b.  Date and location of training;
    c.  Number of hours of training;
    d.  Certificates, scores or other documents received.

4. **Outside Training.** Each employee must provide the training coordinator with a copy of any certificates or other documents received for training outside the GCCJA for inclusions in the employee's training file.

## C.    Weapons Training:

1. An officer may only carry a weapon if they receive training on the weapon's safe and proper usage and qualify with it.

2. The weapon must meet the proper specifications and be inspected by the GCCJA for that particular type of weapon.

3. **To be considered approved, a weapon must initially be:**

    a.  Issued to the officer by the GCCJA; or
    b.  Approved by the Jail Administrator or designee for use by the in the performance of their assigned duties.

4. **Issuance and Storage of GCCJA Weapons:** The GCCJA will be responsible for the storage, and issuance, of all GCCJA issued weapons.

5. **TASERs:**

    a.  The GCCJA will store TASERs in a secured, dry, climate controlled area until such time that they are issued, disposed of or replaced.

     6.  **O. C. Spray.** The GCCJA will store all O.C. Spray in a safe, dry, climate controlled area until such time the spray is issued, disposed of, or replaced.

**D.**    **Other Weapons:** No detention officer is permitted to carry and use a weapon until they have received training and are qualified as proficient in its use by a certified weapons instructor. All approvals are conditional upon annual requalification.

**E.**    **Defensive Tactics:**  All officers are required to complete the following training related to self-protection, the protection of others and safety and security.

     1.  Orientation to defensive tactics;
     2.  Warm-up exercises;
     3.  Crawling and dragging yourself across the floor;
     4.  Hand to hand combat;
     5.  Take downs;
     6.  Any other tactical move required by the instructor.

**F.**    **Position Requirement:**  All officers employed by the GCCJA will be required to attend and qualify for defensive tactics, Taser and Firearms.  In the event that an officer cannot or will not complete these requirements, they will be disciplined up to and including termination.

---

Jail Administrator: _____  Date: 7 - 1 - 16
                          **Jim Gerlach**

**Adopted:**    July 1st, 2016
**Revised:**    TBA

# GRADY COUNTY LAW ENFORCEMENT CENTER (GCLEC)

## POLICIES AND PROCEDURES

## Detentions – 17.0

## PRISON RAPE ELIMINATION ACT
### (PREA)



---

## 17.1 Policy:

The GCCJA has a zero tolerance standard for the incidence of inmate rape and sex-related offenses and attempts thereof and will make every effort to prevent these incidents. The GCCJA will strictly enforce all federal and state laws regarding inmate sexual misconduct, threats of sexual assault or intimidation by providing clear definitions of prohibited conduct, establishing uniform methods of the prompt reporting and investigation of allegations of sex-related offenses or threats, identification of predators, protection of victims and prescribing sanctions for substantiated sexual offenses as well as false allegations.

## 17.2 Purpose:

The written directives included in this manual are intended for GCCJA use only. They are for internal administrative purposes and do not create any higher legal standard of care or liability. Violations of laws will be appropriately addressed in a proper judicial proceeding. The directives may, however, form the basis for disciplinary action.

## 17.3 Definitions:

**Agency:** The unit of a State, local, corporate, or nonprofit authority, or of the Department of Justice, with direct responsibility for the operation of any facility that confines inmates, including the implementation of policy as set by the governing, corporate, or nonprofit authority.

**Agency or facility head:** The principal official of an agency.

**Contractor:** A person who provides services on a recurring basis pursuant to a contractual agreement with the agency.

**Direct staff supervision:** Security staff is in the same room with, and within reasonable hearing distance of the inmate.

**Employee:** A person who works directly for the agency or facility.

**Exigent circumstances:** Any set of temporary and unforeseen circumstances that require immediate action in order to combat a threat to the security or institutional order of a facility.

**Facility:** A place, institution, building (or part thereof), set of buildings, structure, or area (whether or not enclosing a building or set of buildings) that is used by an agency for the confinement of individuals.

**Gender nonconforming:** A person whose appearance or manner does not conform to traditional societal gender expectations.

**Inmate:** Any person incarcerated or detained in a prison or jail.

**Intersex:** A person who's sexual or reproductive anatomy or chromosomal pattern does not seem to fit typical definitions of male or female. Intersex medical conditions are sometimes referred to as disorders of sex development.

**Jail:** A confinement facility of a Federal, State, or local law enforcement agency whose primary use is to hold persons pending adjudication of criminal charges, persons committed to confinement after adjudication of criminal charges for sentences of one year or less, or persons adjudicated guilty who are awaiting transfer to a correctional facility.

**Juvenile:** Any person under the age of 18, unless under adult court supervision and confined or detained in a prison or jail.

**Juvenile facility:** A facility primarily used for the confinement of juveniles pursuant to the juvenile justice system or criminal justice system.

**Law enforcement staff:** Employees responsible for the supervision and control of inmates in lockups.

**Lockup:** A facility that contains holding cells, cell blocks, or other secure enclosures that are:

> ➢ Under the control of a law enforcement, court, or custodial officer; and
> ➢ Primarily used for the temporary confinement of individuals who have recently been arrested, detained, or are being transferred to or from a court, jail, prison, or other agency.

**Medical practitioner:** A health professional who, by virtue of education, credentials, and experience, is permitted by law to evaluate and care for patients within the scope of his or her professional practice. A "qualified medical practitioner" refers to such a professional who has also successfully completed specialized training for treating sexual abuse victims.

**Mental health practitioner:** A mental health professional who, by virtue of education, credentials, and experience, is permitted by law to evaluate and care for patients within the scope

**DDR #6, 025**

**Volume 4 (of 4)**                                                                 **4 App 98**

of his or her professional practice. A "qualified mental health practitioner" refers to such a professional who has also successfully completed specialized training for treating sexual abuse victims.

**Pat search:** A physical search for contraband and weapons by an officer conducted without removing the clothing, although shoes and socks may be removed.

**Prison:** An institution under Federal or State jurisdiction whose primary use is for the confinement of individuals convicted of a serious crime, usually in excess of one year in length, or a felony.

**Security staff:** Employees primarily responsible for the supervision and control of inmates in housing units, recreational areas, dining areas, and other program areas of the facility.

**Strip search:** A visual examination of the unclothed body for contraband. This search may include the examination of the clothes while removed.

**Substantiated allegation:** An allegation that was investigated and determined to have occurred.

**Transgender:** A person whose gender identity (i.e., internal sense of feeling male or female) is different from the person's assigned sex at birth.

**Unfounded allegation:** An allegation that was investigated and determined not to have occurred.

**Unsubstantiated allegation:** An allegation that was investigated and the investigation produced insufficient evidence to make a final determination as to whether or not the event occurred.

**Volunteer:** An individual who donates time and effort on a recurring basis to enhance the activities and programs of the agency.

## 17.4 Procedure:

A.    **Sexual abuse includes:**

  1.  Sexual abuse of an inmate by another inmate; and

  2.  Sexual abuse of an inmate by a staff member, contractor, or volunteer.

B.    **Sexual abuse of an inmate by another inmate:** includes any of the following acts, if the victim does not consent, is coerced into such act by overt or implied threats of violence, or is unable to consent or refuse:

  1.  Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;

  2.  Contact between the mouth and the penis, vulva, or anus;

3. Penetration of the anal or genital opening of another person, however slight, by a hand, finger, object, or other instrument; and

4. Any other intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or the buttocks of another person, excluding contact incidental to a physical altercation.

C. **Sexual abuse of an inmate by a staff member, contractor, or volunteer:** includes any of the following acts, with or without consent of the inmate:

1. Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;

2. Contact between the mouth and the penis, vulva, or anus;

3. Contact between the mouth and any body part where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

4. Penetration of the anal or genital opening, however slight, by a hand, finger, object, or other instrument, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

5. Any other intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh, or the buttocks, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

6. Any attempt, threat, or request by a staff member, contractor, or volunteer to engage in the activities described in paragraphs (1) - (5) of this section;

7. Any display by a staff member, contractor, or volunteer of his or her uncovered genitalia, buttocks, or breast in the presence of an inmate, and;

D. **Voyeurism:** Voyeurism by a staff member, contractor, or volunteer means an invasion of privacy of an inmate by staff for reasons unrelated to official duties, such as peering at an inmate who is using a toilet in his or her cell to perform bodily functions; requiring an inmate to expose his or her buttocks, genitals, or breasts; or taking images of all or part of an inmate's naked body or of an inmate performing bodily functions.

E. **Sexual harassment includes:**

1. Repeated and unwelcome sexual advances, requests for sexual favors, or verbal comments, gestures, or actions of a derogatory or offensive sexual nature by one inmate directed toward another; and

**DDR #6, 027**

**Volume 4 (of 4)**                                    **4 App 100**

2. Repeated verbal comments or gestures of a sexual nature to an inmate, by a staff member, contractor, or volunteer, including demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures.

F.    **Prevention and Planning:**

1. **Zero tolerance of sexual abuse and sexual harassment.** The GCCJA and all employees, contractors, volunteers and inmates will adhere to a zero tolerance policy toward all forms of sexual abuse and sexual harassment of inmates. The GCCJA has established through this policy our approach to preventing, detecting and responding to such conduct.

2. **PREA Coordinator.** The GCCJA will designate an upper-level, agency-wide PREA coordinator, with sufficient time and authority to develop, implement, and oversee agency efforts to comply with the PREA standards throughout its facilities.

3. **Contracting with other entities for the confinement of inmates.** The GCCJA will ensure that all contracts for the confinement of its inmates with private agencies or other entities, including other government agencies, will include in any new contract that the GCCJA has adopted and adheres to the PREA standards.

4. **Supervision and monitoring.** The Jail Administrator or designee will develop and document a staffing plan that provides for adequate levels of staffing, and, where applicable, video monitoring, to protect inmates against sexual abuse. In calculating adequate staffing levels and determining the need for video monitoring, agencies will take into consideration.

   a.   The physical layout of each facility;
   b.   The composition of the inmate population;
   c.   The prevalence of substantiated and unsubstantiated incidents of sexual abuse; and
   d.   Generally accepted detention and correctional practices;
   e.   Any judiciary findings of inadequacy;
   f.   Any findings of from Federal investigative agencies;
   g.   Any findings of inadequacy from internal or external oversight bodies;
   h.   All components of the physical facilities layout including "blind-spots" or isolation locations;
   i.   The number and placement of supervisory staff;
   j.   Programs, program locations, and shift hours;
   k.   Any applicable local, state, regulations, standards, or laws;
   l.   Any findings from the PREA Auditor;
   m.   Any other relevant factors.

5. **Juvenile Inmates:** The GCCJA does not house, hold or detain juvenile inmates. In the event that a need arises, juvenile inmates will not be placed in any location in which the juvenile inmate will have sight, sound, or physical contact with any adult inmate.

6. **Limits to cross-gender viewing and searches:** Personnel will not conduct cross-gender strip searches or cross-gender visual body cavity searches (meaning a search of the anal or genital opening) except by court order or when performed by medical practitioners. Personnel will document all cross-gender strip searches and cross-gender visual body cavity searches. Cross-gender pat searches of female inmates, absent exigent circumstances is prohibited, and any cross-gender pat searches of female inmates performed due to exigent circumstances will be documented.

7. **Limited Viewing:** Personnel will ensure that inmates are able to shower, perform bodily functions, and change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks. Upon arrival of any person of the opposite gender, employees will announce their presence when entering an area where inmates are likely to be showering, performing bodily functions, or changing clothing.

8. **Transgender searches for purpose of genital status.** Personnel will not search or physically examine a transgender or intersex inmate for the sole purpose of determining the inmate's genital status. If the inmate's genital status is unknown, it may be determined during conversations with the inmate, by reviewing medical records, or, if necessary, by learning that information as part of a broader medical examination conducted in private by a medical practitioner. Inmates of unknown genital status will be reviewed by medical personal for a determination.

9. **Pat down searches of transgender and intersex persons.** This agency will train officers and staff in how to conduct cross-gender pat-down searches, and searches of transgender and intersex inmates, in a professional and respectful manner, and in the least intrusive manner possible, consistent with security needs.

10. **Inmates with disabilities and Inmates who are limited English proficient.**

    a. This agency will ensure that inmates with disabilities (including, for example, inmates who are deaf or hard of hearing, those who are blind or have low vision, or those who have intellectual, psychiatric, or speech disabilities), have an equal opportunity to participate in or benefit from all aspects of the agency's efforts to prevent, detect, and respond to sexual abuse and sexual harassment. Such steps will include:

        i. Providing access to interpreters who can interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary.
        ii. That written materials are provided in formats or through methods that ensure effective communication with inmates with disabilities, including inmates who have intellectual disabilities, limited reading skills, or who are blind or have low vision.

iii.    The classification staff will ensure that disabled inmates have access to these materials and programs.

NOTE: *This agency is not required to take actions that it can demonstrate or would result in a fundamental alteration in the nature of a service, program, or activity, or in undue financial and administrative burdens, as those terms are used in regulations promulgated under title II of the Americans With Disabilities Act, 28 CFR 35.164.*

b.  This agency will ensure that reasonable step(s) are taken to ensure meaningful access to all aspects of the agency's efforts to prevent, detect, and respond to sexual abuse and sexual harassment to inmates who are limited English proficient, including steps to provide interpreters who can interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary. Officers will use Language Line Services for interpretation.

    i.  Officers will call Language Line at 1-888-808-9008.

        1.  Enter on key pad – the client code- **79919465**;
        2.  Press 1 for Spanish, 2 for all other languages;
        3.  Brief the interpreter and summarize what you wish to accomplish;
        4.  Add the limited English speaker to the line.

c.  The GCCJA will not rely on inmate interpreters, inmate readers, or other types of inmate assistants except in limited circumstances where an extended delay in obtaining an effective interpreter could compromise the inmate's safety, the performance of first-response duties under Staff first responder duties, or the investigation of the inmate's allegations.

11. **Hiring and promotion decisions:** The GCCJA will not hire or promote anyone who may have contact with inmates, and will not enlist the services of any contractor, who may have contact with inmates, who:

a.  Has engaged in sexual abuse in a prison, jail, lockup, community confinement facility, juvenile facility, or other institution (as defined in 42 U.S.C. § 1997);
b.  Has been convicted of engaging or attempting to engage in sexual activity in the community facilitated by force, overt or implied threats of force, or coercion, or if the victim did not consent or was unable to consent or refuse; or
c.  Has been civilly or administratively adjudicated to have engaged in the activity described in paragraph (a) of this section.

12. **Background Checks:** The GCCJA will consider any incidents of sexual harassment in determining whether to hire or promote anyone, or to enlist the services of any contractor, who may have contact with inmates.

13. **Upgrades to facilities and technologies:** When designing or acquiring any new facility and in planning any substantial expansion or modification of existing facilities, the GCCJA will consider the effect of the design, acquisition, expansion, or

Page **7** of **26**

**DDR #6, 030**

modification upon the agency's ability to protect inmates from sexual abuse. When installing or updating a video monitoring system, electronic surveillance system, or other monitoring technology, the GCCJA will consider how such technology may enhance the agency's ability to protect inmates from sexual abuse.

**G.    Responsive Planning:**

1. **Evidence protocol and forensic medical examinations:**

   a. To the extent the GCCJA is responsible for investigating allegations of sexual abuse; the GCCJA will follow a uniform evidence protocol that maximizes the potential for obtaining usable physical evidence for administrative proceedings and criminal prosecutions.

   b. The protocol will be developmentally appropriate for meeting the most recent edition of the U.S. Department of Justice's Office on Violence against Women publication, "A National Protocol for Sexual Assault Medical Forensic Examinations, Adults/Adolescents," or similarly comprehensive and authoritative protocols developed after 2011.

   c. The GCCJA will offer all victims of sexual abuse access to forensic medical examinations without financial cost, where evidentiary or medically appropriate. Such examinations will be performed by Sexual Assault Forensic Examiners (SAFEs) or Sexual Assault Nurse Examiners (SANEs) where possible. If SAFEs or SANEs cannot be made available, the examination can be performed by other qualified medical practitioners. The GCCJA will document its efforts to provide exams.

   d. The GCCJA will attempt to make available to the victim, a victim advocate from a rape crisis center. If a rape crisis center is not available to provide victim advocate services, the GCCJA will make available to provide these services a qualified staff member from a community-based organization or a qualified agency staff member. The GCCJA will document efforts to secure services from rape crisis centers.

   e. As requested by the victim, the victim advocate, qualified agency staff member, or qualified community-based organization staff member will accompany and support the victim through the forensic medical examination process and investigatory interviews and will provide emotional support, crisis intervention, information, and referrals.

   f. To the extent the GCCJA itself is not responsible for investigating allegations of sexual abuse; the agency will request that the investigating agency follow the requirements of paragraphs (a) through (e) of this section.

2. **Ensuring referrals of allegations for investigations:**

   a. The GCCJA will ensure that an administrative and/or criminal investigation is completed for all allegations of sexual abuse and sexual harassment.

   b. The GCCJA will ensure that all allegations of sexual abuse or sexual harassment are referred for investigation to Jail Investigations.

**DDR #6, 031**

**Volume 4 (of 4)**                                    **4 App 104**

     i.    Investigations will ensure that there is a complete tracking system from the initial request through the final disposition.

    ii.    Investigations will retain statistical data to include:

        1. Number of allegations of sexual abuse and sexual harassment received.
        2. Number of allegations resulting in an administrative investigation.
        3. Number of allegations referred for criminal investigation.
        4. Number of investigations completed.

   c.   The GCCJA will document all such referrals.

**H.    Training and Education:**

  1.  **Employee training:**

    a.  The GCCJA will train all employees who may have contact with inmates on:

        i.    The zero tolerance policy for sexual abuse and sexual harassment;

       ii.    How to fulfill their responsibilities under agency sexual abuse and sexual harassment prevention, detection, reporting, and response policies and procedures;

      iii.    Inmates right to be free from sexual abuse and sexual harassment;

      iv.    The right of inmates and employees to be free from retaliation for reporting sexual abuse and sexual harassment;

       v.    The dynamics of sexual abuse and sexual harassment in confinement;

      vi.    The common reactions of sexual abuse and sexual harassment victims;

     vii.    How to detect and respond to signs of threatened and actual sexual abuse;

    viii.    How to avoid inappropriate relationships with inmates;

      ix.    How to communicate effectively and professionally with inmates, including lesbian, gay, bisexual, transgender, intersex, or gender nonconforming inmates; and

       x.    How to comply with relevant laws related to mandatory reporting of sexual abuse to outside authorities;

      xi.    Employees are advised that sexual conduct between staff and inmates, volunteers or contractors regardless of consensual status, is prohibited and subject to administrative and disciplinary sanctions including termination.

    b.  All current employees who have not received such training will be trained within one year of the effective date of the PREA standards, and the agency will provide each employee with refresher training **annually** to ensure that all employees know the agency's current sexual abuse and sexual harassment policies and procedures.

    c.  The training officer will document, through employee signature that employees understands the training they have received.

**DDR #6, 032**

**Volume 4 (of 4)**                                       **4 App 105**

2. **Temporary contractor(s), regular contractor(s) and volunteer(s) training:**

   a. The GCCJA will ensure that all volunteers and contractors who have contact with inmates (or enter the secure portion of the facility) have been trained on their responsibilities under the agency's sexual abuse and sexual harassment prevention, detection, and response policies and procedures.
   b. The level and type of training provided to volunteers and contractors will be based on the services they provide and level of contact they have with inmates, all volunteers and contractors who have contact with inmates will be notified of the agency's zero tolerance policy regarding sexual abuse and sexual harassment and informed how to report such incidents. Any training documentation will be retained by the PREA Coordinator.

3. **Inmate education:**

   a. During the intake process, inmates will receive information explaining this agency's zero tolerance policy regarding sexual abuse and sexual harassment, how to report incidents or suspicions of sexual abuse or sexual harassment, their rights to be free from sexual abuse and sexual harassment and to be free from retaliation for reporting such incidents, and regarding agency policies and procedures for responding to such incidents. This information is communicated orally and in writing in a language clearly understood by the inmate, prior to assignment to a housing unit.

      i. In booking, all inmates will sign a form acknowledging the zero tolerance policy on sexual misconduct.

   b. The GCCJA will provide refresher information whenever an inmate is transferred from a different agency.

      i. Information is available 24/7 via the kiosks located in the housing areas.
      ii. Officers will ensure that inmates in segregation and medical receive this training.
      iii. All inmates receiving additional in-depth training will sign acknowledgement of the training.
      iv. Inmate's unable to sign due to limited English, or disability will utilize the translation services to ensure comprehension.
      v. The Inmate handbook acknowledgement form and the inmate Zero Tolerance Sexual Misconduct form will be retained in the inmates file.
      vi. In addition to providing such education, the Jail Administrator will ensure that key information is continuously and readily available or visible to inmates through posters, inmate handbooks, or other written formats.

4. **Specialized training, Investigations:**

    a.  In addition to the training provided to all employees, the GCCJA will ensure that, to the extent it conducts sexual abuse investigations; its investigators have received training in conducting investigations in confinement settings.

    b.  Specialized training will include:

        i.   Techniques for interviewing sexual abuse victims;

        ii.   Proper use of Miranda and Garrity warnings;

        iii.  Sexual abuse evidence collection in confinement settings;

        iv.  Criteria and evidence required to substantiate a case for administrative action or prosecution referral;

        v.   The training staff will maintain documentation that agency investigators have completed the required specialized training in conducting sexual abuse investigations.

5. **Specialized training, Medical and mental health care:**

    a.  The training staff will ensure that all full and part-time medical and mental health care practitioners who work in its facilities have been trained in:

        i.   How to detect and assess signs of sexual abuse and sexual harassment;

        ii.   How to preserve physical evidence of sexual abuse;

        iii.  How to respond effectively and professionally to victims of sexual abuse and sexual harassment; and

        iv.  How and to whom to report allegations or suspicions of sexual abuse and sexual harassment.

    b.  The training staff will maintain documentation that medical and mental health practitioners have received the training.

I.    **Screening for Risk of Sexual Victimization and Abusiveness:**

1.  **Screening for risk of victimization and abusiveness:**

    a.  All inmates will be assessed during an intake screening and upon transfer from another outside facility for their risk of being sexually abused by other inmates or sexually abusive toward other inmates.

    b.  Intake screening will take place within 24 hours of arrival at the facility.

    c.  Such assessments will be conducted using both the existing digital classification system and paper systems.

    d.  The intake screening will consider, at a minimum, the following criteria to assess inmates for risk of sexual victimization:

        i.   Whether the inmate has a mental, physical, or developmental disability;

        ii.   The age of the inmate;

        iii.  The physical build of the inmate;

        iv.  Whether the inmate has previously been incarcerated;

v.  Whether the inmate's criminal history is exclusively nonviolent;

vi. Whether the inmate has prior convictions for sex offenses against an adult or child;

vii. Whether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming;

viii. Whether the inmate has previously experienced sexual victimization;

ix. The inmates own perception of vulnerability; and

x.  The inmate's detainment status for civil immigration purposes.

e.  The intake screening will consider prior acts of sexual abuse, prior convictions for violent offenses, and history of prior institutional violence or sexual abuse, as known to the agency, in assessing inmates for risk of being sexually abusive.

f.  Within a set time period, not to exceed 30 days from the inmate's arrival at the facility, the classification staff in conjunction with the PREA coordinator will reassess the inmate's risk of victimization or abusiveness based upon any additional, relevant information received by the facility since the intake screening.

g.  An inmate's risk level will be reassessed by the classification staff when warranted due to a referral, request, incident of sexual abuse, or receipt of additional information that bears on the inmate's risk of sexual victimization or abusiveness.

h.  Inmates will not be disciplined for refusing to answer, or for not disclosing complete information in response to, questions asked about mental, physical, or developmental disability, perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming, has previously experienced sexual victimization, or inmates own perception of vulnerability.

i.  The GCCJA will control the dissemination within the facility of responses to questions asked in order to ensure that sensitive information is not exploited to the inmate's detriment by staff or other inmates.

    i.  Administration staff, classification, PREA Coordinator and supervisors may obtain access to this controlled information.

2. **Use of screening information:**

a.  The GCCJA will use information from the risk screening form to notify housing, bed, and work, education, and program assignments. The GCCJA will attempt to keep separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive.

b.  The GCCJA will make individualized determinations about how to ensure the safety of each inmate.

c.  In deciding whether to assign a transgender or intersex inmate to housing and programming assignments, classification will consider on a case-by-case basis whether a placement would ensure the inmates health and safety, and whether the placement would present management or security problems.

d.  A transgender or intersex inmates own views with respect to his or her own safety will be given serious consideration.

e. Transgender and intersex inmates will be given the opportunity to shower separately from other inmates.

f. The GCCJA will not place lesbian, gay, bisexual, transgender, or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status, unless for housing needs and/or safety and security.

3. **Protective Custody:**

a. Inmates at high risk for sexual victimization will not be placed in involuntary segregated housing unless an assessment of all available alternatives has been made, and a determination has been made that there is no available alternative means of separation from likely abusers.

b. Inmates placed in segregated housing for this purpose will have access to programs, privileges, education, and work opportunities to the extent possible.

c. Classification will assign such inmates to involuntary segregated housing only until an alternative means of separation from likely abusers can be arranged.

d. Every 30 days, the Classification staff in conjunction with the PREA coordinator will afford each inmate a review to determine whether there is a continuing need for separation from the general population.

J. **Reporting:**

1. **Inmate reporting:**

a. The GCCJA will provide internal and external ways for inmates to privately report sexual abuse and sexual harassment, retaliation by other inmates or staff for reporting sexual abuse and sexual harassment, and staff neglect or violation of responsibilities that may have contributed to such incidents. Reporting may occur via:

   i. Inmate request via the kiosk;
   ii. Inmate Grievance process to the Jail Administrator;
   iii. Verbally speaking with officers or supervisors;
   iv. Handwritten inmate request;
   v. Handwritten note to officers or staff;
   vi. During inmate evaluations;
   vii. Reporting to another inmate;
   viii. To any contractor, volunteer, or employee;

b. The GCCJA will inform inmates of at least one way to report abuse or harassment to a public or private entity or office that is not part of this agency and that is able to receive and immediately forward inmate reports of sexual abuse and sexual harassment to officials, allowing the inmate to remain anonymous upon request. Inmates may contact Domestic Violent Intervention Services Call Rape's 24 hour hotline at 1-800-656-4673.

c. The GCCJA will attempt to notify all inmates upon arrival of the facility about sexual harassment, sexual misconduct, and sexual abuse. Inmates may be informed via:

    i. Posters inside each pod, booking, and various areas throughout the facility;
    ii. Intake handout;
    iii. Inmate handbook.

d. The GCCJA will insure that all inmates can report sexual harassment, sexual misconduct, sexual abuse threw the following options:

    i. To any contractor, volunteer, or employee;
    ii. Direct (via phone) to Internal Affairs by dialing, *73.
    iii. Call Rape 1-800-656-4673;
    iv. Immigration hold inmates may also report via Department of Homeland Security, or consular officials.

e. All employees, temporary contractors, regular contractors, volunteers, and employees will accept reports made verbally, in writing, anonymously, and from third parties and will promptly document any verbal reports. All reports of sexual misconduct will be reported to the supervisor.

f. The GCCJA will provide a method for temporary contractors, regular contractors, volunteers, and employees to privately report sexual abuse and sexual harassment of inmates. Reports may be made.

    i. To any officer or employee;
    ii. To Call Rape at 1-800-656-4673.

2. **Exhaustion of Administrative Remedies:**

a. The GCCJA will not impose a time limit on when an inmate may submit a grievance regarding an allegation of sexual abuse.

    i. Employees will not require an inmate to use any informal grievance process, or to otherwise attempt to resolve with staff, an alleged incident of sexual abuse.

b. The GCCJA will ensure that:

    i. An inmate who alleges sexual abuse may submit a grievance without submitting it to a staff member who is the subject of the complaint; and
    ii. Such grievance is not referred to a staff member who is the subject of the complaint.

**DDR #6, 037**

**Volume 4 (of 4)**                                                      **4 App 110**

    c.  The GCCJA will issue a final agency decision on the merits of any portion of a grievance alleging sexual abuse within 30 days of the initial filing of the grievance. Computation of the 30-day time period will not include time consumed by inmate in preparing any administrative appeal.

        i.  The GCCJA may claim an extension of time to respond, of up to 30 days (not to exceed 160 days), if the normal time period for response is insufficient to make an appropriate decision. The GCCJA will notify the inmate in writing of any such extension and provide a date by which a decision will be made.

       ii.  At any level of the administrative process, including the final level, if the inmate does not receive a response within the time allotted for reply, including any properly noticed extension, the inmate may consider the absence of a response to be a denial at that level.

    d.  Third parties, including fellow inmates, staff members, family members, attorneys, and outside advocates, will be permitted to assist inmates in filing requests for administrative remedies relating to allegations of sexual abuse, and will also be permitted to file such requests on behalf of inmates.

       i.  If a third party files such a request on behalf of an inmate, the GCCJA will require as a condition of processing the request that the alleged victim agree to have the request filed on his or her behalf, and may also require the alleged victim to personally pursue any subsequent steps in the administrative remedy process.

       ii.  If the inmate declines to have the request processed on his or her behalf, the GCCJA will document the inmate's decision.

    e.  The GCCJA has established procedures for the filing of an emergency grievance alleging that an inmate is subject to a substantial risk of imminent sexual abuse.

       i.  Inmates who have an emergency grievance will report to the officer on shift. Inmate grievances of an emergent manor will be reviewed by the on shift sergeants.

       ii.  After receiving an emergency grievance alleging and determining that the inmate is subject to a substantial risk of imminent sexual abuse, the GCCJA will immediately forward the grievance (or any portion thereof that alleges the substantial risk of imminent sexual abuse) to a supervisor and jail investigations.

       iii.  Jail investigations will provide an initial response within 48 hours, and will issue a final agency decision within 5 calendar days. The initial response and final decision will document the determination whether the inmate is in substantial risk of imminent sexual abuse and the action taken in response to the emergency grievance.

    f.  The GCCJA may discipline an inmate for filing a grievance related to alleged sexual abuse only where the GCCJA demonstrates that the inmate filed the grievance in bad faith.

3. **Inmate access to outside confidential support services:**

    a.  The GCCJA will provide inmates with access to outside victim advocates for emotional support services related to sexual abuse by giving inmates mailing addresses and telephone numbers, including toll-free hotline numbers where available, of local, State, or national victim advocacy or rape crisis organizations, and by enabling reasonable communication between inmates and these organizations, in as confidential a manner as possible.

        i.  National Sexual Assault Hotline: 1-800-656-4673, 1220 L Street NW, Suite 505, Washington DC, 20005.

    b.  The GCCJA will inform inmates, prior to giving them access, of the extent to which such communications will be monitored and the extent to which reports of abuse will be forwarded to authorities in accordance with mandatory reporting laws.

    c.  The GCCJA will maintain or attempt to enter into memoranda of understanding or other agreements with community service providers that are able to provide inmates with confidential emotional support services related to sexual abuse. The GCCJA will maintain copies of agreements or documentation showing attempts to enter into such agreements.

        i.  The MOU will be maintained in the Jail Administrators office.

4. **Third-party reporting:**

    a.  The GCCJA will establish a method to receive third-party reports of sexual abuse and sexual harassment and will distribute publicly information on how to report sexual abuse and sexual harassment on behalf of an inmate.

        i.  The GCCJA will have ways of receiving third party reports.

            1.  They may report through Call Rape;
            2.  Report to any officer or employee;
            3.  They may call the Grady County Sheriff's Office;
            4.  Contact directly the Jail Administrator.

K.    **Official Response Following an Inmate Report:**

1. **Staff and agency reporting duties:**

    a.  The GCCJA employees, temporary contractors, regular contractors and volunteers will report immediately any knowledge, suspicion, or information regarding an

incident of sexual abuse or sexual harassment that occurred in a facility, whether or not it is part of the agency; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation to their immediate supervisor.

b. Apart from initial reporting to supervisor(s) or Jail Investigations, staff will not reveal any information related to a sexual abuse report to anyone other than to the extent necessary, to make treatment, investigation, and other security and management decisions.

c. Unless otherwise precluded by Federal, State, or local law, medical and mental health practitioners will be required to report sexual abuse pursuant to paragraph (a) of this section and to inform inmates of the practitioner's duty to report, and the limitations of confidentiality, at the initiation of services.

d. The GCCJA supervisors will report all allegations of sexual abuse and sexual harassment, including third-party and anonymous reports, to Jail Investigators.

2. **Agency protection duties.** When this agency learns that an inmate is subject to a substantial risk of imminent sexual abuse, it will take immediate action to protect the inmate.

3. **Reporting to other confinement facilities:**

a. Upon receiving an allegation that an inmate was sexually abused while confined at another facility, the Jail Administrator or designee that received the allegation will notify the head of the facility or appropriate office of the agency where the alleged abuse occurred.

b. Such notification will be provided as soon as possible, but no later than 72 hours after receiving the allegation.

c. The Jail Administrator or designee will document that they have provided such notification.

d. The facility/agency that receives such notification will ensure that the allegation is investigated.

4. **Staff first responder duties.**

a. Upon learning of an allegation that an inmate was sexually abused, the first security staff member to respond to the report will be required to:

i. Separate the alleged victim and abuser;

ii. Preserve and protect any crime scene until appropriate steps can be taken to collect any evidence;

iii. If the abuse occurred within a time period that still allows for the collection of physical evidence, request that the alleged victim not take any actions that could destroy physical evidence, including, as appropriate, washing, brushing teeth, changing clothes, urinating, defecating, smoking, drinking, or eating unless medically required;

inmates who have pre-existing conditions will be sent to Medical for a medical review; and

b. If the first staff responder is not a detention officer, the responder will request that the alleged victim not take any actions that could destroy physical evidence and then notify the detention officer or supervisor.

c. First responders will use the form "Sexual Misconduct/PREA Checklist" and ensure that a copy is attached to the supervisor's log.

5. **Coordinated response:**

   a. The Jail Administrator or assigned supervisor will lead a coordinated response which includes:

       i. An officer will take the initial report and begin the investigation.

       ii. If the response involves inmate and employee rape allegations, Investigations will coordinate with the Jail Administrator and/or Sheriff's Office.

       iii. Investigations will also coordinate with an Evidence Collection Officer for proper evidence collection;

       iv. Investigations will coordinate with domestic violence intervention services (Call RAPE) for SANE exam and other investigative information.

6. **Agency protection against retaliation:**

   a. The GCCJA will protect all inmates and staff who report sexual abuse or sexual harassment or cooperate with sexual abuse or sexual harassment investigations from retaliation by other inmates or staff. The PREA coordinator will monitor, in writing that all inmates and staff who report sexual abuse or sexual harassment or cooperate with sexual abuse or sexual harassment investigations are protected from retaliation by other inmates or staff.

   b. The GCCJA will utilize multiple protection measures, such as housing changes or transfers for inmate victims or abusers, removal of alleged staff or inmate abusers from contact with victims, and emotional support services for inmates or staff who fear retaliation for reporting sexual abuse or sexual harassment or for cooperating with investigations.

   c. For at least 90 days following a report of sexual abuse, the PREA coordinator will monitor the conduct and treatment of inmates or staff who reported the sexual abuse and of inmates who were reported to have suffered sexual abuse to see if there are changes that may suggest possible retaliation by inmates or staff, and will act promptly to remedy any such retaliation. Items the agency should monitor include any inmate disciplinary reports, housing, or program changes, negative performance reviews or reassignments of staff.

   d. In the case of inmates, such monitoring will also include periodic status checks.

    e.  If any other individual who cooperates with an investigation expresses a fear of retaliation, the classification officer will take appropriate measures to protect that individual against retaliation.

    f.  The GCCJA obligation to monitor will terminate if the investigation determines that the allegation is unfounded.

**L.**   **Investigations:**

   1.  **Criminal and administrative agency investigations:**

      a.  When the GCCJA conducts its own investigations into allegations of sexual abuse and sexual harassment, it will do so promptly, thoroughly, and objectively for all allegations, including third-party and anonymous reports.

      b.  Where sexual abuse is alleged, the agency will use investigators who have received special training in sexual abuse investigations.

      c.  Investigators will gather and preserve direct and circumstantial evidence, including any available physical and DNA evidence and any available electronic monitoring data; will interview alleged victims, suspected perpetrators, and witnesses; and will review prior complaints and reports of sexual abuse involving the suspected perpetrator.

      d.  When the quality of evidence appears to support criminal prosecution, the investigator will conduct compelled interviews only after consulting with prosecutors as to whether compelled interviews may be an obstacle for subsequent criminal prosecution.

      e.  The credibility of an alleged victim, suspect, or witness will be assessed on an individual basis and will not be determined by the person's status as inmate or staff. No investigator will require an inmate who alleges sexual abuse to submit to a polygraph examination or other truth-telling device as a condition for proceeding with the investigation of such an allegation.

      f.  Administrative investigations:

          i.  Will include an effort to determine whether staff actions or failures to act contributed to the abuse; and

         ii.  Will be documented in written reports that include a description of the physical and testimonial evidence, the reasoning behind credibility assessments, and investigative facts and findings.

      g.  Criminal investigations will be documented in a written report that contains a thorough description of physical, testimonial, and documentary evidence and attaches copies of all documentary evidence where feasible.

      h.  Substantiated allegations of conduct that appears to be criminal will be referred for prosecution.

      i.  The GCCJA will retain all written reports referenced in paragraphs (f) and (g) of this section for as long as the alleged abuser is incarcerated or employed by the agency, plus five years.

j.  The departure of the alleged abuser or victim from the employment or control of the facility or agency will not provide a basis for terminating an investigation.

k.  When outside agencies investigate sexual abuse, the facility will cooperate with outside investigators and will endeavor to remain informed about the progress of the investigation. An investigator will be assigned to investigations outside of this agency. After the conclusion of the other agencies investigation, the Investigator will provide a written summary to the Jail Administrator.

2.  **Evidentiary standard for administrative investigations:** The GCCJA investigators will impose no standard higher than a preponderance of the evidence in determining whether allegations of sexual abuse or sexual harassment are substantiated.

3.  **Reporting to inmates:**

    a.  Following an investigation into an inmate's allegation of sexual abuse the investigator will inform the inmate as to whether the allegation has been determined to be substantiated, unsubstantiated, or unfounded.

    b.  If this agency did not conduct the investigation, the investigator will request the relevant information from the investigative agency in order to inform the inmate.

    c.  Following an inmate's allegation that a staff member has committed sexual abuse against the inmate, the GCCJA will subsequently inform the inmate (unless this agency has determined that the allegation is unfounded) whenever:

        i.    The staff member is no longer posted within the inmates unit;
        ii.   The staff member is no longer employed;
        iii.  The agency learns that the staff member has been indicted on a charge related to sexual abuse; or
        iv.   The GCCJA learns that the staff member has been convicted on a charge related to sexual abuse.

    d.  Following an inmate's allegation that he or she has been sexually abused by another inmate, the GCCJA will subsequently inform the alleged victim whenever:

        i.    The GCCJA learns that the alleged abuser has been indicted on a charge related to sexual abuse; or
        ii.   The GCCJA learns that the alleged abuser has been convicted on a charge related to sexual abuse.

    e.  All such notifications or attempted notifications will be documented.

    f.  The GCCJA obligation to report under this standard will terminate if the inmate is released from GCCJA custody.

**M.     Discipline:**

1. **Disciplinary sanctions for staff:**

   a. All employees will be subject to disciplinary sanctions up to and including termination, and criminal prosecution for violating agency sexual abuse or sexual harassment policies.
   b. Termination will be the presumptive disciplinary sanction for staff who have engaged in sexual abuse.
   c. Disciplinary sanctions for violations of policies relating to sexual abuse or sexual harassment (other than actually engaging in sexual abuse) will be commensurate with the nature and circumstances of the acts committed, the staff member's disciplinary history, and the sanctions imposed for comparable offenses by other staff with similar histories.
   d. All terminations for violations of agency sexual abuse or sexual harassment policies, or resignations by staff who would have been terminated if not for their resignation, will be reported to law enforcement agencies, unless the activity was clearly not criminal, and to any relevant licensing bodies.

2. **Corrective action for contractors and volunteers:**

   a. Any temporary contractor, regular contractor, or volunteer who engages in sexual abuse will be prohibited from contact with inmates and will be reported to law enforcement agencies, unless the activity was clearly not criminal, and to relevant licensing bodies.
   b. The GCCJA will take immediate remedial measures, and will prohibit further contact with inmates.

3. **Disciplinary sanctions for Inmates:**

   a. Inmates will be subject to disciplinary sanctions pursuant to the formal disciplinary process following an administrative finding that the inmate engaged in inmate-on-inmate sexual abuse or following a criminal finding of guilt for inmate-on-inmate sexual abuse, as defined in policy and the Inmate Handbook.
   b. Sanctions will be commensurate with the nature and circumstances of the abuse committed, the inmate's disciplinary history, and the sanctions imposed for comparable offenses by other inmates with similar histories.
   c. The officer will discipline any inmate for sexual contact with staff.
   d. For the purpose of disciplinary action, any report of sexual abuse made in good faith based upon a reasonable belief that the alleged conduct occurred will not constitute falsely reporting an incident or lying, even if an investigation does not establish evidence sufficient to substantiate the allegation.
   e. The GCCJA prohibits any and all sexual activity between inmates and will discipline inmates for such activity.

N.    **Medical and Mental Care:**

1.    **Medical and mental health screenings; history of sexual abuse:**

    a.    If the screening indicates that a person has experienced prior sexual victimization, whether it occurred in an institutional setting or in the community, classification will notify the hearing supervisor, medical, and the programs officer who will ensure that the inmate is offered a follow-up meeting with a medical or mental health practitioner within 14 days of the intake screening. All documents pertaining to this section will be retained by records and/or medical.

    b.    If the screening indicates that a person has previously perpetrated sexual abuse, whether it occurred in an institutional setting or in the community, staff will ensure that the inmate is offered a follow-up meeting with a mental health practitioner within 14 days of the intake screening.

    c.    If the screening indicates that a person has experienced prior sexual victimization, whether it occurred in an institutional setting or in the community, staff will ensure that the inmate is offered a follow-up meeting with a medical or mental health practitioner within 14 days of the intake screening.

    d.    Any information related to sexual victimization or abusiveness that occurred in an institutional setting will be strictly limited to medical and mental health practitioners and other staff, as necessary, to inform treatment plans and security and management decisions, including housing, bed, work, education, and program assignments, or as otherwise required by Federal, State, or local law.

    e.    Medical and mental health practitioners will obtain informed consent from inmates before reporting information about prior sexual victimization that did not occur in an institutional setting, unless the inmate is under the age of 18.

2.    **Access to emergency medical and mental health services:**

    a.    Inmate victims of sexual abuse will receive timely, unimpeded access to emergency medical treatment and crisis intervention services, the nature and scope of which are determined by medical and mental health practitioners according to their professional judgment.

    b.    If no qualified medical or mental health practitioners are on duty at the time a report of recent abuse is made, first responders will take preliminary steps to protect the victim and will immediately notify the appropriate medical and mental health practitioners.

    c.    Inmate victims of sexual abuse while incarcerated will be offered timely information about and timely access to emergency contraception and sexually transmitted infections prophylaxis, in accordance with professionally accepted standards of care, where medically appropriate.

    d.    Treatment services will be provided to the victim without financial cost and regardless of whether the victim names the abuser or cooperates with any investigation arising out of the incident **unless it is determined that the allegations were false, deceptive and/or lies by the accuser (inmate).**

3. **Ongoing medical and mental health care for sexual abuse victims and abusers:**

   a. The GCCJA will offer medical and mental health evaluation and, as appropriate, treatment to all inmates who have been victimized by sexual abuse in any prison, jail, or lockup.
   b. The evaluation and treatment of such victims will include, as appropriate ad as directed by our medical contractor,

      i. Follow-up services;
      ii. Treatment plans; and
      iii. When necessary, referrals for continued care following their transfer to, or placement in, other facilities, or their release from custody.

   c. Inmate victims of sexual abuse while incarcerated will be offered tests for sexually transmitted infections as medically appropriate.
   d. Treatment services will be provided to the victim without financial cost and regardless of whether the victim names the abuser or cooperates with any investigation arising out of the incident, **unless it is determined that the allegations were false, deceptive and/or lies by the accuser (inmate).**
   e. The PREA Coordinator will ensure that medical conducts a mental health evaluation of all known inmate-on-inmate abusers within 60 days of learning of such abuse history and offer treatment when deemed appropriate by mental health practitioners.

O.    **Data Collection and Review:**

1. **Sexual abuse incident reviews:**

   a. The facility will conduct a sexual abuse incident review at the conclusion of every sexual abuse investigation, including where the allegation has not been substantiated, unless the allegation has been determined to be unfounded.
   b. Such review will ordinarily occur within 30 days of the conclusion of the investigation.
   c. The review team will include upper-level management officials, with input from line supervisors, investigators, and medical or mental health practitioners.
   d. The review team, led by PREA Coordinator will:

      i. Consider whether the allegation or investigation indicates a need to change policy or practice to better prevent, detect, or respond to sexual abuse;
      ii. Prepare a report of its findings, including but not necessarily limited to determinations and any recommendations for improvement, and submit such report to the Jail Administrator.

2. **Data collection:**

   a. The GCCJA will collect accurate, uniform data for every allegation of sexual abuse at facilities under its direct control.
   b. The incident-based data collected will include, at a minimum, the data necessary to answer all questions from the most recent version of the Survey of Sexual Violence conducted by the Department of Justice.

3. **Data review for corrective action:**

   a. The GCCJA will review the data collected and aggregated in order to assess and improve the effectiveness of its sexual abuse prevention, detection, and response policies, practices, and training.
   b. Such report will include a comparison of the current year's data and corrective actions with those from prior years and will provide an assessment of the agency's progress in addressing sexual abuse.
   c. The GCCJA may hold back specific material from the reports when publication would present a clear and specific threat to the safety and security of a facility.

4. **Data storage, publication, and destruction:**

   a. The GCCJA will ensure that data collected are securely retained.
   b. Before making aggregated sexual abuse data publicly available, the GCCJA will remove all personal identifiers.
   c. The agency will maintain sexual abuse data collected for at least 10 years after the date of the initial collection unless Federal, State, or local law requires otherwise.

P.    **Auditing and Corrective Action:**

1. **Frequency and scope of audits:**

   a. The Department of Justice may send a recommendation to the jail administrator for an expedited audit if the Department has reason to believe that a particular facility may be experiencing problems relating to sexual abuse. The recommendation may also include referrals to resources that may assist the agency with PREA-related issues.
   b. The Department of Justice will develop and issue an audit instrument that will provide guidance on the conduct of and contents of the audit.
   c. The auditor will review all relevant agency-wide policies, procedures, reports, internal and external audits, and accreditations for each facility type.
   d. The audits will review, at a minimum, a sampling of relevant documents and other records and information for the most recent one-year period.
   e. The auditor will have access to, and will observe, all areas of the audited facilities.
   f. The auditor will be permitted to request and receive copies of any relevant documents (including electronically stored information).

**DDR #6, 047**

g. The auditor will retain and preserve all documentation (including, e.g., video tapes and interview notes) relied upon in making audit determinations.

h. The auditor will be permitted to conduct private interviews with a representative sample of inmates, staff, supervisors, and administrators.

i. The auditor will review a sampling of any available videotapes and other electronically available data that may be relevant to the provisions being audited.

j. Inmates will be permitted to send confidential information or correspondence to the auditor in the same manner as if they were communicating with legal counsel.

k. The PREA Coordinator will prepare any pre-audit documents and will work in conjunction with the Jail Administrator to ensure the facility is prepared for the audit.

2. **Auditor qualifications:**

a. All auditors will be certified by the Department of Justice. The Department of Justice will develop and issue procedures regarding the certification process, which will include training requirements.

b. No audit may be conducted by an auditor who has received financial compensation from the agency being audited (except for compensation received for conducting prior PREA audits) within the three years prior to the agency's retention of the auditor.

3. **Audit contents and findings:**

a. Each audit will include a certification by the auditor that no conflict of interest exists with respect to his or her ability to conduct an audit of the agency under review.

b. Audit reports will state whether agency-wide policies and procedures comply with relevant PREA standards.

c. The audit summary will indicate, among other things, the number of provisions the facility has achieved at each grade level. For each PREA standard, the auditor will determine whether the audited facility reaches one of the following findings:

   i. Exceeds Standard (substantially exceeds requirement of standard);
   ii. Meets Standard (substantial compliance; complies in all material ways with the standard for the relevant review period);
   iii. Does Not Meet Standard (requires corrective action).

d. Audit reports will describe the methodology, sampling sizes, and basis for the auditor's conclusions with regard to each standard provision for each audited facility, and will include recommendations for any required corrective action.

e. Auditors will redact any personally identifiable inmate or staff information from their reports, but will provide such information to the agency upon request, and may provide such information to the Department of Justice.

f. The agency will ensure that the auditor's final report is published on the agency's website if it has one, or is otherwise made readily available to the public.

4.  **Audit corrective action plan:**

    a.  A finding of "Does Not Meet Standard" with one or more standards will trigger a 180-day corrective action period.
    b.  The auditor and the agency will jointly develop a corrective action plan to achieve compliance.
    c.  The auditor will take necessary and appropriate steps to verify implementation of the corrective action plan, such as reviewing updated policies and procedures or re-inspecting portions of a facility.
    d.  After the 180-day corrective action period ends, the auditor will issue a final determination as to whether the facility has achieved compliance with those standards requiring corrective action.
    e.  If the agency does not achieve compliance with each standard, it may (at its discretion and cost) request a subsequent audit once it believes that is has achieved compliance.

5.  **Audit appeals:**

    a.  An agency may lodge an appeal with the Department of Justice regarding any specific audit finding that it believes to be incorrect. Such appeal must be lodged within 90 days of the auditor's final determination. All appeals will follow PREA guidelines.

Q.  **Retention:**

1.  All case records associated with claims of sexual abuse or sexual harassment including incident reports, investigative reports, offender information, case disposition, medical and counseling evaluation findings, and recommendations for post-release and/or counseling are retained in accordance with this policy.

---

Jail Administrator: _____  Date: 7-1-16
                          **Jim Gerlach**

**Adopted:**    July 1st, 2016
**Revised:**    TBA

# GRADY COUNTY LAW ENFORCEMENT CENTER (GCLEC)

## POLICIES AND PROCEDURES

## Detentions – 18.0

## REPORT WRITING



## 18.1 Policy:

All detention employees will be required to write a report in his/her own words when any incident of a rule infraction or disruption occurs at any of the GCCJA detention facilities.

## 18.2 Purpose:

To standardize report writing in order to promote professionalism and consistency.

## 18.3 Philosophy and Ethics:

A detention employee who discovers or witnesses an incident which requires or did require investigative or disciplinary action, reports the incident, in writing, to his/her immediate supervisor.

As a detention employee, report writing is one of the most important duties and skills needed, because the completed and signed report becomes a legal document admissible in a court of law. Therefore, it is important the detention employee writes in a clear, concise, factual and to-the-point report.

## 18.4 Procedure:

A.  **Responsibilities:**

1.  When the report has been completed, one copy each shall go to:

    a.  The individual who wrote the report;
    b.  Team Supervisor on duty;
    c.  Shift Lieutenant;
    d.  Jail Captain; and

Page 1 of **2**
**DDR #6, 050**

     e.  Facility Investigator.

2.  Describe the incident in the fullest possible detail, writing in common English, in the first person, exactly what was observed and any other facts concerning the incident. All reportable incidents shall be completed in the Jail Management System.

3.  All report will be completed by the end-of-shift unless authorized by a supervisor to be completed at a later date.

4.  Attach any and all applicable documents to the report, such as;

    a.  Evidence receipts,
    b.  Statements or incident reports of other deputies or inmates.

5.  **Review Reports:**

    a.  All reports will be reviewed by a supervisor before submission.
    b.  It is always a good idea to have a peer examine the report in order to assist in submitting a solid document.

---

Jail Administrator: _____ Date: 7-1-16
                       **Jim Gerlach**

**Adopted:**    July 1st, 2016
**Revised:**    TBA

# GRADY COUNTY LAW ENFORCEMENT CENTER (GCLEC)

## POLICIES AND PROCEDURES

### Detentions – 21.0

## FACILITY AND INMATE PROGRAMS



---

### 21.1 Mission:

Currently in Development

### 21.2 Purpose:

Currently in Development

### 21.3 Definitions:

Currently in Development

### 21.4 Post Orders:

Currently in Development

---

Jail Administrator: _____ Date: 7-1-16

**Jim Gerlach**

**Adopted:**    July 1st, 2016
**Revised:**    TBA

# <u>Incident Report</u>

## Case #07092015-1

## In Custody Death Report

## Lt. Cliff Walker

## Investigator

**Grady County Criminal Justice Authority**
**215 N 3rd St. Chickasha, OK 73018**

Ex. 13

DDR #3_013

Grady County Criminal Justice Authority

215 N. 3rd Street

Chickasha, OK. 73018

Case #07052015-2

Inmate Death

Investigator-Cliff Walker


Victim-Elliott, Sherry Darlene

DOB- █████████

SSN █████████

Address-614 W Iowa Ae.

Chickasha, OK 73018


Witnesses

Van Der Wys, John/GCCJA

Johnson, Catherine/GCCJA

Burns, Kayla/GCCJA

Shrader, Robert/GCCJA

Taylor, Kris/GCCJA

Johnston, Tamara/Turnkey Healthcare


**DDR #3, 014**

On 7-5-2015 at about 2302 hrs I received a call from Capt. Jason Carpenter who informed me that there had been a death at the jail. I arrived at the jail at about 2320 hrs where I made contact with Capt. Carpenter and Sgt. Johnson. Sgt. Johnson informed that the inmate was a W/F named Sherry Elliott and that she was in cell #127. Ms. Elliott had been brought into the facility by Officer Derek Hunt of the Chickasha Police Department at around 1730 hrs on a complaint of Public Intoxication. Sgt. Johnson said that since Ms. Elliott was intoxicated, she had yet to be booked into the facility and was sleeping it off in the cell. She also informed me that Ms. Elliott had been showing signs of odd behavior earlier in the evening which included crawling around on all 4's and her knocking and scratching at the walls.

I went to cell #127 where I observed Ms. Elliott laying face up in the cell. Her head was near the S/E corner of the cell and she was laid out diagonally toward the opposite corner of the cell with her feet apart. Her left arm was straight out to her side and then it bent at the elbow about *90 with hand resting above the elbow near the south wall. I could also see 3 distinct cuts across the left wrist, however they were not very deep and looked to be old wounds that had started to heal. Her right arm was folded up next to her with her hand resting near her face against the east wall. I noticed that her face was flush and the blood had started to turn it a purple color. Her shirt was pulled up to near the diaphragm exposing her stomach and it appeared that she had urinated on herself at some point as the front of her pants were wet near the crotch. I also noticed that there were EKG electrodes had been applied to both arms and her stomach. Ms. Elliott was wearing one shoe while the other one was sitting outside the cell in the sallyport. There was also a small plastic bag with a sandwich lying next to her on her left side and crushed up tortilla chips and small cookies near the sandwich. The only other thing I could see in the cell was a small piece of paper. That paper looked like it came from the machine EMS would have used to check for vital signs. At first look there didn't appear to be any significant signs of recent trauma or violence to the body. I went and retrieved my camera and began taking photos of the cell and the body.

**Volume 4 (of 4)**                    **4 App 128**

unresponsive, there was no pulse, and she was cold to the touch. He said he noticed her face was flush as he continued to look for pulse and called for medical. He said that he was a medic in the USAF and that he started what he called a medical assessment. He said that he noticed that her left eye was constricted and her right eye was dilated. She was not breathing and no pulse. Officer Van Der Wys said that he was going to start compressions but assumed by her current state that she was dead. Nurse Tamara Johnston arrived from medical and started checking Ms. Elliott as well. Officer Van Der Wys said that once they had believed her to be dead, they started the emergency procedures. He then locked the door to the cell and secured it. Agent Williams asked Officer Van Der Wys if there was anything out of the ordinary about Ms. Elliott and he didn't notice anything during his interaction with her and that she seemed to be like other public intoxication subjects who were brought into the jail. He also mentioned that Ms. Elliott was picking at the walls and eating it, grasping at things in the air, and also said that he heard her talking about rainbows and unicorns.

We next talked to Officer Kayla Burns, who was working central control. She told us that the first time she dealt with Ms. Elliott was when she called in on the intercom. Ms. Elliott told her that she couldn't get out. Officer Burns said that she responded that "I know". She said after that she just watched her on the cameras and didn't interact with her again until Officer Van Der Wys went to check on her because they could no longer hear her. She said that when he went to check on her she could tell something was wrong so she got up and started toward the cell. Officer Van Der Wys said that they needed somebody so she said she hollered at Sgt. Buhere to get medical. Agent Williams asked Officer Burns if she knew what time Ms. Elliott called on the intercom about not being able to get out. Officer Burns said that she thought it was around 1820 hrs. Agent Williams then asked her if she was responsible for checking on the inmates in holding and she said that she was. She said that she checked her thru the cameras and the audible speakers in the cell. Officer Burns said that she would occasionally move and they could hear her snoring thru the speakers and that she believed Ms. Elliott was drunk and just needed to sleep it off. Officer Burns told us that she responded to the situation at MSF and when she returned she turned on the speaker and couldn't

hear Ms. Elliott snoring anymore. Officer Van Der Wys told her that he was going to check on her at that point and that was when he found her dead. She also told us that she was the one who called EMS and that she called them from the Lt's office. Agent Williams asked her when she noticed Ms. Elliott not breathing. Officer Burns wasn't sure, but said that she believed she stopped breathing around 2100 hrs. That was what Sgt. Johnson told her though after watching the video and not what she personally observed because she was over at MSF at that time. Officer Burns also commented on Ms. Elliott's odd behavior. Officer Burns said that she was clawing at the walls, trying to grab things that weren't physically there, and even trying to get out of the cell. She also said that Ms. Elliott at one point tried putting her food into her shoe. Agent Williams asked if that was unusual behavior for an inmate. Officer Burns said that while it was odd, it wasn't necessary unusual for an intoxicated person to behave odd. I asked her what the disturbance was at MSF and how long her and the other officers where over there. She said it was 2 groups of inmates about to fight and that they were over there for over an hour. I asked who was working central control when she was over there and she said it was Officer Shrader.

Agent Williams and I next spoke to nurse Tamara Johnston. Nurse Johnston told us that she never actually had any contact with Ms. Elliott before she was called for the medical emergency. She said she was in the office and heard the call for medical. She said that she grabbed her bag and went to the cell where Ms. Elliott was. She said that when she got there that Officer Van Der Wys was already checking Ms. Elliott for a pulse. He told her he couldn't get a pulse so she also started checking for a pulse. She said she checked for a radial and brachial pulse and there was none. Nurse Johnston also commented that although she wasn't stiff, Ms. Elliott was cold to the touch. Agent Williams asked her if this was the first contact that she had with Ms. Elliott and she confirmed that it was. Nurse Johnston did say that she received a report from the nurse going off duty that Ms. Elliot was intoxicated and that she was to follow up with her and complete a medical intake once she had been booked in. Agent Williams asked her if Ms. Elliott had already died by the time she got there and Nurse Johnston said that when Ms. Elliott was cold to the touch and they were unable to get a pulse she felt anything further was unwarranted and that Ms. Elliott was dead and she felt

that she had been for at least a few minutes. I asked Nurse Johnston if it was always the normal procedure to wait to do a medical intake until after the person was booked in and she said that it was. I asked if it was the same even for an intoxicated person who comes in and possibly isn't booked in for some time until they sober up. She said that was correct and that there was actually only one time where she checked on an inmate before they were booked in. She said she checked on one inmate about 3 weeks ago for Minco PD because he wanted to know if the arrestee needed to go to the ER and asked Nurse Johnston to do an assessment before they were booked in. She said that was the only time that had happened and isn't normal procedure.

We next spoke to Officer Kris Taylor, who was training in book in with Officer Van Der Wys. He said that he was with Sgt. Johnson when they went to feed her. He described her as "not all there" and said she was scratching at the wall and door. He also mentioned that Ms. Elliott complained of not being able to get out. He said that he went back to check on her a little later with Sgt. Johnson and that he could hear her snoring. He described the snoring as "hard logs" with real deep breath and heavy exhales. He said other than that he didn't have any interaction with her other than seeing her on camera. He said that while he was in central they would check on her and that they could hear her breathing. He said he was eventually called over to MSF and when he came back over he was performing a watch tour on the 2nd floor when the medical call came in.

We last spoke to Officer Robert Shrader. He told us that he really didn't have any interaction with Ms. Elliott. He explained that he came and worked Central Control while Officer Burns was called over to MSF for the altercation they were having over there. He said that when he arrived at central control he was told that Ms. Elliott was in cell #127 and that she had been brought in for Public Intoxication a little before 1800. They told him that they were waiting to book her in until she had sobered up. He said that she was asleep and he noticed her twitch her feet. He said that Officer Van Der Wys told him that she had been doing that all night. Officers Van Der Wys and Burns then went to MSF to deal with that situation. He said he checked on every one about every 15 minutes on the camera

and that Ms. Elliott appeared to him to be sleeping the whole time. Officer Shrader said after about an hour the officers returned and Officer Van Der Wys went to do a welfare check on her and she was unresponsive. He said he never left central and watched this on camera. He said that Officer Burns called for Sgt. Johnson so he then called for medical over the radio. After medical responded, he was ordered to put the jail on lockdown. Officer Shrader said that EMS responded and checked on Ms. Elliott and then after they left all the administrators were contacted. He said that he remained in central until a little after 0000 hrs when he was relieved by Officer Burns. Agent Williams asked Officer Shrader when the last time he saw any movement from Ms. Elliott. He told him that he didn't really know, but thought that he saw her feet move at around 2115 hrs.

After completing these interviews, Dr. Emma Prophet from the Medical Examiner's Office arrived at about 0141 hrs. I assisted her as she completed her duties. When she was done she took custody of Ms. Elliott's body and had it transported to the ME's office in OKC.

After Dr. Prophet left the facility Capt. Jason Carpenter and I went about trying to find someone to make a death notification to. Since Ms. Elliott had yet to be booked into the facility, no one had yet gotten any of her personal information, including emergency contacts. I was able to read the arrest affidavit submitted by Officer Derek Hunt of the Chickasha Police Department and determined her residence was 614 W Iowa Ave here in Chickasha. I was also able to determine from the affidavit that Ms. Elliott lived there with her girlfriend (Cynthia Quiroga). Capt. Carpenter and I then went to 614 W Iowa Ave. to try and make contact with Ms. Quiroga. We arrived at the home with Lt. James Weidenmaier of the Chickasha Police Department and made contact with Ms. Quiroga and Debbie White, who told us that she was Ms. Elliott's cousin. When we delivered the news that Ms. Elliot had died, Ms. White almost immediately asked Ms. Quiroga how many pills Ms. Elliot had taken. Ms. Quiroga stated she didn't know. They told us that Ms. Elliott had a bad heart and was bi-polar. I asked them for a list of the medications that she had taken. The meds they showed me for Ms. Elliott were as follows:

Lyrica 150 mg

Sulfameth Trimethoprim 160 mg

Valtrex 500 mg

Oxycontin 20 mg

Trazadone 100 mg

Montelukast Sodium 10 mg

Amrix 30 mg

I asked them how much Ms. Elliott had drank today before being arrested and Ms. Quiroga told me that it was 2 beers along with whatever medication she had taken. Ms. Quiroga, in her shock at the news, also made a statement that sounded like, "She said she was going to do it if we couldn't be together." Capt. Carpenter asked her to say what she had just said again. Ms. Quiroga then told us that she made that statement a long time ago, when they first got together. It should be noted that before she was arrested, there had been a domestic disturbance at the home between Ms. Elliott and Ms. Quiroga. It was the reason that the Police were called there in the first place. Because of the situation I decided not to press this issue at this time. While we were leaving, Ms. White and Ms. Quiroga were calling other members of the family and advising them of what had happened.

Later that week I went back and reviewed all the video from when Ms. Elliott was brought into the jail until she was found by Officer Van Der Wys. Officer Hunt pull into the sallyport at 1733 hrs. He then takes her to the book in area where she is dressed out by Officer Bare. Ms. Elliott is walking and talking under her own power at this time. At 1741 hrs, after being dressed out, Ms. Elliott is placed into cell #127. In the cell Ms. Elliott can be seen picking and knocking on the walls. She is also seen looking and messing with the door like she's possibly trying to open it. Ms. Elliott's behavior does seem odd as during this time she can be seen getting down on all 4's and looking around like she can't find something. She is also

constantly fidgeting and can't seem to sit still. At 1816 hrs she can be seen going over to the intercom and speaking into it. At 1822 hrs Sgt. Johnson can be seen opening the door and bringing Ms. Elliott some food and even starts to unwrap it for her. Ms. Elliott takes the food and after Sgt. Johnson leaves she sits down on the floor and having never eaten any of it she starts to try and stuff the food into her shoe. A few moments later she again gets down on all 4's and starts picking at the wall in the corner, just out of camera view. At 1828 hrs she lays out flat onto her stomach. She doesn't move from this basic position again until she is moved by Officer Van Der Wys when he finds her unresponsive. At 1834 hrs, Sgt. Johnson comes into the cell to check on her. When Ms. Elliott doesn't respond initially, Sgt. Johnson lifts her up a little and speaks to her for a moment.

At 1837 hrs I noticed that Ms. Elliott's breathing gets really deep and heavy. Her upper torso seems to lift and sometimes jerk significantly when she breaths. At 1851 hrs Sgt. Johnson again opens the door to the cell to look in on Ms. Elliott and Officer Taylor is with her. This is the last time anyone opens the door or enters the cell until 2246 hrs when Officer Van Der Wys comes into the cell and finds Ms. Elliott unresponsive. In watching the video I also noticed that the very heavy breathing and the visible rising and falling of her torso stops at 2041 hrs. Again at 2246 hrs, Officer Van Der Wys enters the cell and finds Ms. Elliott followed shortly by Officer Burns and Sgt. Johnson. Officer Burns leaves for a moment and returns within the minute with Nurse Johnston. Kristi Strickland, who is a medical technician also enters the cell, but doesn't touch or manipulate the body of Ms. Elliot in anyway. When Ms. Elliott is found to be deceased, everyone exits the cell and it is secured at 2249 hrs. EMS is allowed into the cell at 2255 hrs and they check on Ms. Elliott, but take no lifesaving steps when they also conclude she has already died. They exit the cell at 2259 and it remains secured with no one entering or exiting until Captain Carpenter and I arrive.

I also spoke to the arresting officer, Officer Derek Hunt of the Chickasha Police Department. Officer Hunt told me that he was dispatched to the home On Iowa for a domestic disturbance. He told me he saw Ms. Elliott in the alley outside the home and she was stumbling around. Officer Hunt told me that it was obvious

that Ms. Elliott was intoxicated after speaking to her. He said that she smelled mostly of alcohol, admitted to drinking 2 beers, and he believed that was the main source of her intoxication. However she admitted to taking her Rx medications which included muscle relaxers. He even said that when he first contacted her there was an unknown pill stuck to her shirt. Officer Hunt also mentioned to me that he noticed things thrown around the back yard of the residence at 614 W. Iowa. and in the alley. Officer Hunt told me noticed several empty pill bottles in the items that had been thrown around.

Copies of the video and photos taken by me will be retained along with the incident reports and the daily log for 7-5-2015.

Lt. Cliff Walker

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

XOUCHI JONATHAN THAO,       )
Special Administrator for the Estate of  )
KONGCHI JUSTIN THAO,       )
                                 )
          Plaintiff,       )
                                 )
v.                            )      Case No. CIV-19-01175-JD
                                 )
GRADY COUNTY CRIMINAL JUSTICE   )
AUTHORITY, et al.,       )
                                 )
          Defendants.      )

## <u>ORDER</u>

Before the Court is Plaintiff's Unopposed Motion to File Exhibits by Conventional Means ("Motion"). [Doc. No. 148]. Plaintiff seeks leave to file certain exhibits by conventional means, specifically three video clips in support of the response to Defendant's motion for summary judgment and six video clips in support of the response to the *Daubert* motion directed at Barry Dickey.

The Court GRANTS the Motion. Plaintiff may conventionally file three video clips in support of the response to Defendant's motion for summary judgment and six video clips in support of the response to Defendant's motion to exclude expert testimony of Barry Dickey, in the manner set forth in the Motion. The filing shall comply in all ways with the ECF Policies & Procedures Manual, including filing a Notice of Conventional Filing, and Plaintiff shall submit two complete copies of the conventional

filing as required by the Notice of Conventional Filing (one for the Court Clerk and one

for chambers).

IT IS SO ORDERED this 17th day of August 2023.

_____
JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE

2

## *Thao v. Grady County Criminal Justice Authority et al (closed 09/30/2024)*

**Oklahoma Western District Court**

Case no. 5:19-cv-01175-JD (W.D. Okla.)
Filed date: August 22, 2023
Docket entry no.: 160

Docket text:

> CONVENTIONALLY FILED EXHIBITS re 158 Order granting 148 Plaintiff's Unopposed Motion to File Exhibits by Conventional Means by Plaintiff Xouchi Jonathan Thao. Four flash drives received in the Court Clerk's Office. One blue and one red flash drive labeled "#155 Exhibits"; red flash drive provided to chambers and blue flash drive maintained in the Court Clerk's Office. One orange and one yellow flash drive labeled "#154 Exhibits"; yellow flash drive provided to chambers and orange flash drive maintained in the Court Clerk's Office.(rr) (Entered: 08/22/2023)

This PDF was generated on January 27, 2025 by PacerPro for a text-only docket entry synced on November 06, 2024.

https://app.pacerpro.com/cases/1080182086

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | | |
|---|---|---|---|
| (1) | XOUCHI JONATHAN THAO,<br>Special Administrator For The<br>Estate of KONGCHI JUSTIN THAO, | ) ) ) | |
| | | ) | |
| | Plaintiff, | ) | |
| | | ) | |
| v. | | ) | Case No. CIV-19-1175-JD |
| | | ) | |
| (2) | GRADY COUNTY CRIMINAL<br>JUSTICE AUTHORITY, *et al.* | ) ) | |
| | | ) | |
| | Defendants | ) | |

## REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT GRADY COUNTY CRIMINAL JUSTICE AUTHORITY'S MOTION FOR SUMMARY JUDGMENT

Defendant Grady County Criminal Justice Authority ("GCCJA" or "Defendant") pursuant LCvR 7.1(i), files this Reply to "Plaintiff's Response to the Motion for Summary Judgment Filed by Defendant Grady County Criminal Justice Authority" [Dkt. 154]. In further support of its Motion for Summary Judgment, Defendant states as follows:

### Reply to Plaintiff's Response to Defendant's LCvR 56.1(b) Statement

1-6, 8, 24-26, 37-43. Plaintiff has failed to produce any evidence which refutes Fact Nos. 1-6, No. 8, Nos. 24-26, or Nos. 37-43. Evidence which is not submitted in an admissible form may still be considered on summary judgment if the content or substance of the evidence would be admissible at trial. *See*, *Thomas v. Int'l Bus. Machines*, 48 F.3d 478, 485 (10th Cir. 1995). As such, Fact Nos. 1-6, No. 8, Nos. 24-26, and Nos. 37-43 should be deemed admitted for the purposes of summary judgment. *See* Fed. R. Civ. P. 56(e) and LCvR 56-1(e).

13-19, 28-29. Plaintiff has failed to produce any evidence which refutes Fact Nos.

13-19, or Fact Nos. 28-29. As such, Fact Nos. 13-19 and Fact Nos. 28-29 should be deemed

admitted for the purposes of summary judgment. *See* Fed. R. Civ. P. 56(e) and LCvR 56-

1(e).

21-22. Plaintiff has failed to produce any evidence which refutes Fact Nos. 21-22.

Plaintiff's factual assertions are not responsive. As such, Fact Nos. 21-22 should be deemed

admitted for the purposes of summary judgment. *See* Fed. R. Civ. P. 56(e) and LCvR 56-

1(e).

23, 31, 36.    Plaintiff has failed to produce any evidence which refutes Fact Nos.

23, 31, or 36. Plaintiff's comments are argumentative, irrelevant, and non-responsive and

should be disregarded. Furthermore, Plaintiff's reliance on the opinions of his expert, Mr.

Jones, is misplaced. Mr. Jones' opinions are not a matter of fact and are disputed in this

case. As such, Fact Nos. 23, 31, and 36 should be deemed admitted for the purposes of

summary judgment. *See* Fed. R. Civ. P. 56(e) and LCvR 56-1(e).

### **Response to Plaintiff's "Additional Facts that Preclude Summary Judgment"**

Defendant does not dispute Plaintiff's Fact Nos. 3, 7, or 9.

1-2, 5, 8, 10, 15, 18. Admitted, but irrelevant.

4.    Denied that the jailer "slammed" Thao into the wall or that he "tackled" him

as characterized by Plaintiff. The video evidence speaks for itself.

6.    Admitted, but Plaintiff omits relevant context. *See* Defendant's Fact Nos. 12-

18.

2

11.    Admitted, but irrelevant with regard to the 2016 Notice of Violation. Denied with regard to Plaintiff's assertion that Defendant "failed to make those same required sight checks on Thao." As Plaintiff acknowledges, a site check was conducted on Thao approximately 25 minutes after he was placed in Cell 126, and the next required site check was only 14 minutes late as Plaintiff's expert, Justin Jones, agrees. (Ex. 1, Jones Depo., p. 146:22 – p. 147:5; p. 162:7-18).

12-13. Denied. As set forth in Defendant's Motion and Brief to Exclude Expert Testimony of Barry Dickey (Dkt. 128) and Defendant's Reply to Plaintiff's Response to Motion to Exclude Expert Testimony of Barry Dickey (Dkt. 162) filed contemporaneously herewith, Plaintiff's expert's transcripts of the jail recordings are inherently unreliable and may not accurately reflect what jailers may or may not have heard. Moreover, there is no evidence that any jailers heard or understood any of Thao's alleged statements as set forth Plaintiff's Fact No. 13.

14.    Denied with regard to the assertion of Plaintiff's own subjective opinions that Thao's last utterance was a "cry for help" and that the door handle inside Cell 126 was "an obvious tie-off point for someone to hang themselves." Admitted as to the remainder.

16-17. Denied. *See* Defendant's Fact Nos. 36-43.

## ARGUMENT AND AUTHORITY

Plaintiff contends that the Defendant has argued the wrong standard for governmental liability under 42 U.S.C. § 1983 and, citing *Quintana v. Santa Fe Cty. Bd. of Comm'rs*, 973 F.3d 1022, 1033-34 (10th Cir. 2020), *Garcia v. Salt Lake Cty.*, 768 F.2d 303, 310 (10th Cir. 1985), and *Crowson v. Wash. Cty. State of Utah*, 983 F.3d 1166, 1191

3

(10th Cir. 2020), argues that, in the specific context of inadequate medical care cases, Tenth Circuit law permits entity liability under § 1983 in the absence of a single underlying constitutional violation when the combined acts or omissions of several employees acting under municipal policy or custom result in a constitutional deprivation. Defendant does not dispute that that is the case. However, Plaintiff omits that, in *Crowson*, the Tenth Circuit made clear that a specific underlying constitutional violation ***is required*** when entity liability is premised upon allegations of inadequate training, which is exactly what Plaintiff is claiming herein. *See*, *Crowson*, 983 F.3d at 1191-92 ("With this legal background in place, we now proceed to the question of whether our resolution of the claims against the individual defendants forecloses the County's liability. We conclude that it does with respect to the failure-to-train claim, but not as to the theory based on a systemic failure of medical policies and procedures.")[1] With regard to his failure to train claim, Plaintiff must show an underlying constitutional violation.

However, there is no reliable evidence in this case indicating that any jail staff were subjectively aware that Thao was suffering from an objectively serious medical or psychiatric problem or that he was suicidal. Citing Thao's attempt to run out of the cell and his purported utterances while in Cell 126 raises an inference that jail staff were

---

[1] Plaintiff further suggests that the Defendant's failure to address *Garcia* and its progeny in its summary judgment motion means the motion "cannot support summary judgment." (Dkt. 154, p. 13). However, none of the cases cited by Plaintiff support that contention. Defendant is not raising the issue for the first time in its Reply brief as Plaintiff contends, but rather is merely responding to Plaintiff's raising of the issue. Defendant is not required to be prescient and to address every potential issue in its opening brief that the Plaintiff could possibly raise.

subjectively aware that Thao was suffering from a significant psychiatric problem and that he was suicidal. However, contrary to Plaintiff's contention, this evidence does not raise any such reasonable inference – even taken in the light most favorable to Plaintiff. There is no evidence that Thao ever directly told jail staff that he was suicidal or thinking of killing himself and, as discussed above, there is no reliable evidence that any jail staff heard or understood Thao's purported utterances while in Cell 126.

Likewise, there is no evidence of inadequate training of jail staff. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985). As set forth in the Defendant's Motion, the staff were adequately trained, including training on recognizing mental health issues with prisoners. In response, Plaintiff argue that the Defendant "provides no special training for the supervision of inmates housed in Cell 126…[and] did not provide training to jail staff on identifying mental health problems in inmates..." (Dkt. 154, p. 30). However, Jim Gerlach explained that there was no reason to provide special training for the supervision of inmates housed in Cell 126 because it is a cell which is essentially like all others aside from the lack of a camera. (Dkt. 154-3, pp. 7-10). Furthermore, as discussed above, Plaintiff's contention that the Defendant did not provide any training on identifying mental health problems in inmates is without evidentiary support and disputed.

Regardless, inadequacy in training may serve as the basis for municipal liability under § 1983 "only where the failure to train amounts to deliberate indifference..." to individuals' constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality...can a city be liable for such a failure under § 1983." *Id*. at 389. Here, Plaintiff has failed to point to any evidence that the Defendant was deliberately indifferent with regard to any inadequacies in staff training.

Plaintiff asserts:

As set forth above, Estate cited a prior death in an adjacent cell that provided actual notice to Defendant that the cell lacked adequate supervision and it was clear that officers lacked adequate training on identifying and addressing mental health and substance abuse crises among inmates…There is no dispute the deficiency letter provided notice that a constitutional violation was a "highly predictable" or "plainly obvious" consequence of doing nothing.

Defendant admits the decision to house Thao in Cell 126 was consistent with its official policies and practices and that it did not follow the same Oklahoma Jail Standards that the Department of Health cited it for violating in 2016….As set forth in *Mata*, it is well settled that a conscious decision to act contrary to written protocols, and to persist in doing so despite knowledge of the risk, supports an inference of indifference.

(Dkt. 154, pp. 22-23). However, Plaintiff's argumentation in this regard is highly misleading. First, contrary to Plaintiff's assertion, the 2016 Notice of Violation said absolutely nothing about a lack of "adequate training on identifying and addressing mental health and substance abuse crises among inmates." Rather, it only addressed the need to ensure that all areas of the jail were sight checked at least once every hour. Moreover, again contrary to Plaintiff's assertion, Mr. Gerlach did not admit that the Defendant did not

6

follow Oklahoma Jail Standards with regard to Cell 126. Rather, he testified that **jail staff** – not the Defendant – failed to conduct the required hourly sight checks in this case. (Dkt. 154-3, pp. 2-3). There is no evidence that the Defendant made a conscious decision to not follow Oklahoma Jail Standards with regard to the sight checks of Cell 126. To the contrary, it is undisputed that it was the Defendant's policy that Cell 126 was required to be sight checked at least once every hour. (See Defendant's Fact No. 30).

Plaintiff next argues that:

> …[T]he summary judgment record includes specific examples of post-incident conduct by the Defendant through its authorized decision-maker, Mr. Gerlach, that support the inference the jailers acted consistent with "the way things are done and have been done in" Grady County, including: (1) a failure to impose any discipline; (2) a failure to revise any policies or practices, (3) a failure to update any training curriculum, and perhaps most importantly, (4) direct testimony confirming that jailer conduct was consistent with policy.

(Dkt. 154, p. 24). However, contrary to Plaintiff's assertion the cited deposition testimony does not support Plaintiff's contention that the Defendant failed "to update any training curriculum." (See, Dkt. 154-3, pp. 2-4). Likewise, the cited deposition testimony does not support Plaintiff's claim that "jailer conduct was consistent with policy." To the contrary, Mr. Gerlach clearly testified that staff did not follow jail policy with regard to conducting hourly sight checks of Cell 126. (Dkt. 154-3, pp. 2-3).

Regardless, Plaintiff cannot use such post-incident conduct to prove the existence of an unconstitutional policy or deliberate indifference. In *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009), the Tenth Circuit Court of Appeals noted that such evidence could not prove the existence of a policy because "basic princip[le]s of linear time prevent

**Volume 4 (of 4)**                                                          **4 App 145**

us from seeing how conduct that occurs *after* the alleged violation could have somehow caused that violation." *Id*. In *Durkee v. Minor*, 841 F.3d 872, 877 (10th Cir. 2016), the Tenth Circuit noted that post-incident evidence could not establish deliberate indifference. *Id*. at 877 (citing *Cordova*, 569 F.3d at 1194). Likewise, in *Waller v. City and County of Denver*, 932 F.3d 1277, 1286 (10th Cir. 2019), the Tenth Circuit held that post-event evidence "cannot be used as evidence that, prior to [the incident at issue], Denver 'decision makers ... deliberately chose[ ] a training program that w[ould] cause violations of constitutional rights." (Quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). Also, "only investigation deficiencies occurring ***prior to*** [the event at issue] could help [plaintiff] demonstrate the requisite 'direct causal link between the municipal action and the deprivation of federal rights."' *Id*. at 1289 (emphasis added) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). That is because "[b]asic princip[le]s of linear time prevent us from seeing how conduct that occurs *after* the alleged violation could have somehow caused that violation." *Id*. (quoting *Cordova*, 596 F.3d at 1194). As for discipline, "a subsequent failure to discipline cannot be the cause of a prior injury." *Id*. at 1290 (citing *Cordova*, 596 F.3d at 1194). Lastly, in response to the plaintiff's argument on appeal that he sufficiently alleged "Denver had a custom, policy, or practice of tolerating and ratifying the use of excessive force," the Tenth Circuit again disagreed, noting plaintiff alleged only one *prior* incident of excessive force, even though he had alleged post-event incidents of excessive force, and that this was far short of a "widespread practice" or a custom. *Id*.

Moreover, to the extent that Plaintiff may wish to use this argument to show that jail staff's alleged failure to respond to Thao's serious psychiatric/suicidal issues was

consistent with jail policy and practice, he must show that jail staff subjectively knew that Thao was suffering from an objectively serious medical or psychiatric problem or that he was suicidal. However, as discussed above, there is no reliable evidence in this case indicating that any jail staff had any such subjective knowledge.

Plaintiff next argues that the Defendant's Motion does not address Plaintiff's claim of intermediate harm – *i.e.*, that the Defendant failed "to respond to a person with a 'significant medical or psychiatric problem.'" (Dkt. 154, p. 26). Plaintiff concludes:

> As with liability arising under the *Garcia* line of cases, Defendant's motion avoided any argument associated with Estate's claim of intermediate harm based on the failure to respond to Thao's serious psychiatric problem. Again, because Defendant did not raise the issue in its Rule 56 motion, Estate lacks notice of the arguments and evidence it needs to place in the record to provide an intelligible response. Accordingly, Estate respectfully requests the Court deny the motion as to issues of intermediate harm.

(Dkt. 154, p. 28)

However, Plaintiff's argument in this regard makes very little sense. Aside from the alleged failure to respond to Thao's psychiatric problem resulting in his now apparent suicidal ideations – which the Defendant most certainly addressed in its Motion – Plaintiff fails to identify any failure to respond to any other medical or mental health issues on the part of Thao which would qualify as an "intermediate harm." Plaintiff's purported "intermediate harm" in this case is also the "ultimate harm" which was addressed in the Defendant's summary judgment brief. Plaintiff's argument in this regard provides no sound basis for the denial of Defendant's Motion.

Finally, Plaintiff argues that questions of fact exist which preclude the granting of summary judgment with regard to his excessive force claim. However, Plaintiff fails to

adequately address the Defendant's argument that any use of excessive force on Thao was not caused by any policy, practice, or custom of the Defendant. Rather, Plaintiff asserts that "because the Defendant has given its full-throated endorsement to the jailer's use of the TASER, that admission supports an inference that its use was consistent with Defendant's practice." (Dkt. 154, p. 35). However, Plaintiff's contention that the Defendant has given "its full-throated endorsement" to Officer Henneman's use of the TASER is without evidentiary support. Likewise, Plaintiff's implied contention that the Defendant admitted that Henneman's use of the TASER was consistent with Defendant's practice is also without evidentiary support. The cited deposition testimony of Mr. Gerlach which Plaintiff relies on for the contention that jail staff's actions were consistent with jail policy and practice only relate to staff's actions *after* Thao had been placed in Cell 126. (See, Dkt. 154-3, pp. 2-3). Accordingly, because Plaintiff cannot show any evidence of any causal connection between the alleged use of excessive force and any policy, practice, or custom of the Defendant, the Defendant is entitled to summary judgment with regard to that claim.

## CONCLUSION

WHEREFORE, premises considered, Defendant Grady County Criminal Justice Authority respectfully requests the Court to grant summary judgment in his favor and to dismiss all of Plaintiffs' claims against him with prejudice to the re-filing thereof.

Respectfully submitted,

s/ W.R. Moon, Jr.
Andy A. Artus, OBA No. 16169
W.R. Moon, OBA No. 32079
COLLINS, ZORN & WAGNER, PLLC
429 N.E. 50th Street, Second Floor

**Volume 4 (of 4)**                    **4 App 148**

Oklahoma City, OK  73105
Telephone:   (405) 524-2070
Facsimile:   (405) 524-2078
Email:        aaa@czwlaw.com
              wrm@czwlaw.com

ATTORNEYS FOR DEFENDANT
GRADY COUNTY CRIMINAL
JUSTICE AUTHORITY

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2023, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

J. Spencer Bryan
Steven J. Terrill
BRYAN & TERRILL LAW, PLLC
3015 E. Skelly Dr., Suite 400
Tulsa, OK 74105
sjterrill@bryanterrill.com
jsbryan@bryanterrill.com
        -and-
Glenn Katon
Katon.Law
385 Grand Ave., Ste. 200
Oakland, CA 94610
gkaton@katon.law
*Attorneys for Plaintiffs*

Jessica L. Dark, OBA No. 31236
Robert S. Lafferrandre, OBA No. 11897
Pierce Couch Hendrickson Baysinger
 & Green, L.L.P
1109 N. Francis Ave.
Oklahoma City, OK 73106
jdark@piercecouch.com
rlafferrandre@piercecouch.com
*Attorneys for Trevor Henneman*

s/ W. R. Moon, Jr._____
W.R. Moon, Jr.

**Volume 4 (of 4)**                                   **4 App 149**

Justin Jones                                    May 11, 2023

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA


XOUCHI JONATHAN THAO,            )
SPECIAL ADMINISTRATOR FOR THE )
ESTATE OF KONGCHI JUSTIN THAO,)
                                 )
          Plaintiff,             )
                                 )
vs.                              ) NO. CIV-19-1175-JD
                                 )
                                 )
GRADY COUNTY CRIMINAL            )
JUSTICE AUTHORITY, ET AL.,       )
                                 )
          Defendants.            )




DEPOSITION OF JUSTIN W. JONES

TAKEN ON BEHALF OF THE DEFENDANTS

IN OKLAHOMA CITY, OKLAHOMA

ON MAY 11, 2023


REPORTED BY:  JANA C. HAZELBAKER, CSR

**Exhibit 1**
**Volume 4 (of 4)**                              **4 App 150**

Justin Jones                                      May 11, 2023

```
                                                 Page 146
 1   signs and symptoms of suicide and mental health
 2   issues?
 3        A    As I sit here, I'd have to go back and look
 4   at the deposition.  I don't recall.
 5        Q    Okay.  Do you have any reason to disagree
 6   with him in that he received that training if that's
 7   what he stated during his deposition?
 8        A    I have no reason to --
 9             MS. DARK:  Object to form.
10             THE WITNESS:  I have no reason to disagree
11   with him.
12        Q    (By Mr. Moon) Okay.  I want to look down at
13   the bottom of Page 12 under Jail Standard
14   310:670-5-2.
15        A    To be clear --
16             MR. TERRILL:  You're talking about Page 12
17   of his report, right?
18             MR. MOON:  Of the report, yes.
19             THE WITNESS:  I'm sorry, 12?
20        Q    (By Mr. Moon) Yes, Page 12 of your report.
21        A    Okay.  I'm there.
22        Q    In the last paragraph it states that, "It
23   was one hour and 14 minutes later before he was seen
24   again and this was to prepare him for transport."
25             And my question, then, even assuming that
```

**Exhibit 1**
**Volume 4 (of 4)**                              **4 App 151**

Justin Jones                                    May 11, 2023

Page 147

1    the "once per hour" means once every 60 seconds -- or

2    60 minutes, I apologize, that means it was 14 minutes

3    over that 60-minute time period, is that correct,

4    since he had been observed?

5         A    Correct.

6         Q    On Page 15 of your report at the very

7    bottom in the last paragraph, it says, "While on

8    A pod, Mr. Thao is witnessed on video fidgeting while

9    attempting to rest on his bedding that was required

10   to be on the floor."

11            And my question is if you thought that was

12   a significant symptom, his fidgeting while he was

13   attempting to rest on his bedding?

14        A    Oh, his fidgeting?

15        Q    Yeah.

16        A    It's -- it's indicative -- I mean, here's

17   a -- I'll phrase it this way.  If he was a new

18   reception right off the street, I wouldn't have paid

19   any attention to it.

20            The fact he'd been incarcerated, he's been

21   in handcuffs before, he's been in close, confined --

22   even if he's claustrophobic.

23            The fidgeting was indicative to me that,

24   you know, he was nervous, there was anxiety.

25   Because, you know, most inmates will just -- you

Exhibit 1
4 App 152

Volume 4 (of 4)

Justin Jones                                      May 11, 2023

                                                  Page 162

1   wadded up towel already that nobody had ever picked

2   up, water in the vestibule area, and then water

3   coming out from under the door of the cell before

4   they put him in there.

5       Q    Okay.  Anything else?

6       A    No, sir.

7       Q    Also on Page 18, in the third paragraph

8   about middle of the way down you state that, "He only

9   received one glancing visual check during the hour

10  and 40 minutes he was in the cell."

11          And I think we discussed previously that

12  the only potential interpretation that they were over

13  on -- or had taken too long to perform a sight check

14  was that he was 14 minutes over --

15      A    Right.

16      Q    -- and so that that would have been the

17  only issue as far as timing of sight checks, correct?

18      A    Correct.

19      Q    On Page 19, in the second paragraph under

20  "Opinions" it states, "In this case, the expectation

21  that staff would use good judgment without any

22  meaningful training to know how or when to elevate

23  care decisions was also a factor."

24          We looked at some training documents

25  previously during your deposition.  Based upon what

                                      **Exhibit 1**
**Volume 4 (of 4)**                   **4 App 153**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) | XOUCHI JONATHAN THAO,<br>SPECIAL ADMINISTRATOR FOR<br>THE ESTATE OF KONGCHI JUSTIN THAO, | |
| | PLAINTIFF, | |
| v. | | CASE NO.: CIV-19-1175-JD |
| (2) | GRADY COUNTY CRIMINAL JUSTICE<br>AUTHORITY, ET AL. | |
| | DEFENDANTS. | |

**PLAINTIFF'S UNOPPOSED MOTION TO ADD PAGE INADVERTENTLY OMITTED FROM SUMMRY JUDGMENT RECORD**

Plaintiff files this unopposed motion to add a page to ECF 154-5, which was inadvertently omitted from that exhibit, based on the following:

Plaintiff filed his Response to the Motion for Summary Judgment Filed by Defendant Grady County Criminal Justice Authority (ECF 154) on August 17, 2023. The response included Exhibit 5 (ECF 154-5), which is excerpts of the deposition of Jimmy Duncan. Plaintiff inadvertently omitted a page from that exhibit, page 102 of the deposition transcript, which is cited at page seven of the response. Plaintiff asks the Court to add that page, attached as an exhibit to this motion, to ECF 154-5. Defendant does not oppose this relief.

Respectfully submitted,

s/Glenn Katon
Glenn Katon (pro hac vice)
Katon.Law
385 Grand Ave., Ste 200
Oakland, CA 94610
T: (510) 463-3350
F: (510) 463-3349
Email: gkaton@katon.law

and


Steven J. Terrill, OBA # 20869
J. Spencer Bryan, OBA # 19419
BRYAN & TERRILL LAW, PLLC
2500 S. Broadway, Suite 122
Edmond, OK 73013
T/F:    (918) 935-2777
Email: sjterrill@bryanterrill.com
Email: jsbryan@bryanterrill.com

**COUNSEL FOR PLAINTIFF**




<u>CERTIFICATE OF SERVICE</u>

On August 24, 2023, I served counsel of record in this case with the foregoing

document through the Court's ECF filing system.



s/Glenn Katon
Glenn Katon

2

Jimmy Duncan                                        January 27, 2023

Page 102

1          A.  No.  I'm --

2          Q.  You don't recall?

3          A.  No, I'm not.

4          Q.  Oh, okay.  I suspect I know the answer to

5      this, but do you weigh more or less?

6          A.  More.

7          Q.  What do you weigh now?

8          A.  Like 285.

9          Q.  And what do you figure you weighed in

10     November 2017?

11         A.  Probably -- I don't know.  If I had to

12     estimate, probably around 265, 270.

13         Q.  Okay.  Do you know if there was any

14     investigation into what happened on the elevator with

15     Mr. Thao while he was being transported to 126?

16         A.  I don't know if there was -- what

17     investigation was done or what wasn't done.  I don't

18     know.  That's our investigations department.

19         Q.  Okay.  Do you know if there was anyone who

20     was disciplined as a result of what happened on the

21     elevator with Mr. Thao?

22         A.  I do not know.

23         Q.  And were you part of any debriefing on the

24     incident of what happened in the cell in 126 where

25     Mr. Thao was found hanging from the door?

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

XOUCHI JONATHAN THAO,            )
Special Administrator for the Estate   )
of KONGCHI JUSTIN THAO,          )
                                 )
                    Plaintiff,   )
                                 )
v.                               )         Case No. CIV-19-01175-JD
                                 )
GRADY COUNTY CRIMINAL JUSTICE    )
AUTHORITY, et al.                )
                                 )
                    Defendants.  )

### ORDER

Before the Court is Plaintiff's Unopposed Motion to Add Page Inadvertently Omitted from Summary Judgment Record ("Motion"). [Doc. No. 165]. The Motion seeks permission to add page 102 of the deposition of Jimmy Duncan attached as Exhibit 5 to Plaintiff's Response to the Motion for Summary Judgment [Doc. No. 154-5]. The Motion states counsel inadvertently omitted the page from the exhibit and further requests that the Court add the omitted page. Defendant does not oppose.

Accordingly, the Court GRANTS the Motion [Doc. No. 165]. Plaintiff shall submit Exhibit 5 to include the omitted page to this Court's orders inbox within one (1) business day of the date of this Order, or by **August 28, 2023**. The Court DIRECTS its courtroom deputy to replace Exhibit 5 upon receipt of the resubmitted Exhibit 5 to include page 102 of Jimmy Duncan's deposition. The remainder of Exhibit 5 shall not differ from what Plaintiff previously filed at [Doc. No. 154-5].

IT IS SO ORDERED this 25th day of August 2023.

_____
JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | | |
|---|---|---|---|
| (1) | XOUCHI JONATHAN THAO, SPECIAL ADMINISTRATOR FOR THE ESTATE OF KONGCHI JUSTIN THAO, | | |
| | PLAINTIFF, | | |
| v. | | | CASE NO.: CIV-19-1175-JD |
| (2) | GRADY COUNTY CRIMINAL JUSTICE AUTHORITY, ET AL. | | |
| | DEFENDANTS. | | |

## PLAINTIFF'S MOTION FOR LEAVE TO FILE ONE-PAGE SUPPLEMENTAL BRIEF REGARDING SUMMARY JUDGMENT PURSUANT TO LCvR7.1(i)

Plaintiff moves the Court for Leave to File One-Page Supplemental Brief Regarding Summary Judgment Pursuant to LCvR7.1(i), based upon the following.

The parties' summary judgment briefs do not refer the Court expressly to applicable law of the Tenth Circuit on the doctrine of "systemic failure." *See* Ex. 1, Proposed Supp. Br., *passim*. Defendant's motion for summary judgment asserts that "[f]irst and foremost, Plaintiff must show an underlying violation of the Decedent's constitutional rights by an agent, employee or officer of the GCCJA before municipal liability can be imposed against the Defendant." Def.'s Mot. for Summ. J., ECF 124 at 12. Defendant cites case law to support this proposition, but wholly ignores the Tenth Circuit line of cases that explicitly permits entity liability under 42 U.S.C. § 1983 in the

absence of a single underlying constitutional violation in the specific context of inadequate medical care at jails and prisons. Pl.'s Resp. to Mot. for Summ. J., ECF 154 at 12.

Thus, Defendant put Plaintiff in the position of explaining the line of cases that provides for municipal liability without a single underlying constitutional violation without knowing how Defendant would argue that such cases do not apply to Defendant's actions and omissions here. Given the many cases that recognize that a single underlying constitutional violation is not necessary and Defendant's numerous acts and omissions that caused Justin Thao's death, Plaintiff could not possibly address every argument that Defendant might make for the first time in its reply. *See* Pl.'s Resp. to Mot. for Summ. J., ECF 154 at 13 ("When a party moves for summary judgment on ground A, his opponent is not required to respond to ground B – a ground the movant might have presented but did not."). Defendant's argument in reply that failure-to-train and failure-to-supervise claims do require a single underlying violation does not address or acknowledge the "systemic failure" doctrine established by Tenth Circuit law, which includes failure-to-train and failure-to-supervise analyses. See Ex. 1, Proposed Supp. Br., *passim*. Plaintiff's response brief explains some concepts that are the basis of systemic failure, such as "various deficiencies in prison conditions must be considered together," but does not expressly refer the Court to that doctrine as recognized by the Tenth Circuit. Plaintiff believes the Court should be apprised clearly of the systemic failure doctrine.

2

**CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiff's Motion for Leave to

File One-Page Supplemental Brief Regarding Summary Judgment Pursuant to

LCvR7.1(i), and deem Exhibit 1 filed.

Respectfully submitted,

s/Glenn Katon
Glenn Katon (pro hac vice)
Katon.Law
385 Grand Ave., Ste 200
Oakland, CA 94610
T: (510) 463-3350
F: (510) 463-3349
Email: gkaton@katon.law

and

Steven J. Terrill, OBA # 20869
J. Spencer Bryan, OBA # 19419
BRYAN & TERRILL LAW, PLLC
2500 S. Broadway, Suite 122
Edmond, OK 73013
T/F:    (918) 935-2777
Email: sjterrill@bryanterrill.com
Email: jsbryan@bryanterrill.com

**COUNSEL FOR PLAINTIFF**

3

<u>CERTIFICATE OF SERVICE</u>

On September 1, 2023, I served counsel of record in this case with the foregoing document through the Court's ECF filing system.

<div style="text-align: right;">
<u>s/Glenn Katon</u>

Glenn Katon
</div>

4

EXHIBIT 1

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

(1)   XOUCHI JONATHAN THAO,
      SPECIAL ADMINISTRATOR FOR
      THE ESTATE OF KONGCHI JUSTIN THAO,

              PLAINTIFF,

v.                                                    CASE NO.: CIV-19-1175-JD

(2)   GRADY COUNTY CRIMINAL JUSTICE
      AUTHORITY, ET AL.

              DEFENDANTS.

## PLAINTIFF'S SUPPLEMENTAL BRIEF IN RESPONSE TO
## MOTION FOR SUMMARY JUDGMENT

Plaintiff files this Supplemental Brief in Response to Motion for Summary

Judgment, based on the following:

Plaintiff's First Claim against Defendant is for its deliberate indifference to

Plaintiff's serious medical needs and risk of harm, based upon acts and omissions

"individually and collectively, [that] served as the moving force behind Justin [Thao]'s

death." Compl., ECF 1-2 at 11. This is a claim of "systemic failure" by Defendant, which

supports *Monell* liability even in the absence of an individual constitutional violation. In

*Crowson v. Washington County, Utah*, 983 F.3d 1166 (10th Cir. 2020), the Tenth Circuit

recognized that where there is a systemic failure by a municipal defendant in a deliberate

indifference jail case, the plaintiff need not show an individual constitutional violation.

<u>EXHIBIT 1</u>

*Id*. at 1192 (even if defendants did not violate the Constitution individually "their

*combined* acts may be sufficient for *Monell* liability") (original emphasis).

Judge Tymkovich, in a law review article this year, describes the law as follows:

> [S]ystemic failure claims do not require an individual officer to have
> committed a constitutional violation. Instead, the theory is that a
> municipality failed so egregiously in implementing proper policies,
> training, supervision, discipline, or hiring that it caused a constitutional
> violation. Thus, even if no individual officer committed a constitutional
> violation, the collective negligence of the individual officers caused by the
> municipality's egregious failures would suffice for municipal liability. Of
> course, the plaintiff would still need to make a proper showing for an actual
> injury, causation, and deliberate indifference.

Timothy M. Tymkovich, Municipal Liability: Tensions in the Tenth Circuit, 100 Denv.

L. Rev. 439, 457 (2023) (internal footnote citing *Garcia v. Salt Lake Cty*., 768 F.2d 303

(10th Cir. 1985) omitted).

Accordingly, Plaintiff maintains that the summary judgment evidence amply

supports his claim that Defendant's systemic failure caused Justin Thao's death and

Defendant's motion should, therefore, be denied.

Respectfully submitted,

<u>s/Glenn Katon</u>
Glenn Katon (pro hac vice)
Katon.Law
385 Grand Ave., Ste 200
Oakland, CA 94610
T: (510) 463-3350
F: (510) 463-3349
Email: gkaton@katon.law

and

**Volume 4 (of 4)**                                          **4 App 163**

<u>EXHIBIT 1</u>

Steven J. Terrill, OBA # 20869
J. Spencer Bryan, OBA # 19419
BRYAN & TERRILL LAW, PLLC
2500 S. Broadway, Suite 122
Edmond, OK 73013
T/F:    (918) 935-2777
Email: sjterrill@bryanterrill.com
Email: jsbryan@bryanterrill.com

**COUNSEL FOR PLAINTIFF**

<u>CERTIFICATE OF SERVICE</u>

On September 1, 2023, I served counsel of record in this case with the foregoing document through the Court's ECF filing system.

s/Glenn Katon
Glenn Katon

3

**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| XOUCHI JONATHAN THAO,<br>Special Administrator for the Estate<br>of KONGCHI JUSTIN THAO,<br><br>       Plaintiff,<br><br>v.<br><br>GRADY COUNTY CRIMINAL JUSTICE<br>AUTHORITY; et al.,<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. CIV-19-1175-JD<br><br>    JURY TRIAL DEMANDED |

**DEFENDANT GRADY COUNTY CRIMINAL JUSTICE AUTHORITY'S
RESPONSE TO PLAINTIFF'S MOTION TO FOR LEAVE TO SUPPLEMENT**

Defendant Grady County Criminal Justice Authority ("Defendant"), by and through

its counsel of record, hereby files its Response to "Plaintiff's Motion For Leave To File

One-Page Supplement Brief Regarding Summary Judgment Pursuant to LCvR7.1(i)" (Dkt.

172). For the reasons set forth herein, Plaintiff's Motion should be denied.

Plaintiff's Motion requests leave to file a supplemental brief to address the doctrine

of "systemic failure." *See* Dkt. 172, p. 1-2. In his Motion, Plaintiff acknowledges that he

addressed the underlying concepts of this doctrine in his Response but does not believe he

has adequately apprised the Court of the doctrine and thus seeks leave to supplement his

Response to Defendant's Motion for Summary Judgment. *Id*. at 2. Plaintiff's proposed

supplement only cites to one case (*Crowson v. Washington County*, *Utah*, 983 F.3d 1166

(10th Cir. 2020)) and includes a law review article which makes reference to *Garcia v. Salt

Lake Cty*., 768 F.2d 303, 310 (10ᵗʰ Cir. 1985). Plaintiff cited to and discussed both *Crowson*

and *Garcia* in his Response to Defendant's Motion for Summary Judgment. *See* Dkt. 154,

p. 19. While Plaintiff's Response does not use the phrase "systemic failure", the underlying

concepts are addressed at length. A supplemental brief should not be used to reargue the

points and authorities included in an opening or response brief. *See* LCvR7.1(i). Plaintiff's

failure to include the phrase "systemic failure" does not warrant a supplemental brief. To

quote from the same law review article Plaintiff cites in his proposed supplement:

> Although this theory of liability appears to make plaintiffs' burdens lighter,
> in reality the claim is just a recognition that in some *rare* cases an injury can
> be caused by a group of officials, rather than by a single one. Whether an
> individual violation is required for municipal liability turns on the facts of
> the case, *not the framing or name of the claim*.

Timothy M. Tymkovich, *Municipal Liability: Tensions in the Tenth Circuit*, 100 Denv. L.

Rev. 439, 458 (2023)(emphasis added). Plaintiff's proposed supplemental brief contains

no new arguments or authorities and is unnecessary.

 WHEREFORE, premises considered, Defendant Grady County Criminal Justice

Authority respectfully requests the Court deny Plaintiff's Motion For Leave To File

Supplement Brief.

 Respectfully submitted,

 s/W.R. Moon Jr.
 Andy A. Artus, OBA No. 16169
 W.R. Moon, OBA No. 32079
 COLLINS, ZORN & WAGNER, PLLC
 429 N.E. 50th Street, Second Floor
 Oklahoma City, OK   73105
 Telephone:   (405) 524-2070
 Facsimile:   (405) 524-2078
 Email:      aaa@czwlaw.com
             wrm@czwlaw.com

**Volume 4 (of 4)**                              **4 App 166**

ATTORNEY FOR DEFENDANTS
GRADY COUNTY CRIMINAL
JUSTICE AUTHORITY

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 19, 2023, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants.

J. Spencer Bryan
Steven J. Terrill
BRYAN & TERRILL, PLLC
2500 S. Broadway, Suite 122
Edmond, OK 73013
sjterrill@bryanterrill.com
jsbryan@bryanterrill.com

Glenn Katon
Katon.Law
385 Grand Ave., Ste. 200
Oakland, CA 94610
gkaton@katon.law

*Attorneys for Plaintiffs*

s/W.R. Moon, Jr.
W.R. Moon, Jr.

3

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

(1)  XOUCHI JONATHAN THAO,
     SPECIAL ADMINISTRATOR FOR
     THE ESTATE OF KONGCHI JUSTIN THAO,

          PLAINTIFF,

v.                                              CASE NO.: CIV-19-1175-JD

(2)  GRADY COUNTY CRIMINAL JUSTICE
     AUTHORITY, ET AL.

          DEFENDANTS.

## PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY

Pursuant to LCvR7.1(m), Plaintiff submits the following Notice of Supplemental
Authority.

1.      On May 16, 2024, the United States District Court for the Eastern of
Oklahoma issued its opinion in *Estate of Lakey v. City of Wilson*, *et al*., 2024 U.S. Dist.
LEXIS 88318 (E.D. Okla. May 16, 2024).  (Ex. 1).

2.      The opinion is relevant to imposing municipal liability for employee
actions consistent with agency policy, an issue raised in Estate's pending motion for
partial summary judgment (ECF 66).

Respectfully submitted,


s/J. Spencer Bryan
Steven J. Terrill, OBA # 20869
J. Spencer Bryan, OBA # 19419
BRYAN & TERRILL LAW, PLLC
2500 S. Broadway, Suite 122
Edmond, OK 73013
T/F:    (918) 935-2777
Email: sjterrill@bryanterrill.com
Email: jsbryan@bryanterrill.com

And

s/Glenn Katon
Glenn Katon (pro hac vice)
Katon.Law
385 Grand Ave., Ste 200
Oakland, CA 94610
T: (510) 463-3350
F: (510) 463-3349
Email: gkaton@katon.law

2

 Caution
As of: July 16, 2024 2:54 PM Z

# *Lakey v. City of Wilson*

United States District Court for the Eastern District of Oklahoma

May 16, 2024, Decided; May 16, 2024, Filed

Case No. CIV-20-152-RAW

**Reporter**
2024 U.S. Dist. LEXIS 88318 *

CYNTHIA LAKEY and DOUGLAS LAKEY, as co-Special Administrators for the Estate of Jared Lakey, Plaintiffs, v. 1. CITY OF WILSON, 2. JOSHUA TAYLOR, in his official and individual capacities, 3. BRANDON DINGMAN, in his individual capacity, 4. CHRIS BRYANT, in his official and individual capacities as Sheriff of Carter County, 5. DAVID DUGGAN, in his individual capacity, 6. LONE GROVE, 7. TERRY MILLER, in his individual capacity, and 8. KEVIN COOLEY, in his official and individual capacities, Defendants.

**Subsequent History:** Appeal filed, 06/13/2024

**Prior History:** *Lakey v. City of Wilson, 2022 U.S. Dist. LEXIS 17725, 2022 WL 301599 (E.D. Okla., Feb. 1, 2022)*

## Core Terms

training, official capacity, custom, summary judgment, excessive force, reasonable jury, rights, constitutional right, mutual aid, summary judgment motion, individual capacity, policies, deliberate indifference, argues, municipal, constitutional violation, failure to train, supervisory, injuries, risks, qualified immunity, use of force

**Counsel:** [*1] For Cynthia Lakey, Co-Special Administrator for the Estate of Jared Lakey, -, Jared Lakey, Douglas Lakey, Co-Special Administrator of the Estate of Jared Lakey, Plaintiffs: J. Spencer Bryan, LEAD ATTORNEY, Steven J. Terrill, Bryan & Terrill Law, PLLC, Edmond, OK.

Joshua Taylor, in his individual capacity, Defendant, Pro se, Lawton, OK.

Brandon Dingman, in his individual capacity, Defendant, Pro se, Lawton, OK.

For Chris Bryant, in his individual capacity, Chris Bryant, in his official capacity as Sheriff of Carter County,

Defendants: Jamison C. Whitson, Justin P. Ashlock, Wellon B. Poe, Collins Zorn & Wagner, PLLC, Oklahoma City, OK.

For David Duggan, in his individual capacity, Defendant: Jessica L. Dark, Randall J. Wood, Robert S. Lafferrandre, Pierce Couch Hendrickson Baysinger & Green (OKC), Oklahoma City, OK.

For Lone Grove, Terry Miller, in his individual capacity, Defendants: Eric D. Janzen, Rosenstein Fist & Ringold, Tulsa, OK.

For Department of Public Safety, Interested Party: J. Kevin Behrens, LEAD ATTORNEY, Oklahoma Department of Public Safety, Oklahoma City, OK.

**Judges:** RONALD A. WHITE, UNITED STATES DISTRICT JUDGE.

**Opinion by:** RONALD A. WHITE

## Opinion

### ORDER

Before the court is the Motion for Summary Judgment **[*2]** and Brief in Support by Chris Bryant in his individual capacity [Docket No. 376] Motion for Summary Judgment and Brief in Support by Chris Bryant in his Official Capacity [Docket No. 377]; and Amended Motion for Summary Judgment and Brief in Support by Lone Grove [Docket No. 385].

### I. Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Rule 56(a) F.R.Cv.P.* An issue is genuine if there is

sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim. *Sidlo v. Millercoors, LLC, 718 Fed.Appx. 718, 725 (10th Cir.2018)*. When applying this standard, the court views the evidence and draws reasonable inferences therefrom in the light most favorable to the nonmoving party. *Doe v. City of Albuquerque, 667 F.3d 1111, 1122 (10th Cir.2012)*. In weighing the proof, this court should "not weigh the evidence, pass on the credibility of witnesses, or substitute [its] judgment for that of the jury." *Marquez v. City of Albuquerque, 399 F.3d 1216, 1220 (10th Cir. 2005)* quoting *Questar Pipeline Co. v. Grynberg, 201 F.3d 1277, 1284 (10th Cir. 2000)*.

## II. Sheriff Bryant

Chris Bryant was the Sheriff of Carter County at the time of the incident giving rise to this litigation. The Carter County Sheriff's **[*3]** Office employed Deputy Duggan the officer who placed Mr. Lakey in the LVNR. Plaintiff sued Sheriff Bryant in both his individual capacity and his official capacity. He has moved both in his individual capacity and his official capacity for summary judgment. [Docket No. 376 and 377]. A reasonable jury could find that Sheriff Bryant maintained a policy or custom of mutual aid that ultimately harmed Mr. Lakey and that Sheriff Bryant was deliberately indifferent to the risk of such harm.

### a. Standard for Individual Liability

It is undisputed by the parties, and the record shows that Sheriff Bryant was not present during the incident with Jared Lakey, and thus his liability for the incident if any rests on his supervisory role. *Trujillo v. Williams, 465 F.3d 1210, 1227 (10th Cir.2006)* ("In order for liability to arise under *§ 1983*, a defendant's direct personal responsibility for the claimed deprivation of a constitutional right must be established."); *Novitsky v. City of Aurora, 491 F.3d 1244, 1254 (10th Cir. 2007)*. To sustain a *§1983* cause of action against a supervisor, a Plaintiff must satisfy three elements: (1) personal involvement; (2) causation; and (3) state of mind. *Estate of Booker v. Gomez, 745 F.3d 405, 435 (10th Cir. 2014)*.

The first element, personal involvement can be met "by demonstrating [a defendant] promulgated, created, implemented [,] or possessed responsibility **[*4]** for the

continued operation of a policy... provided the policy or custom resulted in a violation of the plaintiff's constitutional rights." *Burke v. Regalado, 935 F.3d 960, 997 (10th Cir. 2019)*. The second element requires the plaintiff show "that the defendant's alleged action(s) caused the constitutional violation" by setting "in motion a series of events that the defendant knew or should have known would cause others to deprive the plaintiff of her constitutional rights." *Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 768 (10th Cir. 2013)*. Finally, the third element is met when the plaintiff can show that the defendant "took the alleged actions with the requisite state of mind" which "can be no less than the mens rea required" of the subordinates to commit the underlying constitutional violation. *Estate of Booker, 745 F.3d at 435* citing *Porro v. Barnes, 624 F.3d 1322, 1328 (10th Cir.2010)*. The third element can be met by a showing that the supervisor acted with deliberate indifference. In this context, "deliberate indifference is a strict standard... requiring proof that a municipal actor disregarded a known or obvious consequence of his actions." *Burke, 935 F.3d at 997*. Whether an "official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence ...." *Farmer v. Brennan, 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)*.

### b. Standard for Liability in his Official **[*5]** Capacity

The Estate's official capacity claim against Sheriff Bryant, "represents only another way of pleading an action against an entity of which an officer is an agent. *Burke, 935 F.3d at 998* quoting *Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)*. To enforce liability against Sheriff Bryant in his official capacity, the Plaintiff, must show "(1) the existence of a municipal policy or custom, and (2) that there is a direct causal link between the policy and custom and the injury alleged." *Jensen v. W. Jordan City, 968 F.3d 1187, 1204 (10th Cir. 2020)* (internal citations omitted). Municipal policy includes policy statements, ordinances, regulations, and the individual decisions of city officials who have "final policy making authority" *David v. City and Cty. of Denver, 101 F.3d 1344, 1357 (10th Cir. 1996)*. Liability may also be imposed when policymakers ratify or approve of their subordinate's wrongful conduct. *Carney v. City and Cty. of Denver, 534 F.3d 1269, 1274 (10th Cir. 2008)*.

2024 U.S. Dist. LEXIS 88318, *5

## ANALYSIS

### 1. Supervisory Liability

In the present case, the Plaintiff has provided sufficient evidence to support a claim for supervisory liability under *§1983* against Sheriff Bryant in his individual capacity. With respect to the first element, there is no dispute that Sheriff Bryant was not personally involved in the incident with Mr. Lakey. Instead, Plaintiff argues that the violation of Mr. Lakey's rights was caused by the policies and practices promulgated or maintained by **[*6]** Sheriff Bryant. Plaintiff argues that the mutual aid policy and an unofficial practice of allowing excessive force caused Mr. Lakey's injuries.

We have already held that a reasonable jury could find that Deputy Duggan's conduct constituted excessive force in violation of Mr. Lakey's constitutional rights. Therefore, Defendant Bryant is not entitled to summary judgment on the grounds that there is no underlying constitutional violation by his subordinate Deputy Duggan. Furthermore, Plaintiff argues that the Court should infer the existence of additional facts and evidence suggesting that Sheriff Bryant approved of Deputy Duggan's conduct because of the destruction of the cell phone discussed in Plaintiff's Motion for Spoliation Sanctions. [Docket No. 336]. That motion was denied [Docket No. 424] and this Court's decision is based on the evidence in summary judgment record.

The record does not show that there is a pattern of allowing unconstitutional force from which a jury could infer an unofficial policy of permitting excessive force. However, a reasonable jury could find that the Mutual Aid policy maintained by Sheriff Bryant caused Mr. Lakey's injuries. The Mutual Aid policy states **[*7]** that "[r]equests from other law enforcement agencies, whether municipal, state, or federal, for back-up personnel or other assistance will be honored by the Carter County Sheriff's Office whenever the request is of an urgent nature". [Docket No. 405-10]. Sheriff Bryant testified that he knew prior to this incident that officers Dingman and Taylor had a reputation for not providing adequate backup to Carter County officers who aided the two Lone Grove officers pursuant to the policy. In his deposition, Sheriff Bryant acknowledged that continuing the policy put both his deputies and Mr. Lakey at risk because deputies may have felt compelled to use more force than usual to compensate for the lack of adequate back up. [Bryant Deposition, Docket No. 406-8 p. 127-130].

Sheriff Bryant testified that he was also aware of rumors that Officer Taylor had a reputation for mishandling situations where he may have to go "hands on" with a suspect. *Id* at 135-140. Deputy Duggan testified that he used the LVNR against Mr. Lakey is because he did not trust officers Dingman and Taylor to assist him if less forceful means of apprehending Mr. Lakey failed. In the light most favorable to the Plaintiff, a reasonably jury **[*8]** could find that continuing the Mutual Aid policy despite the concerns regarding the Lone Grove officers caused Deputy Duggan to be in a position where he felt obligated to use excessive force thus violating Mr. Lakey's rights.

Furthermore, a reasonable jury could find, that Sheriff Bryant was deliberately indifferent to the risks of continuing the Mutual Aid policy without providing additional officer training. Deliberate indifference requires a plaintiff to show that the defendant "knew or should have known of the misconduct, and yet failed to act to prevent future harm". *McClelland v. Facteau, 610 F.2d 693, 697 (10th Cir. 1979)*. The standard to be applied is the conduct of a reasonable person, under the circumstances, in the context of his authority and what he knew or should have known. "[A] local government policymaker is deliberately indifferent when he deliberately or consciously fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type experienced by the plaintiff." *Burke v. Regalado, 935 F.3d 960, 997-98 (10th Cir. 2019)* citing *Hollingsworth v. Hill, 110 F.3d 733, 745 (10th Cir. 1997)* (quotations omitted).

Defendant Bryant acknowledged that the mutual aid policy posed a risk to his officers and to Mr. Lakey. [Bryant Deposition, Docket No. 406-8 p. 127-130]. **[*9]** While the mutual aid policy was clearly not the sole cause of the incident, a reasonable jury could find that violating a suspect's constitutional rights was "a known or obvious consequence" of maintaining a policy that put both officers and the public in danger. *Burke, 935 F.3d at 997*. Sheriff Bryant knew that the two Wilson officers, Dingman and Taylor, created unsafe situations for his deputies. Instead of altering the policy or providing additional training to his officers on how to manage situations with inadequate backup, Sheriff Bryant continued the policy and provided no additional training. Thus, a reasonable jury could find that Sheriff Bryant should be held liable in his individual capacity because he knew that this policy would cause harm and yet failed to act, thus causing Mr. Lakey's injuries.

## 2. Qualified Immunity

Defendant Bryant asserts that he is entitled to qualified immunity on the Plaintiff's claims against him in his individual capacity. [Docket No. 376]. Qualified immunity "protects public officials from individual liability in a *§ 1983* action unless the officials violated 'clearly establish constitutional rights of which a reasonable person would have known.'" *Workman v. Jordan, 32 F.3d at 478* (quoting *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)*). At the summary **[*10]** judgment phase, the plaintiff must show that the defendant (1) violated a constitutional right and (2) that the right was clearly established. *Estate of Booker, 745 F.3d 411*. When determining whether a right was clearly established, there must be a Supreme Court or Tenth Circuit decision, or the clearly established weight of authority form other courts must have found that the conduct was unlawful". "Under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton. 572 U.S. 650, 656, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014)*. Courts must, therefore, not define a case's context for the purposes of clearly established rights in a manner that imports genuinely disputed factual propositions. *Id.* "Although the very action in question does not have previously been held unlawful, 'in light of pre-existing law the unlawfulness must be apparent.'" *Albright v. Rodriguez, 51 F.3d 1531, 1535 (10th Cir. 1995)* (quoting *Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)*).

As discussed, a reasonable jury could find that Defendant Bryant by continuing the mutual aid policy and failing to properly train his deputies, violated Mr. Lakey's rights. Plaintiff failed to show that maintaining the policy clearly violated Mr. Lakey's established rights at the time of the challenged conduct. Plaintiff does not provide any case law supporting its argument **[*11]** that it was clearly established that Defendant Bryant's actions in his individual capacity violated Mr. Lakey's rights. Plaintiff only argues that because Duggan violated clearly established law that Sheriff Bryant also violated clearly established law by continuing a policy that caused the violation. We disagree. "*Section 1983* is not a vicarious liability provision" and the "plaintiff must demonstrate the liability of each supervisory official against whom a claim is made". *Serna v. Colorado Dep't of Corr., 455 F.3d 1146, 1155 (10th Cir. 2006)*. In the light most favorable to the Plaintiff, Sheriff Bryant maintained a policy that may have created an additional risk of harm to officers and the public but had not previously resulted in any excessive force or constitutional violations. An officer, Deputy Duggan used excessive force to mitigate the risks that were caused in part by the policy. Plaintiff has not provided any case law suggesting that that this conduct violated clearly established law at the time of the conduct. Thus, Sheriff Bryant in his individual capacity is entitled to qualified immunity.

Therefore, Sheriff Bryant's in His Individual Capacity's Motion for Summary Judgment is hereby GRANTED on the grounds of qualified immunity [Docket No. 376].

## 3. Official **[*12]** Capacity Claims

Plaintiffs have sued Sheriff Bryant both in his individual capacity and in his official capacity as Sheriff of Carter County under *§1983*. Because the Plaintiff does not allege that Sheriff Bryant personally participated in the underlying alleged constitutional violations against Mr. Lakey, the elements of the two claims are substantially the same. Plaintiff must show that Sheriff Bryant "promulgated, created, implemented [,] or possessed responsibility for the continued operation of a policy" that caused a violation of the plaintiff's constitutional rights. *Burke v. Regalado, 935 F.3d 960, 999 (10th Cir. 2019)*. Both theories of liability require a (1) causal relationship between a policy or custom and (2) deliberate indifference. *Id.* Thus, for the purposes of this case the elements of supervisory responsibility are the same as Sheriff Bryant's liability as an official or policy maker.

For substantially the same reasons that we find that there is sufficient evidence regarding supervisory liability, we also find the same of official capacity liability. A reasonable jury could find that Sheriff Bryant maintained a mutual aid policy that made it more likely that his officers would encounter situations where they felt that using **[*13]** excessive force was their only option. A reasonable jury could find that failing to alter the policy despite being aware of the dangerous behavior of Officers Taylor and Dingman caused Deputy Duggan to violate Mr. Lakey's rights.

## 4. Failure to Train

Plaintiff argues that Sheriff Bryant should be held liable in his official capacity for failing to adequately train Deputy Duggan. To sustain a claim for *§1983* liability on

a failure to train the Plaintiff must prove "(1) the existence of a county policy or custom involving deficient training [;] (2) the policy or custom's causation of an injury [;] and (3) the city's adoption of a policy or custom with deliberate indifference. *Waller v. City & Cty. of Denver, 932 F.3d 1277, 1283-84 (10th Cir. 2019)*. It is not enough for plaintiffs to show that there were general deficiencies in the City's training program. Instead, the Plaintiff must identify the specific deficiency in the county's training program closely related to his ultimate injury and the Plaintiff must prove that the deficiency in training caused the officer to act with deliberate indifference to his safety. *See City of Canton v. Harris, 489 U.S. 378, 391, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)*.

In the context of failure to train, deliberate indifference can exist when municipality fails to train officers how to handle recurring situations **[*14]** presenting an obvious potential to violate the Constitution. *Allen v. Muskogee, 119 F.3d 837, 842 (10th Cir. 1997)*. When analyzing the third prong, the Tenth Circuit has developed the following test: the policymakers (1) knew to a moral certainty that officers would confront a particular situation, (2) the situation presents the officer with a difficult choice that training would assist them in making; and (3) making the wrong choice in this situation frequently results in a citizen's deprivation of rights. *Lance v. Morris, 985 F.3d 787, 802 (10th Cir. 2021)*. The three part test utilized by the tenth circuit provides a "way to determine whether a particular problem will recur enough to alert county officials to an obvious deficiency in the training". *Lance, 985 F.3d at 802*. "In most instances this can be established by proving the existence of a tortious pattern of conduct." *Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir.1998)*.

In the present case, Plaintiff argues that the Sherriff allowed deputies to use "stranglehold's without any recent training", however there is no evidence that the Carter County Sheriff's Office authorized it's officers to use the Lateral Ventricular Neck Restraint ("LVNR") or any other maneuver that could be described as a stranglehold. However, as we have discussed, Sheriff Bryant knew the risks of continuing the Mutual Aid policy **[*15]** and sending his deputies to assist Lone Grove police officers that were either unable or unwilling to back up his deputies. Additional training could have helped his deputies manage such situations without risking the health of the public. There is evidence in the record from which a reasonable jury could infer that Sheriff Bryant knew that assisting the Lone Grove police routinely put his deputies in situations where they would

be more likely to use excessive force and did not provide them with additional training on how to mitigate these risks. Triable issues of fact exist regarding the extent to which Defendant Bryant knew that this policy would present such a risk and whether additional training could have mitigated such risks. Therefore, Defendant Bryant in his official capacity is not entitled to summary judgment on Plaintiffs' *§ 1983* claims arising out of failure to train.

### 5. State Law Excessive Force Claim.

Defendant Bryant, in his official capacity also moved for Summary Judgment on the Plaintiff's state law excessive force claim. [Docket No. 377 p. 20]. Sheriff Bryant argues that he is entitled to immunity under the *Oklahoma Governmental Tort Claims Act ("OGTCA" or "The Act"), Okla. Stat 51 § 151, et. seq.* Under Oklahoma law, the OGTCA is the exclusive remedy for a plaintiff **[*16]** to recover against a governmental entity in tort. *Watkins v. Central State Griffin Memorial Hospital, Okla., 2016 OK 71, 377 P.3d 124 (2016)*. When a government employee commits a tort while acting within the scope of their employment, the government is vicariously liable for the tort as their employer. *Teeter v. City of Edmond, 85 P.3d 817, 2004 OK 5, ¶ 21*. Scope of employment under the Act is defined as "performance by an employee acting in good faith within the duties of the employee's office or employment or of tasks lawfully assigned by a competent authority including the operation." *Okla. Stat. tit. 51, § 152 (12)*.

Defendant Bryant argues that because Deputy Duggan's use of force was a violation of Sheriff's office use of force policy, his actions fell outside the scope of his employment and therefore Defendant Bryant in his Official Capacity is immune under the OGTCA. We disagree. The Supreme Court of Oklahoma has held that an employee's torts are within the scope of employment if the act giving rise to the complaint "was done for the purpose of doing the work assigned" by the employer. *Rodebush v. Oklahoma Nursing Homes, Ltd., 1993 OK 160, ¶ 13, 867 P.2d 1241, 1246*; citing *Mistletoe Express Serv. v. Culp, 1959 OK 250, 353 P.2d 9 (Okla.1959)*. This rule encompasses instances when the employee acts beyond the given authority. *Id. Patsy Oil & Gas Co. v. Odom, 1939 OK 341, 186 Okl. 116, 96 P.2d 302 (1939)*. For instance, in *Patsy*, the employer was held responsible for the employee taking a dynamite cap to an oil and gas well even though the employer did not authorize the use **[*17]** of dynamite on

2024 U.S. Dist. LEXIS 88318, *17

the rig. *Id.* Thus, an employee is not taken out of the scope his employment merely for violating employer policies.

In the present case, the LVNR Duggan employed was not an authorized maneuver under the Carter County Sheriff's office policies. Nevertheless, Deputy Duggan employed the LVNR in the process of trying to assist the Wilson officers' arrest of Mr. Lakey. This action was clearly taken pursuant to his assigned work as a Sheriff's Deputy. Thus, the mere fact that using the LVNR may have violated county policy does not take his actions outside the scope of his employment. Therefore, Defendant Bryant, in his official capacity is not entitled to immunity from Plaintiff's state law claims.

Therefore, Sheriff Bryant's in His Official Capacity's Motion for Summary Judgment is hereby DENIED [Docket No. 377].

### III. City of Lone Grove

Defendant Lone Grove Plaintiff sued the City of Lone Grove for the conduct of its employee, Officer Miller on the night of the incident with Mr. Lakey. To sustain a claim against the City, the Plaintiff is required to demonstrate that Officer Miller violated Mr. Lakey's constitutional rights and that he acted in a way that implemented a City policy [*18] or custom. We have already held that Officer Miller is not entitled to summary judgment for the claims Plaintiff has alleged against him. Therefore, the City of Lone Grove is not entitled to summary judgment on the Plaintiff's claims on a theory that Officer Miller's conduct did not violate Mr. Lakey's constitutional rights. *See Emmett v. Armstrong, 973 F. 3d 1127, 1139 (10th Cir. 2020)* (Holding that because a district court's finding that no excessive force was used should be overturned, that logically, the grant of summary judgment against for supervisory liability for the same violation should also be overturned.)

The Plaintiff specifically asserts a *§1983* claim against the City of Lone Grove based on (1) a policy or practice of excessive force and (2) another claim based on a failure to train resulting in Officer Miller's alleged deliberate indifference to Mr. Lakey's serious medical needs. [Docket No. 113].

### 1. Summary Judgment Regarding Lone Grove's Liability for Officer Miller's Use of Force.

The standard for holding the City of Lone Grove liable for Officer Miller's conduct is the same standard applied to Sheriff Bryant in his official capacity. *Supra* p. 4. Whether the City of Lone Grove is liable for any constitutional violation by Miller [*19] depends on (1) the existence of a municipal policy or custom, and (2) whether there is a direct causal link between the policy or custom and the injury alleged. *Bryson v. City of Okla. City, 627 F.3d 784, 788 (10th Cir. 2010)*.

Plaintiff alleges that Officer Miller's unconstitutional conduct is linked to "a written policy or unwritten practice that authorized police officers to use force that is unreasonable considering the totality of circumstances facing the officer" or that the policies are so "vague that it authorized the use of excessive force as applied to Jared." [Docket No. 87 ¶356, 357]. The Plaintiff also argues that Lone Grove admitted that Officer Miller acted in accordance with policy on the evening of the incident, thus implying that he was carrying out a policy of the city. [ Docket No 398 p. 19]. In response to the Plaintiff's request for admission: "Each use of force by Terry Miller against Jared Lakey was consistent with Lone Grove's written policy or unwritten practice". The City objected to the use of the term "use of force", but otherwise admitted that "Miller's conduct with respect to the incident was deemed consistent with Lone Grove Police Department policies and practice" [Docket No. 406-2 Lone Grove Responses to Requests [*20] for Admission.]

In support of its argument, the Plaintiff does not provide any binding precedent, but does point to points to cases from other circuits and district court cases that we ultimately find persuasive. In *Kersh*, a Fifth Circuit case, a municipality stipulated to the fact that the officer complied with city customs and policies during the allegedly unconstitutional conduct at issue. *Kersh v. Derozier, 851 F.2d 1509, 1513 (5th Cir. 1988)*. Therefore, because the jury found that the officer violated the plaintiff's rights, the court held that the customs and policies of the city necessarily violated the plaintiffs' rights. Plaintiff also cites to several district court cases including *Strachan v. City of Federal Heights, Colo, 837 F. Supp. 1086, 1092 (D.Colo. 1993)*. In *Strachan*, the defendant City admitted that the allegedly unconstitutional conduct by the officers in that case was "in conformance with the custom and policy of the City". *Id at 1092*. *Federal Rule of Civil Procedure 36(b)* states that "[a]ny matter admitted under this rule is conclusively established". Thus, the court held it was conclusively established that the officers conduct was in conformance with city policy. Therefore, the court

2024 U.S. Dist. LEXIS 88318, *20

denied the city's motion for summary judgment holding that the plaintiff's *§1983* claim against the city could survive because plaintiff's injury stemmed from a then existing **[\*21]** municipal policy or custom. The court also noted that this finding should not be interpreted as an admission that the officer's conduct was unconstitutional. *Id.*

Similarly, here, the City of Lone Grove may be liable if Mr. Lakey's injuries were the result of an unconstitutional policy or custom. The City admitted that "Officer Miller's actions conduct with respect to the incident was deemed consistent with Lone Grove Police Department policies and practice". We have already held that a reasonable jury could find that Officer Miller's conduct violated Mr. Lakey's rights. Therefore, because the City admitted that Officer Miller acted in compliance with City policies, a reasonable jury could find that the Lone Grove policies caused Mr. Lakey's injuries to the same extent that Officer Miller did. Thus, Defendant's Motion for Summary Judgment as to these claims [Docket No. 385] is hereby DENIED in part.

**2. The City of Lone Grove's Liability for Failure to Train**.

The standard for governmental liability for failure to train is set forth *Supra* p. 9. In the present case, the Plaintiff does not point to any specific deficiency in the City's training program that can be tied to Mr. Lakey's injuries. **[\*22]** Plaintiff alleges that Officer Miller was trained to withhold CPR until EMS arrives, but there is no support for this assertion in the record. Additionally, Officer Miller initiated CPR before EMS arrived. While it is true that his delayed response to Mr. Lakey's medical needs may have amounted to a violation of Mr. Lakey's constitutional rights, the delay cannot be directly tied to any training program was closely related to these actions. "Officers who are well trained are not free from error". *City of Canton, Ohio v. Harris, 489 U.S. 378, 391, 109 S. Ct. 1197, 1206, 103 L. Ed. 2d 412 (1989)*. Plaintiff suggests that additional training would have helped avoid the harm to Mr. Lakey but suggesting more or better training is not sufficient to show that the City's existing training was deficient or caused the harm at issue. *See City of Canton, Ohio v. Harris, 489 U.S. 378, 391, 109 S. Ct. 1197, 1206, 103 L. Ed. 2d 412 (1989)* ("Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.") Furthermore, there is no evidence in the record indicating that the City

enacted any of its training policies with any actual or constructive knowledge that such policies were "substantially certain to result in a constitutional violation". *Bryson v. City of Oklahoma City, 627 F.3d 784, 789 (10th Cir. 2010)*.

Finally, there **[\*23]** is no evidence that the City adopted any of its policies with deliberate indifference. There is no evidence that the training the City provided had caused any violations of an arrestee's rights prior to this incident. To the extent that the City knew that officers would encounter this situation, they arguably prepared them adequately by providing CPR training. Therefore, Defendant Miller's Motion for Summary Judgment is hereby GRANTED in part as to the Plaintiff's failure to train claims.

**Conclusion**

In sum, the Motion for Summary Judgment and Brief in Support by Chris Bryant in his individual capacity [Docket No. 376] is hereby GRANTED. The Motion for Summary Judgment and Brief in Support by Chris Bryant in his Official Capacity [Docket No. 377] is hereby DENIED; and the Amended Motion for Summary Judgment and Brief in Support by Lone Grove is GRANTED in part and DENIED in part as outlined above [Docket No. 385].

IT IS SO ORDERED THIS 16th DAY OF MAY, 2024.

/s/ Ronald A. White

RONALD A. WHITE

UNITED STATES DISTRICT JUDGE

---

**End of Document**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| XOUCHI JONATHAN THAO, | ) |
| Special Administrator for the | ) |
| Estate of KONGCHI JUSTIN THAO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Case No. CIV-19-1175-JD |
| | )     JURY TRIAL DEMANDED |
| GRADY COUNTY CRIMINAL JUSTICE | ) |
| AUTHORITY, et al., | ) |
| | ) |
| Defendants. | ) |

## DEFENDANT GRADY COUNTY CRIMINAL JUSTICE AUTHORITY'S RESPONSE TO PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY

Defendant Grady County Criminal Justice ("Defendant"), hereby submits its Response to "Plaintiff's Notice of Supplemental Authority" [Dkt. 181]. In his Notice, Plaintiff represents that the attached opinion, *Estate of Lakey v. City of Wilson, et al.*, 2024 U.S. Dist. LEXIS 88318 (E.D. Okla. May 16, 2024), is relevant to imposing municipal liability for employee actions consistent with agency policy, an issue raised in the Plaintiff's pending motion for partial summary judgment (Dkt. 66). However, Plaintiff's contention in that regard is simply not true. Nowhere in the *Lakey* opinion does the court assert or even suggest that municipal liability under 42 U.S.C. § 1983 can be imposed for employee actions that are "consistent with agency policy." Rather, the opinion reiterates the proper standard for § 1983 municipal liability employed in the Tenth Circuit – *i.e.*, that the violation must be ***caused by*** some municipal policy or custom. (*See*, Dkt. 181-1, pp. 2-5). Of course, *Lakey*'s discussion of the relevant legal standard in that regard is certainly

not new law. Furthermore, the *Lakey* opinion is an unpublished, non-final district court opinion and, as such, has no binding precedential effect on this Court.

Accordingly, because the *Lakey* case is not relevant to the issue raised in the Plaintiff's partial summary judgment motion, and because it is has no binding precedential effect on this Court, Plaintiff's Notice of Supplemental Authority should be disregarded.

Respectfully submitted,

s/W.R. Moon Jr.
Andy A. Artus, OBA No. 16169
W.R. Moon, OBA No. 32079
COLLINS, ZORN & WAGNER, PLLC
429 N.E. 50th Street, Second Floor
Oklahoma City, OK  73105
Telephone:   (405) 524-2070
Facsimile:   (405) 524-2078
Email:        aaa@czwlaw.com
              wrm@czwlaw.com

ATTORNEYS FOR DEFENDANT
GRADY COUNTY CRIMINAL
JUSTICE AUTHORITY

**Volume 4 (of 4)**                                        **4 App 178**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 2, 2024, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants.

J. Spencer Bryan
Steven J. Terrill
BRYAN & TERRILL, PLLC
2500 S. Broadway, Suite 122
Edmond, OK 73013
sjterrill@bryanterrill.com
jsbryan@bryanterrill.com

Glenn Katon
Katon.Law
385 Grand Ave., Ste. 200
Oakland, CA 94610
gkaton@katon.law

***Attorneys for Plaintiffs***

s/W.R. Moon, Jr.
W.R. Moon, Jr.

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

(1)    XOUCHI JONATHAN THAO,
SPECIAL ADMINISTRATOR FOR
THE ESTATE OF KONGCHI JUSTIN THAO,

PLAINTIFF,

v.                                                              CASE NO.: CIV-19-1175-JD

(2)    GRADY COUNTY CRIMINAL JUSTICE
AUTHORITY, ET AL.

DEFENDANTS.

**PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO**
**NOTICE OF SUPPLEMENTAL AUTHORITY**

Plaintiff files this Reply to Defendant's Response to Notice of Supplemental

Authority, based upon the following:

Defendant's response to Plaintiff's Notice of Supplemental Authority completely

misapprehends the analysis in the case Plaintiff supplied to the Court. Plaintiff's Notice

informed the Court of *Estate of Lakey v. City of Lone Grove*, in which the United States

District Court for the Eastern District of Oklahoma considered a plaintiff's argument that

because the defendant city in that case "admitted that Officer Miller acted in accordance

with policy on the evening of the incident . . . he was carrying out a policy of the city."

2024 U.S. Dist. LEXIS 88318, *19. That is precisely the argument Plaintiff in this case

makes in his Motion for Partial Summary Judgment (ECF 66). The District Court in

*Lakey* examined the argument and the court's reasoning is apt here.

Chief Judge White recounted the plaintiff's argument, which he expressly found persuasive:

> In *Kersh*, a Fifth Circuit case, a municipality stipulated to the fact that the officer complied with city customs and policies during the allegedly unconstitutional conduct at issue. *Kersh v. Derozier*, 851 F.2d 1509, 1513 (5th Cir. 1988). Therefore, because the jury found that the officer violated the plaintiff's rights, the court held that the customs and policies of the city necessarily violated the plaintiffs' rights. Plaintiff also cites to several district court cases including *Strachan v. City of Federal Heights, Colo*, 837 F. Supp. 1086, 1092 (D.Colo. 1993). In *Strachan*, the defendant City admitted that the allegedly unconstitutional conduct by the officers in that case was "in conformance with the custom and policy of the City". *Id* at 1092. Federal Rule of Civil Procedure 36(b) states that "[a]ny matter admitted under this rule is conclusively established". Thus, the court held it was conclusively established that the officers conduct was in conformance with city policy.[1]

*Id*. *20. The court's analysis applies with equal force to Plaintiff's Motion for Partial Summary Judgment here.

Defendant's other comments about the significance of the *Lakey* case are of no moment. Chief Judge White's opinion is thorough and well reasoned, regardless of whether it is "non-final," as are all orders denying summary judgment, and non-binding, since it is from a neighboring federal district court.

Respectfully submitted,

s/Glenn Katon
Glenn Katon (pro hac vice)
Katon.Law
385 Grand Ave., Ste 200
Oakland, CA 94610
T: (510) 463-3350
F: (510) 463-3349
Email: gkaton@katon.law

---

[1] Defendant GCCJA made the same admission in this case. ECF 66-2 (Resp. No. 5).

2

and

Steven J. Terrill, OBA # 20869
J. Spencer Bryan, OBA # 19419
BRYAN & TERRILL LAW, PLLC
2500 S. Broadway, Suite 122
Edmond, OK 73013
T/F:    (918) 935-2777
Email: sjterrill@bryanterrill.com
Email: jsbryan@bryanterrill.com

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| XOUCHI JONATHAN THAO, | ) | |
| Special Administrator for the Estate of | ) | |
| KONGCHI JUSTIN THAO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-19-01175-JD |
| | ) | |
| GRADY COUNTY CRIMINAL JUSTICE | ) | |
| AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER</u>

Before the Court are a Motion for Partial Summary Judgment [Doc. No. 66] and a

Motion to Supplement [Doc. No. 172] filed by Plaintiff Xouchi Jonathan Thao, Special

Administrator for the Estate of Kongchi Justin Thao ("Estate"), in addition to Defendant

Grady County Criminal Justice Authority's ("GCCJA") Motion for Summary Judgment

[Doc. No. 124]. The parties have filed responses, replies, exhibits, and supplemental

authority to these motions [Doc. Nos. 86, 87, 151, 154, 164, 175, 181, 182, and 183],

which has been considered by the Court. The only remaining claims—and those subject

to the summary judgment motions—are the Estate's Eighth Amendment claims against

GCCJA.

This case involves a federal inmate who committed suicide while temporarily

housed in the Grady County Law Enforcement Center. The Court is saddened by the facts

of this case. But the evidence does not show that GCCJA's training or policies were

established with deliberate indifference to the risk of violating constitutional rights.

Without establishing deliberate indifference in the municipal liability context, the Estate

cannot prevail on its Eighth Amendment claims against GCCJA. Consequently, the Court

denies the Estate's motions and grants GCCJA's motion.[1]

## I.    <u>BACKGROUND</u>[2]

In 2017, Kongchi Justin Thao ("Thao") was convicted of a federal crime and

sentenced to twelve months and one day in federal prison. In November 2017, the United

States Marshals Service ("USMS") transferred Thao from the Otero County Prison

Facility in New Mexico to the Los Angeles Metropolitan Detention Center in California.

On the way, Thao and other federal "turnaround" inmates were temporarily housed at the

Grady County Law Enforcement Center ("jail"). [Doc. No. 124-7 at 1]. Turnaround

inmates are federal inmates that are being transported elsewhere but stay at the jail for a

few hours overnight. According to the USMS's "Prisoner in Transit Medical Summary"

which included a box that could be checked for "suicide watch," Thao did not have any

medical issues. [Doc. No. 151-1 at 1].

While in the jail's holding area with the other turnaround inmates, Thao ran in the

direction of a jail nurse standing near the door. An officer stopped Thao and restrained

him. The officer put Thao in handcuffs and escorted him to the elevator. Several other

---

[1] The Court uses CM/ECF page numbering from the top of filings in citations, if
available. Otherwise, the Court uses the page numbering at the bottom of the filings.

[2] The Court recounts only the facts relevant to its analysis and those needed to
provide context.

officers accompanied them in the elevator. While in the elevator, one guard, Officer Henneman, tased Thao on his leg. The officers then walked Thao from the elevator to cell 126. Cell 126 was primarily used as a shower cell but was sometimes used for turnaround inmates who were difficult to control. The cell had a covered door window and was equipped with an intercom but no video surveillance. It was near the sallyport which led to the bus area. When needed, turnaround inmates would spend a few hours in cell 126 before being escorted to the bus area for transport. The cell next door, cell 127, was used similarly. In 2015, an intoxicated inmate experiencing a drug overdose died in cell 127.

At approximately 2:41 a.m., Thao was placed in cell 126. Around 2:53 a.m., he requested and received a bath towel due to the floor being wet. Around 3:07 a.m., an officer visually checked on Thao through the door window. Around 3:19 a.m., Thao and a female inmate next to him in cell 127 began conversing loudly. During this conversation, Thao made statements like "I'm gonna fucking commit suicide," and "I might as well kill myself. I'm not gonna be shot. Just fucking send me home." They conversed off and on until about 4:10 a.m. At approximately 4:21 a.m., Officer Henneman went to cell 126 to prepare Thao for transport. He found Thao's body hanging by his neck in his cell with the towel tied around the door handle. Thao was immediately pulled down, administered CPR, and taken to the emergency room. He did not survive.

At the time of this incident, GCCJA had policies regarding how and when officers were supposed to use force (such as tasing) and how frequently officers were supposed to check on inmates. For example, officers were required to physically conduct a visual check on every inmate once every hour. For inmates on suicide watch, officers were

required to do this check every fifteen minutes. Inmates on suicide watch were not placed in cells 126 or 127. The officers received training on these policies and other topics such as what behaviors were indicative of mental illness.

The Estate sued GCCJA in the District Court of Grady County, Oklahoma. It brought several Eighth Amendment claims against GCCJA via municipal liability. GCCJA removed the case to this Court.[3]

## II.    **LEGAL STANDARD**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (internal quotation marks and citation omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (explaining that a dispute over a material fact is genuine "if a rational jury could find in favor of the nonmoving party on the evidence presented" (citation omitted)). In applying this standard, the Court "review[s] the facts and all reasonable inferences those facts support[ ] in the light most favorable to the nonmoving party." *Doe*, 952 F.3d at 1189

---

[3] The suit originally included several other parties and claims, but those have since been dismissed. *See* [Doc. Nos. 36, 46, 88, 114].

**Volume 4 (of 4)**                                            **4 App 186**

(second alteration in original) (quoting *Evans v. Sandy City*, 944 F.3d 847, 852 (10th Cir. 2019)).

"When the parties file cross motions for summary judgment, '[the court is] entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts.'" *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quoting *James Barlow Fam. Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997)). "Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Id.* (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)).

## III.  <u>ANALYSIS</u>

GCCJA's motion seeks judgment as a matter of law on both the Estate's failure to provide adequate medical care and excessive force claims. These Eighth Amendment claims are brought under a municipal liability theory by the Estate against GCCJA. The Estate seeks partial summary judgment on the issue of municipal liability for its excessive force claim. It also asks the Court for leave to supplement its briefing in response to GCCJA's motion.

A.     **GCCJA was not deliberately indifferent for purposes of municipal liability.[4]**

The Estate argues that GCCJA violated Thao's Eighth Amendment rights because he was not provided adequate medical care and Officer Henneman used excessive force when he tased Thao. The Estate contends GCCJA's official policies caused these constitutional violations and that it was deliberately indifferent to the risk of causing constitutional injury.

"[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." *Canton*, 489 U.S. at 385 (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694–95 (1978)). "[A] plaintiff seeking to impose liability on a municipality under § 1983" must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."[5] *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997).

---

[4] "The state of mind required to prove a constitutional violation is distinct from the state of mind that may be required to show that a municipality *caused* a constitutional violation." *Dodds v. Richardson*, 614 F.3d 1185, 1209 n.2 (10th Cir. 2010) (Tymkovich, J., concurring) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 n.8 (1989)).

[5] "[T]o establish municipal liability, a plaintiff must first demonstrate a 'municipal policy or custom,' which may take one of the following forms: '(1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.'" *Waller v. City & Cnty. of*

6

An entity is not liable under § 1983 "unless deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Id.* at 400 (emphasis omitted). "For individual defendants, the applicable state of mind will depend on the type of constitutional violation at issue. In contrast, the prevailing state-of-mind standard for a municipality is deliberate indifference regardless of the nature of the underlying constitutional violation." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 771 n.5 (10th Cir. 2013) (citations omitted). Thus, "to hold a municipality liable, a plaintiff must prove that (1) an official policy or custom (2) caused the plaintiff's constitutional injury and (3) that the municipality enacted or maintained that policy with deliberate indifference to the risk of that injury occurring." *George ex rel. Bradshaw v. Beaver Cnty. ex rel. Beaver Cnty. Bd. of Comm'rs.*, 32 F.4th 1246, 1253 (10th Cir. 2022).

Since in this case the third element is dispositive, the Court's analysis focuses on GCCJA's deliberate indifference. *See Crowson v. Washington Cnty.*, 983 F.3d 1166, 1186 (10th Cir. 2020) ("[I]t is important to begin with the Supreme Court's direction in *Collins v. City of Harker Heights* that 'proper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation.' The absence of an affirmative answer to either of these

_____

*Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quoting *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)).

questions is fatal to a claim against the municipality." (citation omitted) (quoting 503

U.S. 115, 120 (1992))).

When the municipality has notice that its action or failure to act is substantially

certain to result in a constitutional violation, and the municipality consciously or

deliberately chooses to disregard the risk of harm, the deliberate indifference standard is

met. *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) ("The deliberate

indifference standard may be satisfied when the municipality has actual or constructive

notice that its action or failure to act is substantially certain to result in a constitutional

violation, and it consciously or deliberately chooses to disregard the risk of harm." (citing

*Brown*, 520 U.S. at 407)). The Tenth Circuit further explained that

> notice can be established by proving the existence of a pattern of tortious
> conduct. In a "narrow range of circumstances," however, deliberate
> indifference may be found absent a pattern of unconstitutional behavior if a
> violation of federal rights is a "highly predictable" or "plainly obvious"
> consequence of a municipality's action or inaction, such as when a
> municipality fails to train an employee in specific skills needed to handle
> recurring situations, thus presenting an obvious potential for constitutional
> violations.

*Id.* at 1307–08 (citations omitted) (first and second quoting *Brown*, 520 U.S. at 409; and

then quoting *Canton*, 489 U.S. at 390 & n.10).

Consequently, to meet this standard, GCCJA would need to have noticed that its

action or inaction was substantially certain to result in the Eighth Amendment violations

the Estate raises—failure to provide medical care and the use of excessive force—and then disregard that risk.[6]

> 1.    GCCJA was not deliberately indifferent to the risk of failing to provide adequate medical care.[7]

The Estate argues GCCJA's training of its officers was deliberately indifferent to the risk of failing to provide adequate medical care. Specifically, the Estate contends GCCJA was deliberately indifferent because it did not provide training on (1) how to identify or handle suicidal inmates or (2) how to supervise inmates housed in cell 126.[8] The Estate claims that the inmate death that occurred in 2015 in the cell next to 126, cell 127, put GCCJA on notice that its current training on suicidal inmates and supervision of cell 126 would lead to a violation of someone's constitutional rights. *See* [Doc. No. 154 at 15] ("As set forth above, Estate cited a prior death in an adjacent cell that provided

---

[6] In its complaint, the Estate technically listed five claims against GCCJA. However, several of these "claims" are just allegations of municipal liability. *See* [Doc. No. 1-2 at 11] (listing "inadequate training" and "inadequate supervision" as "entity claims"). Case law and the Estate's subsequent briefing reveal that the two constitutional claims the Estate brings against GCCJA are a failure to provide adequate medical care claim and a use of excessive force claim, both under the Eighth Amendment.

[7] It is important to highlight that "a finding of 'deliberate indifference' is also required to hold prison officials liable for violating inmates' Eighth Amendment right to humane conditions of confinement. Deliberate indifference, however, is defined differently for Eighth Amendment and municipal liability purposes. In the prison conditions context, deliberate indifference is a subjective standard requiring actual knowledge of a risk by the official. In the municipal liability context, deliberate indifference is an objective standard which is satisfied if the risk is so obvious that the official should have known of it." *Barney*, 143 F.3d at 1307 n.5 (citations omitted).

[8] Although the Estate references the failure to supervise, its filings and arguments show that it is referencing the officers' lack of training on how to specifically supervise cell 126, not GCCJA's failure to supervise its officers.

actual notice to Defendant that the cell lacked adequate supervision and it was clear that officers lacked adequate training on identifying and addressing mental health and substance abuse crises among inmates.").

At the outset, the Court notes that "'[o]ne prior incident, even if it was a constitutional violation sufficiently similar to put officials on notice of a problem, does not describe a pattern of violations.'" *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1287 (10th Cir. 2019) (alteration in original) (quoting *Coffey v. McKinley Cnty.*, 504 F. App'x 715, 719 (10th Cir. 2012) (unpublished)). "'One instance, however egregious, does not a pattern or practice make.'" *Id.* (quoting *Martin v. Malhoyt*, 830 F.2d 237, 255 (D.C. Cir. 1987)). Viewing the evidence in the light most favorable to the Estate, GCCJA was not put on notice via a pattern of tortious conduct.

So, for GCCJA to be deliberately indifferent, a violation of federal rights must have been highly predictable or plainly obvious given its action or inaction. This can be established "when a county fails to train jail guards on how to handle recurring situations presenting an obvious potential to violate the Constitution." *Lance v. Morris*, 985 F.3d 787, 801 (10th Cir. 2021). But importantly, as the Supreme Court's "decision in *Canton* makes clear, 'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410.

Here, GCCJA has put on evidence that its officers were trained on how to supervise inmates, identify suicide risks, and handle those types of situations. For example, Officer Gerlach, GCCJA's representative, affirmed that officers were trained

"on when they should contact the nurse on duty regarding the condition of someone in custody," [Doc. No. 154-3 at 26], and how to identify "behavior" consistent with "substance abuse problems" [*id.* at 21]. When asked if the officers' "training involve[d] identifying suicide risks," Officer Gerlach answered "yes." [Doc. No. 124-8 at 26]. He said, although the officers "don't receive a certificate or degree on it," "they're basically trained on how to identify as a general person somebody that's in distress or somebody that has some tendencies that they might hurt themselves." [*Id.*]. Officer Gerlach also agreed that the officers received "suicide prevention training" that was included as part of their "annual training on the state jail standards." [*Id.* at 27]. Officer Gerlach stated they received training on the jail's policies and procedures and training manuals. Excerpts of these materials include:

> Staff shall provide twenty-four (24) hour supervision of inmates. [Doc. No. 151-2 at 1].

> At the beginning of each shift, the shift supervisor will assign officers to designated areas within the detention facility and will document the assignment with central control. Officers will remain in the unit assigned unless relieved by another officer and will ensure that they are able to see or hear the activities of the inmates so they can respond promptly to emergency situations. [*Id.* at 4].

> Safety Checks: Assigned officers will complete a welfare check of inmates at least once every hour, or more frequently if needed, by visually looking into living areas and observing the inmates for signs of mental or physical distress, unrest between or among inmates or any other behavior that suggests a problem could be developing. [*Id.* at 4–5].

> Inmates who are mentally ill shall be separated from other inmates. Every effort shall be made to contact a local hospital, clinic, or mental health facility for the detention of the mentally ill. [Doc. No. 151-4 at 2].

11

Suicide Risks. Inmates with a history of suicide attempts or threats will be placed in a two-person cell (safety and security permitting) with increased supervision regardless of their security score, pending further review and evaluation by the mental health staff. [*Id.* at 3].

Similarly, Officer Duncan stated the officers received forty hours of training on these policies and procedures. He affirmed that "if an inmate were to say that he was going to kill himself," his training required him to "bring [the inmate] straight to medical for medical to make -- to speak with him and make a determination from there." [Doc. No. 124-15 at 5]. Officer Duncan explained that the officers are not trained to identify mental health issues in the diagnostic sense but that their training helped them identify conduct that was indicative of mental health issues such as "change in appetite, change in appearance, [and] change in behavior." [Doc. No. 124-15 at 8].

Additionally, Officer Farley, a shift supervisor at GCCJA, had the following exchanges with the Estate's attorney, Mr. Katon, and GCCJA's attorney, Mr. Moon, at his deposition:[9]

> Mr. Katon: Are you given any training on what to do if any prisoner either says that they want to commit suicide or gives some other indication that they might be a suicide risk?
>
> Officer Farley: Yes.
>
> Mr. Katon: What is that training?
>
> Officer Farley: To bring them to the nurse and let the nurse determine if they need to be put on suicide watch or not.
>
> Mr. Katon: Is that considered a very serious concern at the Grady County Law Enforcement Center?

---

[9] For readability, the Court has omitted the parties' objections to the form of these questions.

**Volume 4 (of 4)**                                        **4 App 194**

Officer Farley: Yes.

Mr. Katon: As a shift supervisor, if a detention officer told you that an inmate joked about killing themselves, and the detention officer didn't do anything about it, would you instruct the detention officer that that was not acceptable?

Officer Farley: Yes.

. . .

Mr. Moon: If an inmate did present something that might indicate to you or another detention officer that they might be suicidal, were you trained in what to do in that incident -- or instance?

Officer Farley: Yes.

Mr. Moon: What would you -- what were you trained to do?

Officer Farley: At that point in time, we would let medical know that we have a potential suicidal inmate, let her know everything that's going on, and then she'll make the call to put them on suicide watch or not.

. . .

Mr. Katon: And you mentioned to Mr. Moon that you were trained on what to do if an inmate expressed to you any intention to commit suicide. Is that right?

Officer Farley: Yes.

Mr. Katon: Were you trained to listen to what inmates were saying that did not constitute a threat of suicide but might indicate a mental health crisis?

Officer Farley: I don't quite understand that question.

Mr. Katon: So if somebody said to you, "Hey, Farley, I'm going to kill myself," it would be very clear what you were required to do. Right?

Officer Farley: Yes.

Mr. Katon: If there were other things that an inmate said like "Just kill me. I want to die," is it clear what an officer should do if they heard that?

Officer Farley: Yes.

Mr. Katon: What[] should the officer do when they hear that?

Officer Farley: At that point in time, we need to get him pulled out, pull him downstairs, and if it's safe to do so, let him talk to the nurse.

Mr. Katon: And that's because they said, "Just kill me"?

Officer Farley: Yes.

Mr. Katon: So -- so what training did you receive about what things that an inmate said would require you to bring them right to the nurse other than the obvious "I'm going to kill myself"? What's the training on that?

Officer Farley: Any kind of threat of harm to oneself or any other needs to be dealt with.

Mr. Katon: Okay. So how about "I want to die. I just want to die"? Is that a threat of harm that would require you to bring the person to the nurse under your training?

Officer Farley: Yes. If I heard that, I would take them down to the nurse.

[Doc. No. 124-9 at 22–26].

"A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Brown*, 520 U.S. at 411. Here, the Estate has failed to demonstrate this. GCCJA has put on evidence that its officers were trained to handle suicide risks, respond to inmates with mental illness, identify behaviors that would suggest an inmate would hurt himself, and take inmates to medical staff as the jail's policies mandated. The Estate has proffered no evidence to the contrary; nor has it presented evidence as to what

14

this training, which it argues was inadequate, entailed. And, unlike other cases, there is no evidence that GCCJA was aware of any deficiencies with its training. *See Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1049–50 (10th Cir. 2022) ("To the extent that employees participated in training, they were administered tests on which they were encouraged to cheat using provided answer keys . . . . Miller, the only [jail] employee with any medical background, testified that she had no training on mental health issues and was not qualified to diagnose medical conditions . . . .[T]he Sheriff was aware of these serious deficiencies in training."). Thus, the Estate does not genuinely dispute that GCCJA trained its officers on how to handle these types of recurring situations, and no reasonable trier of fact could find that GCCJA's training of its officers was substantially certain to lead to a constitutional violation.[10]

Regarding whether GCCJA was deliberately indifferent because it did not specifically train its officers on how to use cell 126, the Tenth Circuit has adopted a three-part test "to determine whether a particular problem is likely to recur enough to alert county officials to an obvious deficiency in the training[:]"

---

[10] The Estate also cites to *Lance v. Morris* in support of its arguments. 985 F.3d 787, 801 (10th Cir. 2021). In *Lance*, the county adopted policies but did not train its officers on those policies. *See id.* ("The county adopted a policy stating that '[s]upervisors will determine the immediacy of medical complaints and take the appropriate action . . . . But [plaintiff] presented evidence that the county hadn't trained employees how to determine 'the immediacy of medical complaints,' particularly when medical personnel were away from the detention center."). Here, the Estate has presented no such evidence. The evidence presented by GCCJA, however, shows officers received training on their policies and procedures.

1. The county's policymakers know "to a moral certainty that [their] employees will confront a given situation."

2. "[T]he situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult."

3. "[T]he wrong choice . . . will frequently cause the deprivation of a citizen's constitutional rights."

*Lance*, 985 F.3d at 802 (alteration in original) (quotations omitted) (quoting *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)).[11]

Specific training on how to prevent suicide in cell 126 does not meet any of these parts. First, GCCJA did not know with moral certainty that its officers would confront this type of situation—i.e., a situation where a turnaround inmate with no documented mental health issues in his medical summary would commit suicide in cell 126. It of course knew its officers would need to supervise inmates in a variety of situations—

---

[11] The three-part *Lance* test's place in the inadequate training/deliberate indifference framework is not entirely clear. In *Valdez*, the Tenth Circuit affirmed a district court's decision to treat these three parts as the "element[s] of deliberate indifference." *Valdez v. Macdonald*, 66 F.4th 796, 830 (10th Cir. 2023). Conversely, in *Prince*, the Tenth Circuit analyzed whether a municipality's inadequate training was deliberately indifferent by referencing the *Barney* standard instead of the *Lance* test. 28 F.4th at 1050 (citing *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)); *see also George ex rel. Bradshaw v. Beaver Cnty. ex rel. Beaver Cnty. Bd. of Comm'rs.*, 32 F.4th 1246, 1258 n.3 (10th Cir. 2022). The Court determines that the *Lance* test is best understood as a way of answering the specific question of whether "a problem would recur often enough to require training," not the more general question of whether a municipality was deliberately indifferent. *Lance*, 985 F.3d at 801. So, the Court only analyzes the Estate's second argument regarding cell 126 under the *Lance* test because for its first argument the GCCJA does not dispute that officers should receive training regarding how to handle inmates with mental illnesses (i.e., suicide, substance abuse, etc.). But regardless of what test is used, the Court concludes that, based on the record before it, a rational trier of fact could not find that GCCJA's training of its officers was deliberately indifferent to the risk of an Eighth Amendment violation.

16

hence the one-hour check in requirement. And it knew its officers would encounter inmates with mental illnesses—hence its training on how to identify and respond to those behaviors. But it is not realistic to say that GCCJA's policymakers were certain the officers would encounter this given situation. Municipalities cannot be expected to train for every single factual scenario. Second, supervising an inmate in cell 126 did not present any difficult choices that training would have made less difficult. Officers were already trained on how to supervise inmates. They were trained to visually check on inmates once every hour and look for signs of suicidal ideations. So, it is not clear what additional "choices" officers would need to make when supervising cell 126 inmates or how different training would make such choices easier. Lastly, nothing in the record suggests a wrong choice would deprive an inmate of his constitutional rights.

The Estate argues that, because GCCJA did not address each *Lance* factor, the Court should deny its motion. However, the Estate forgets that GCCJA does argue that the Estate cannot show GCCJA was deliberately indifferent—albeit using different cases than those cited by the Estate. *See* [Doc. No. 124 at 29] ("To establish deliberate indifference to a need for training, Plaintiff must show that the Defendant knew of and disregarded the substantial risk of inadequate training of its employees . . . . Here, Plaintiff cannot demonstrate a specific deficiency in the training of GCCJA staff which was obvious and closely related to the alleged violations of the Decedent's constitutional rights."). And more importantly, here (and other places in its briefing), the Estate misunderstands its burden. "The moving party does not have to negate the nonmovant's claims in order to obtain summary judgment." *Barney*, 143 F.3d at 1307. "'[T]he movant

only bears the initial burden of showing—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (alteration in original) (quoting *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997)). "'If the movant carries this initial burden, the non-movant may not rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'" *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996) (quoting *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995)). Therefore, the Court rejects the Estate's argument that GCCJA's motion must be denied on this basis.

The Court concludes a rational trier of fact could not find that GCCJA acted with deliberate indifference, for purposes of municipal liability, based on the evidence presented. Viewing GCCJA's motion in the light most favorable to the Estate, the Court concludes there is no genuine dispute as to any material facts and GCCJA is entitled to judgment as a matter of law on the Eighth Amendment adequate medical care claim.

2.    <u>GCCJA was not deliberately indifferent to the risk of its officers using excessive force.</u>

The Estate argues Officer Henneman's tasing of Thao "was consistent with the GCCJA's policies or practices and is, therefore, attributable to the GCCJA for purposes of municipal liability." [Doc. No. 66 at 5]. GCCJA argues it is entitled to summary judgment because "Plaintiff cannot demonstrate that the Defendant was deliberately indifferent to a substantial risk that any agent, employee or officer of the GCCJA would

18

use excessive force against inmates or ignore a known substantial risk that they might attempt to commit suicide." [Doc. No. 124 at 28].

To begin, the Estate has not pointed the Court to evidence of "an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019). For instance, the Estate does not direct the Court to evidence in the record showing that GCCJA officers routinely use excessive force on inmates. And although its complaint could feasibly be read to allege ratification, the Estate does not raise any such arguments in its motion or response to the GCCJA's motion. The Court thus centers its analysis on whether GCCJA enacted or maintained "formal regulation[s] or policy statement[s]" with deliberate indifference to the risk of its officers unconstitutionally using excessive force. *Id.*

The Court includes excerpts of GCCJA's policy and procedures on the use of force below:

> The use of physical force by staff shall be restricted to instances of justifiable self-protection, protection of others, protection of property and prevention of an escape, and shall be only to the degree necessary. [Doc. No. 151-3 at 16].

> The GCCJA authorizes detention officers to use only the force which is reasonably necessary to achieve lawful objectives, defend themselves or others from physical harm, to prevent escapes, and then only as a last resort, and overcome resistance. In no event is physical force used as punishment. Detention officers should make decisions to use force in light of their C.L.E.E.T. training, in-service training, and this policy. [Doc. No. 151-5 at 1].

19

Presentation of Less Lethal Weapons: Detention officers may present issued and authorized less lethal weapons, such as the straight wood baton, ASP, the TASER, or O.C. Spray, when the detention officer feels that such presentation may diminish aggressive actions in the given situation. Also included in this category is the use of such devices as pepperball rounds and stingers . . . . In order to use the less lethal weapon the officer must be trained and certified prior to use. [*Id.* at 3].

A TASER will not be deployed on a handcuffed individual without articulable extenuating circumstances. [*Id.*].

Detention officers are authorized and empowered to use necessary force as allowed by this policy, their C.L.E.E.T. training, and in-service training and the Use of Force Outline, Attachment A. Detention officers will be held responsible for their own actions and the actions of all detention officers under their supervision in situations where force is used. [*Id.* at 4].

Less Lethal Weapons: 1. All deputies and detention officers will be trained in the use of less lethal weapons prior to issuance or use of such weapons. 2. Less lethal weapons may be used only as allowed by this policy. 3. Except in extreme emergencies, any weapon which is not authorized or for which training is not provided should not be employed in use of force situations. 4. When less lethal force is utilized, deputies and detention officers will ensure that individuals receive the appropriate level of medical attention, depending on the nature and extent of the injury or the alleged injuries received. [*Id.* at 4–5].

Detention officers are required by state law to report to their immediate supervisor if they witness another detention officer using force which exceeds the degree of force permitted by law or by the policies and guidelines of the GCCJA. [*Id.* at 9].

At the end of each calendar year, the Jail Administrator will conduct an analysis of all use of force incidents occurring during the preceding year to determine whether any policies need revision, any patterns of abuse or excessive force exist or supplemental training is required. [*Id.* at 10].

Every detention officer will be issued a copy of this policy and be instructed on its contents. Officers will also be instructed as to the contents of this policy and any revisions each time they qualify with firearms. [*Id.*].

20

The Estate does not present evidence that there is a pre-existing pattern of excessive force constitutional violations. And it is not plainly obvious or highly predictable that the above policies would lead to a violation of federal rights. On the contrary, the policies set limitations on the use of force, mandate use of force training, and establish a review period for use of force incidents. As previously stated, to succeed on a claim against a municipal entity, a plaintiff must present "facts showing (1) an official policy or custom, (2) causation, and (3) deliberate indifference." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1145 (10th Cir. 2023). Based on this evidence, no rational trier of fact could find that GCCJA was deliberately indifferent. Viewing the Estate's Motion in the light most favorable to GCCJA, and GCCJA's Motion in the light most favorable to the Estate, the Court concludes there is no genuine dispute as to any material facts and GCCJA is entitled to judgment as a matter of law on the Eighth Amendment excessive force claim.[12]

### B.    The Court denies the Estate's Motion to Supplement.

The Estate's Motion to Supplement is two pages. It points the Court to *Crowson v. Washington County*, 983 F.3d 1166, 1186 (10th Cir. 2020) and highlights its systemic failure arguments.

The Court denies the Estate's Motion to Supplement because it is satisfied that these arguments were sufficiently raised in the Estate's briefing. *See Lucas*, 58 F.4th at

---

[12] In its motion, the Estate argues that GCCJA has conceded Officer Henneman's actions were in accordance with its official policies. That may be true. However, that does not mean GCCJA's official polices are deliberately indifferent to the risk of constitutional violations.

1144 n.7 ("While Plaintiff does not refer to *Crowson* by name in the complaint or district court briefing, the mention of systemic deficiencies in the complaint, various examples, and her responses to the motions to dismiss raise a systemic injury argument.").

Additionally, considering how the Court has resolved the parties' motions, these arguments are not determinative. Systemic failure can serve as the underlying constitutional violation "where no individual action by a single officer rises to a constitutional violation" but the sum of several officers' "actions nonetheless violate the plaintiff's constitutional rights." *Crowson*, 983 F.3d at 1191; *see also Lucas*, 58 F.4th at 1144 ("[I]t was error for the district court to not consider a systemic failure as the underlying constitutional violation."). Some of the evidence that shows systemic failure can also go to the elements of municipal liability. But systemic failure does not automatically establish deliberate indifference, or any other element, in the context of municipal liability.

For these reasons, the Court denies the Estate's Motion to Supplement.

IV.    **CONCLUSION**

Consequently, the Court GRANTS GCCJA's motion [Doc. No. 124] and DENIES the Estate's motion [Doc. No. 66]. The Court also DENIES the Estate's Motion to Supplement [Doc. No. 172]. Although other pending motions exist, the Court does not reach those issues given its above analysis and conclusions. A judgment will separately follow.

IT IS SO ORDERED this 30th day of September 2024.

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| XOUCHI JONATHAN THAO,<br>Special Administrator for the Estate of<br>KONGCHI JUSTIN THAO,<br><br>Plaintiff,<br><br>v.<br><br>GRADY COUNTY CRIMINAL JUSTICE<br>AUTHORITY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. CIV-19-01175-JD |

## JUDGMENT

Under Federal Rule of Civil Procedure 58, as specified in the Court's Order issued this same date, the Court enters judgment on the Eighth Amendment claims of Plaintiff Xouchi Jonathan Thao, Special Administrator for the Estate of Kongchi Justin Thao, in favor of Defendant Grady County Criminal Justice Authority.

IT IS SO ORDERED this 30th day of September 2024.

_____
JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

(1)    XOUCHI JONATHAN THAO,
       SPECIAL ADMINISTRATOR FOR
       THE ESTATE OF KONGCHI JUSTIN THAO,

              PLAINTIFF,

v.                                                      CASE NO.: CIV-19-1175-JD

(2)    GRADY COUNTY CRIMINAL JUSTICE
       AUTHORITY, ET AL.

              DEFENDANTS.

## <u>NOTICE OF APPEAL</u>

Plaintiff Xouchi Jonathan Thao, Special Administrator for the Estate of Kongchi Justin Thao, files this Notice of Appeal to the United States Court of Appeals for the Tenth Circuit from the order and judgment of this Court granting defendant Grady County Criminal Justice Authority's Motion for Summary Judgment, entered on September 30, 2024. *See* Docket Entry Nos. 184 and 185.

Respectfully submitted,

s/Glenn Katon
Glenn Katon (pro hac vice)
Katon.Law
385 Grand Ave., Ste 200
Oakland, CA 94610
T: (510) 463-3350
F: (510) 463-3349
Email: gkaton@katon.law

and

Steven J. Terrill, OBA # 20869
J. Spencer Bryan, OBA # 19419
BRYAN & TERRILL LAW, PLLC
2500 S. Broadway, Suite 122
Edmond, OK 73013
T/F:    (918) 935-2777
Email: sjterrill@bryanterrill.com
Email: jsbryan@bryanterrill.com

2