Case No. 24-6226

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

XOUCHI JONATHAN THAO,
*Plaintiff/Appellant*

*vs.*

GRADY COUNTY CRIMINAL JUSTICE AUTHORITY, et al.*,*
*Defendant/Appellee*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
CIV-19-1175-JD
HONORABLE JODI W. DISHMAN, DISTRICT JUDGE

**DEFENDANT/APPELLEE'S PETITION FOR REHEARING *EN BANC***

Jamison C. Whitson, OBA No. 18490
Andy A. Artus, OBA No. 16169
W. R. Moon, Jr., OBA No. 32079
COLLINS ZORN & WAGNER, PLLC
429 N.E. 50th Street, Second Floor
Oklahoma City, OK  73105
Phone:       (405) 524-2070
Email:       jcw@czwlaw.com
ATTORNEYS FOR
APPELLEE/ DEFENDANT

December 8, 2025

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................... i-ii

TABLE OF AUTHORITIES ............................................................................. i-ii

DEFENDANT/APPELLEE'S PETITION FOR REHEARING *EN BANC* .............. 1

I.     INTRODUCTION ............................................................................... 1

II.    RULE 35(B)(1)(b) STATEMENT ...................................................... 1

III.   FACTUAL AND PROCEDURAL HISTORY OF THE CASE ...................... 3

       A. THE GCCJA'S Policies and Training ................................................ 6

IV.   ARGUMENT AND AUTHORITIES ................................................... 9

The Panel's Decision to Reverse the District Court's Grant of Summary Judgment to the Appellee on the Issue of Training Should be Reviewed *EN BANC* ............................................................. 9

V.    CONCLUSION ................................................................................. 13

CERTIFICATE OF COMPLIANCE ............................................................... 15

CERTIFICATE OF SERVICE ........................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

*Barrie v. Grand County, Utah*, 119 F.3d 862 (10th Cir. 1997) .............................. 11

*Berry v. City of Muskogee, Oklahoma*, 900 F.2d 1489 (10th Cir. 1990) .......... 11, 12

*City of Canton v. Harris*, 489 U.S. 378 (1989) ....................................................... 10

*City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) .............................................10

*Connick v. Thompson*, 563 U.S. 51 (2011)...............................................................10

*Cox v. Glanz*, 800 F.3d 1231, n.3 (10th Cir. 2015) ....................................................12
*Crowson v. Wash. Cnty. Utah*, 983 F.3d 1166 (10th Cir. 2020) ..............................10

*Estate of Hocker v. Walsh*, 22 F.3d 995 (10th Cir. 1994)................................. 11, 12

*Estelle v. Gamble*, 429 U.S. 97 (1976) .....................................................................11

*Lopez v. LeMaster*, 172 F.3d 756 (10th Cir. 1999)....................................................10

*Monell v. New York City Dept. of Social Services,* 436 U.S. 658 (1978).................10

*Oxendine v. R.G. Kaplan, M.D.*, 241 F.3d 1272 (10th Cir. 2001)............................11

*Whitley v. Albers,* 475 U.S. 312 (1986) ....................................................................11

**Statutes**
42 U.S.C. § 1983 ................................................................................ 10, 11, 12

# DEFENDANT/APPELLEE GRADY COUNTY CRIMINAL JUSTICE AUTHORITY'S PETITION FOR REHEARING *EN BANC*

## I. INTRODUCTION

Plaintiff/Appellant Xouchi Jonathan Thao ("Appellant") appealed from the District Court's Order of September 30, 2024, which granted the motion for summary judgment filed by Defendant/Appellee Grady County Criminal Justice Authority (Appellee). On November 26, 2025, the Tenth Circuit panel granted in part and reversed in part the District Court's grant of summary judgment to the Appellee. Appellee now seeks *en banc* review of the panel's determination to the extent that it determined that there was a material question of fact regarding whether jail staff in this case were adequately trained to identify suicide risks in housed inmates. Appellee believe that *en banc* consideration is necessary because this case presents a question of exceptional importance, and because remand of this case on this issue would be an exercise in futility.

## II. RULE 35(b)(1)(B) STATEMENT

The Tenth Circuit panel found that Appellant had presented sufficient evidence to raise a material question of fact as to whether the Appellee had adequately trained jail staff to identify suicide risks in housed inmates[1] and reversed

---

[1] Appellant may attempt to reframe the issue as a material question of fact whether Appellee had adequately trained jail staff on how to handle suicidal inmates. However, the panel made no such holding. To the contrary, the panel acknowledged the testimony of Warden Gerlach, Officer Duncan, and Officer Farley, that jail staff

the District Court's grant of summary judgment to the Appellee on that issue. The panel further remanded the case to determine, in the first instance, "whether any individual officer violated Mr. Thao's right to be free from cruel and unusual punishment under the Eighth Amendment by acting with deliberate indifference toward his serious medical needs during his time at the facility." (Opinion, p. 35). Likewise, the panel also expressed no opinion regarding whether the Appellant "has come forward with evidence to meet its burden to show that any lack of training caused a constitutional violation." (Opinion, p. 35, n.14). Thus, this case presents a unique question of exceptional importance, namely whether a plaintiff in a civil rights suit involving inmate suicide can ever prevail under a theory that jail staff were not adequately trained to identify suicide risks in housed inmates. Appellee contends that, applying the settled law of the Tenth Circuit, that a civil rights plaintiff can never prevail on an inmate suicide claim under such a theory of liability, and that the panel's remand of this case constitutes an exercise in futility. Consequently, *en banc* consideration of the panel's decision is necessary to resolve this important and unique issue.

---

were trained to call a nurse if they encountered a suicidal inmate. (Opinion, pp. 15, 16, and 19).

## III. FACTUAL AND PROCEDURAL HISTORY OF THE CASE

On March 22, 2017, Decedent Kongchi Justin Thao was indicted on charges of Count One: Conspiracy to Possess a Controlled Substance with Intent to Distribute and Count Two: Possession of a Controlled Substance with Intent to Distribute in the United States District Court for the Western District of Texas El Paso Division.[2] While on bond, Decedent violated the conditions of release by testing positive for cocaine and marijuana on several occasions, leading to his arrest in April of 2017.[3] On August 10, 2017, Decedent pled guilty to Count One pursuant to a plea agreement with the government.[4] On October 20, 2017, Decedent was sentenced to twelve (12) months and one (1) day in federal prison with credit for time served.[5]

On November 7, 2017, the U.S. Marshals Service began its preparation to transfer Decedent from the Otero County Prison Facility in New Mexico to the Los Angeles Metropolitan Detention Center in California. The USMS noted that Decedent had no medical problems or medications.[6] On November 13, 2017, the U.S. Department of Justice prepared its Prisoner Medical Summary noting that

---

[2] Appx. Vol. I, Doc. 23-1, pp. 211-212.
[3] Appx. Vol. I, Doc. 23-1, pp. 213-228.
[4] Appx. Vol. I, Doc. 23-1, pp. 213-231.
[5] Appx. Vol. I, Doc. 23-1, pp. 232-233.
[6] Appx. Vol. I, Doc. 23-1, pp. 234.

Decedent was cleared for transit and no medical issues were noted, including no indication of suicidal ideation.[7]

Decedent arrived to the Grady County Law Enforcement Center ("GCLEC") at 6:05 pm on November 15, 2017.[8] Decedent and the other federal "turn-around" inmates were placed in the fourth floor holding pod. "Turn-around" inmates are federal inmates that are being transported elsewhere by the USMS and will only be staying in the GCLEC for a few hours overnight.[9]

At 2:38 am on November 16, 2017, Detention Officer Harrison and Nurse Grey approached the fourth floor pod to complete medication pass.[10] Decedent rushed at the door toward the nurse and the officer.[11] Harrison took Decedent to the ground and placed his hands in handcuffs behind his back.[12] After Decedent was under control, the officers walked him to Cell 126, a holding cell on the first floor near the sallyport. He was placed in the cell at approximately 2:41 am.[13] At the time relevant to this case, Cell 126 was used primarily as a shower cell. However, the cell

---

[7] Supp. Appx. Vol. I, pp. 23-24.
[8] Appx. Vol. I, Doc. 23-1, pp. 235-237.
[9] Appx. Vol. I, Doc. 23-1, pp. 235-237; p. 241; p. 244; p. 248.
[10] Appx. Vol. I, Doc. 23-1, pp. 235-237; pp. 275-276.
[11] Appx. Vol. I, Doc. 23-1, pp. 235-237; pp. 275-276; p. 290 (video at 2:38:10-2:38:20).
[12] Appx. Vol. I, Doc. 23-1, pp. 235-237; pp. 275-276; p. 290 (video at 2:38:30-2:39:40).
[13] Appx. Vol. I, Doc. 23-1, pp. 235-236; pp. 273-274; Appx. Vol. II, Doc. 23-2, pp. 15-16; p. 69.

was sometimes used as a backup cell for "turn-around" inmates that got out of control or needed to be by themselves and wait for a flight. It worked well for that, because it was near the sallyport, which led to the bus area. The cell was equipped with an intercom.[14]

At approximately 2:53 am, Decedent asked for and received a GCCJA issued bath towel from Harrison due the cell floor being wet.[15] At approximately 3:07 am, Detention Officer Rebecca Brown visually checked on the Decedent through the cell door window. The Decedent did not appear to be in any emotional or medical distress at that time.[16] At approximately 3:21 am, Detention Officer Henneman walked past Cell 126 and heard the Decedent having a loud conversation with a female inmate awaiting transport in Cell 127. Henneman passed that way again about thirty minutes later and, once again, heard a loud conversation between the Decedent and the female inmate in Cell 127.[17]

Henneman was later asked by Transport Officer Jimmy Duncan to remove the Decedent from Cell 126 and prepare him for transport. At approximately 4:21 am, Henneman found Decedent's body hanging by his neck in his cell with the towel tied around the door handle. Henneman immediately called for help, and pulled

---

[14] Appx. Vol. I, Doc. 23-1, pp. 239-241; Appx. Vol. II, Doc. 23-2, p. 65; pp. 75-76.
[15] Appx. Vol. I, Doc. 23-1, pp. 235-236.
[16] Appx. Vol. I, Doc. 23-1, pp. 235-236; Appx. Vol. II, Doc. 23-2, p. 163.
[17] Appx. Vol. I, Doc. 23-1, pp. 235-236.

5

Decedent down from the noose with the assistance of officers Farley and Duncan. Farley then alerted 911, after which he, Henneman, Duncan, and Nurse Grey administered CPR until EMS arrived.[18]

The Decedent never made any comment or statement to or in the presence of Henneman that he was suicidal or intended to harm himself. Henneman never thought or was concerned that Decedent was going to harm himself. If Henneman had thought Decedent was at risk for committing suicide, he would have advised medical.[19] Officers Duncan and Farley never heard or saw anything which would indicate to them that the Decedent might be suicidal. If the Decedent had given them any indication that he might be suicidal, they would have advised medical staff consistent with their training.[20]

### A. The GCCJA's Policies and Training

The GCCJA's Policy required physical sight checks of any inmates detained in Cell 126 every hour. The Policy requires detention officers to be vigilant in conducting such checks and to immediately report any suspicious circumstances. The GCCJA's Policy requires inmates that have been placed on suicide watch to be checked on every 15 minutes. However, inmates who have been placed on suicide

---

[18] Appx. Vol. I, Doc. 23-1, pp. 235-236; Appx. Vol. II, Doc. 23-2, p. 17; p. 164.
[19] Appx. Vol. II, Doc. 23-2, pp. 28-29.
[20] Appx. Vol. I, Doc. 23-1, p. 286; pp. 288-289; Appx. Vol. II, Doc. 23-2, p. 50; p. 70.

watch are not placed in Cell 126.[21] On November 13, 2017, immediately prior to departing for the GCCJA, Decedent received a medical screening documented on Form 553 from the United States Marshals Service confirming that he was fit for transportation and had not been on suicide watch/psychiatric decompensation within the past month.[22] The GCCJA medical screening policy for federal "turn-around" inmates is for medical staff to review the inmates' medical screening information provided on USMS Form 553 to determine whether an incoming "turn-around" inmate has medication or other medical needs, including suicide risk. That policy was complied with in regard to the Decedent.[23] The GCCJA Policy provides that inmates with a history of suicide attempts or threats will be placed in a two-person cell (safety and security permitting) with increased supervision regardless of their security score, pending further review and evaluation by mental health staff.[24] At the time relevant to this suit, new hires at the GCLEC would go through a 2-week on-the-job field training period, including training on the Oklahoma Jail Standards, and the GCCJA's policies and procedures.[25] Officer Duncan received a 5-day, 40-hour training over the GCCJA's policies and procedures before starting work as a

---

[21] Appx. Vol. I, Doc. 23-1, p. 238; pp. 242-243; pp. 258-259; p. 261; pp. 283-284; Appx. Vol. II, Doc. 23-2, p. 52; pp. 54-55; pp. 63-64; Supp. Appx. Vol. I, pp. 25-47.
[22] Supp. Appx. Vol. I, p. 24.
[23] Appx. Vol. I, Doc. 23-1, pp. 245-251; pp. 256-257; Supp. Appx. Vol. I, pp. 23-24.
[24] Appx. Vol. I, Doc. 23-1, p. 260; Supp. Appx. Vol. I, pp. 48-52.
[25] Appx. Vol. I, Doc. 23-1, pp. 278-282.

7

detention officer. Duncan also received periodic additional training on the policies and procedures, periodic training on the Oklahoma jail standards, training regarding identification of signs of mental health episodes, and training regarding how to deal with suicidal inmates. On September 6, 2015, Duncan was trained and certified in Defensive Tactics Custody/Control. On April 29, 2016, Duncan was trained and certified in Escorting Inmates.[26]

On March 6, 7, and 10, 2017, Officer Kyle Ellis received on-the-job training, including training on GCCJA's policies and procedures, training in controlling and correcting inmate behavior, training on patrolling a housing unit and identifying problems, and situational control. On September 28, 2017, Ellis was trained and certified in Ethical Behavior for Corrections Officers.[27]

When he first came to work at the GCLEC, Officer Farley went through a 3-day orientation period, including training on the Oklahoma Jail Standards and the GCCJA policies and procedures. On September 6, 2015, Officer Farley completed and was certified on a 40-hour Defensive Tactics Custody/Control course. In September 2016, Officer Farley received more training on GCCJA policy and procedure. Farley was trained that, if an inmate says they want to commit suicide or

---

[26] Appx. Vol. II, Doc. 23-2, pp. 47-49; pp. 50-51; p. 53; pp. 56-62; p. 169-189.
[27] Appx. Vol. II, Doc. 23-2, pp. 190-196.

otherwise gives an indication of being suicidal, he was to bring them to the nurse to evaluate whether they should be placed on suicide watch.[28]

On October 11, 12, 16, 17, and 21, 2017, Officer Christopher Harrison received on-the-job training, including training on GCCJA's policies and procedures, training in controlling and correcting inmate behavior, training on patrolling a housing unit and identifying problems, and situational control.[29]

On April 17, 18, 21, and 22, 2017, Officer Henneman received on-the-job training, including training on GCCJA's policies and procedures, training in controlling and correcting inmate behavior, training on patrolling a housing unit and identifying problems, and situational control. On September 7, 2017, Henneman was certified on the use of X26 and X26P tasers after a 10-12 hour training.[30]

GCCJA detention officers also received yearly training and testing on the Oklahoma Jail Standards, including training on supervision of prisoners, rights and responsibilities of inmates, emergency procedures, First Aid and CPR, and identifying inmates at risk of suicide and preventing suicide.[31]

## IV. ARGUMENT AND AUTHORITIES

### The Panel's Decision to Reverse the District

---

[28] Appx. Vol. I, Doc. 23-1, p. 277-287; pp. 285-287; Appx. Vol. II, Doc. 23-2, pp. 197-198.
[29] Appx. Vol. II, Doc. 23-2, pp. 199-208.
[30] Appx. Vol. II, Doc. 23-2, pp. 20-21; pp. 209-220.
[31] Appx. Vol. I, Doc. 23-1, pp. 262-263; p. 277; Appx. Vol. II, Doc. 23-2, pp. 221-235.

### **Court's Grant of Summary Judgment to the Appellee on the Issue of Training Should be Reviewed *En Banc***

There are limited circumstances where inadequacy in training can be a basis for liability under 42 U.S.C. § 1983. *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978)*." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985). Inadequacy in training may serve as the basis for municipal liability under § 1983 "only where the failure to train amounts to deliberate indifference..." to individuals' constitutional rights. *City of Canton*, 489 U.S. at 388. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality...can a city be liable for such a failure under § 1983." *Id.* at 389. It isn't enough to show that there were general deficiencies in a "training program for jailers." *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999). Rather, a plaintiff must "identify a specific deficiency" that was obvious and "closely related" to his injury. *Id*. Moreover, in the Tenth Circuit, § 1983 claims premised upon alleged inadequate training require an underlying constitutional violation by a specific individual. *Crowson v. Wash. Cnty. Utah*, 983 F.3d 1166, 1187 (10th Cir. 2020).

Section 1983 inmate suicide claims are "treated as claims based on the failure of jail officials to provide medical care for those in their custody." *Barrie v. Grand County, Utah*, 119 F.3d 862, 866 (10th Cir. 1997). In *Estelle v. Gamble*, 429 U.S. 97 (1976), the U.S. Supreme Court held that deliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment, and such a constitutional violation is actionable under § 1983. *Estelle* at 104. That ruling thereby established the "deliberate indifference" test against which all § 1983 inmate suicide claims are judged. *Estate of Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir. 1994).

Mere negligence – even gross negligence – is insufficient to support a claim of deliberate indifference under § 1983. *Berry v. City of Muskogee, Oklahoma*, 900 F.2d 1489, 1495 (10th Cir. 1990). "It is obduracy and wantonness, not inadvertence or error in good faith," that violate the Constitution with regard to the "supplying of medical needs..." *Whitley v. Albers,* 475 U.S. 312, 319 (1986). A § 1983 claim alleging inadequate or delayed medical care involves "both an objective and subjective component, such that [the Court] must determine both whether the deprivation is sufficiently serious and whether the government official acted with a sufficiently culpable state of mind." *Oxendine v. R.G. Kaplan, M.D.*, 241 F.3d 1272, 1276 (10th Cir. 2001).

Death by suicide satisfies the objective component of the deliberate indifference test. *Cox v. Glanz*, 800 F.3d 1231, 1240 n.3 (10th Cir. 2015). As to the subjective component, a plaintiff must demonstrate that an officer had actual knowledge that specific inmate was suicidal or that the risk was so substantial or pervasive that such actual knowledge can be inferred, and that they failed to take reasonable measures to that risk. *Berry*, 900 F.2d at 1498; *see also Estate of Hocker*, 22 F.3d at 1000.

In other words, to prevail on his § 1983 deliberate indifference claim, Appellant must show that some individual officer was subjectively aware that there was a substantial risk that the Decedent might attempt to commit suicide, and that they failed to any reasonable steps to abate that risk. However, Appellant could never show that that any such violation was caused by the Appellee failing to adequately train jail staff to identify suicide risks in housed inmates. For there to be an underlying violation at all, the officer would have had to recognize that there was a substantial risk that the Decedent might attempt to commit suicide. Thus, any failure to adequately train jail staff in that regard could not possibly have any causal connection to the underlying violation because recognition of the risk is a requirement for deliberate indifference. Moreover, if there was no underlying violation of the Decedent's constitutional by an individual officer, there could be no liability on the part of the Appellee based on such a theory.

Consequently, even if the panel was correct in determining that there was a material question of fact regarding whether the Appellee had adequately trained jail staff to identify suicide risks in housed inmates, its decision to remand the case back to the District Court to determine whether there was an underlying violation of the Decedent's constitutional rights in the first instance amounts to an exercise in futility because – as a matter of pure logic – Appellant will never be able to establish the required casual connection between the violation and the alleged failure to train. Accordingly, this Petition should be granted and the Court should review the panel's decision *en banc* to resolve this unique question of exceptional importance.

## **CONCLUSION**

For all of the reasons discussed above, Defendant/Appellee Grady County Criminal Justice Authority respectfully request that this Court review the panel's decision *en banc* to resolve this unique question of exceptional importance.

Respectfully submitted,

s/ Jamison C. Whitson
Jamison C. Whitson, OBA No. 18490
Andy A. Artus, OBA No. 16169
W. R. Moon, Jr., OBA No. 32079
COLLINS ZORN & WAGNER, PLLC
429 N.E. 50th Street, Second Floor
Oklahoma City, OK   73105
(405) 524-2070/Fax:   (405) 524-2078
Email:   aaa@czwlaw.com
         wrm@czwlaw.com
         jcw@czwlaw.com

***ATTORNEYS FOR DEFENDANT-APPELLEE GRADY COUNTY CRIMINAL JUSTICE AUTHORITY***

# CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(a)(7)(C), I certify that this brief complies with Fed. R. App. P. 32(a)(7)(B), in that it is proportionally spaced and contains 2,603 words. I relied upon my word processor, WordPerfect X6, to obtain the count.

I certify that the information on this form is true and correct to the best of my knowledge and belief formed after a reasonable inquiry.

s/ Jamison C. Whitson
Jamison C. Whitson

# CERTIFICATE OF DIGITAL SUBMISSION

I further certify that all required privacy redactions have been made and, with the exception of those redactions, every document submitted in Digital Form or scanned PDF format is an exact copy of the written document filed with the Clerk, and

I certify that all required privacy redactions have been made and, with the exception of those redactions, the digital submission is an exact copy of the written document filed with the Clerk, and the digital submissions have been scanned for viruses with TREND Micro, and according to the program, is free of viruses.

I further certify that all paper copies submitted to the Court are exact copies of the version submitted electronically.

s/ Jamison C. Whitson<br>
Jamison C. Whitson

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d)(2), I hereby certify that on December 8, 2025, the foregoing brief was filed electronically the CM/ECF system with the Court and that the requisite number of true and correct copies of the foregoing brief is being forwarded by first class mail to the Court within two days of the date of electronic transmission:

    Clerk of the Court
    United States Court of Appeals for the Tenth Circuit
    Byron White U.S. Courthouse
    1823 Stout Street
    Denver, CO 80257

Further, pursuant to Fed. R. App. P. 25(d)(1), I hereby certify that on

December 8, 2025, the following parties or counsel in this matter were served by electronic means as more fully reflected on the Notice of Electronic Filing:

    J. Spencer Bryan
    Steven J. Terrill
    BRYAN & TERRILL, PLLC
    2500 S. Broadway, Suite 122
    Edmond, OK 73013
    sjterrill@bryanterrill.com
    jsbryan@bryanterrill.com

    Glenn Katon
    Katon Law
    385 Grand Ave., Ste. 200
    Oakland, CA 94610
    gkaton@katon.law

    Jennifer J. Clark
    Ogemdi Maduike
    Sidley Austin LLP
    1501 K Street, NW
    Washington, DC 20005
    jennifer.clark@sidley.com
    oge.maduike@sidley.com

    ***Attorneys for Plaintiff/Appellant***

                                                    s/ Jamison C. Whitson
                                                    Jamison C. Whitson